**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JASON MICHAEL GONZALEZ et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 14 CV 4366 |
| | ) | |
| v. | ) | Honorable Jorge L. Alonso |
| | ) | |
| BRAD JOSEPHSON and STUART | ) | |
| TAYLOR, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM**

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ................................................................................................. iii

FACTS ................................................................................................................................... 1

LEGAL STANDARD............................................................................................................ 1

ARGUMENT ......................................................................................................................... 2

1.     The conditions of confinement do not violate the Fourteenth or Eighth Amendments...... 3

     Commissary prices and telephone rates ........................................................................ 5

     Excessive lockdowns ..................................................................................................... 6

     Inmate handbook and grievance procedure .................................................................. 8

     Loss of personal property............................................................................................... 9

     Higher educational and vocational programs ............................................................... 10

     Denial of electric appliances and other supplies............................................................ 11

     Privacy in double occupancy cells................................................................................. 12

     Absence of ladders in cells ............................................................................................ 14

     24 hour cell illumination................................................................................................ 15

     Mattresses ...................................................................................................................... 18

     Food ............................................................................................................................... 19

     Untimely delivery of mail.............................................................................................. 21

     Heating........................................................................................................................... 23

Lack of outdoor access.................................................................................................. 26

Rule prohibiting detainees from having legal paperwork with another inmate's name ... 27

No access to internet or email ...................................................................................... 29

Regulations concerning on attorney and clergy visits .................................................... 29

Restrictions on stationery supplies................................................................................ 32

Restrictions on food items in cells ................................................................................ 32

Classification procedures .............................................................................................. 33

2.       The Jail policies plaintiffs challenge do not violate the First Amendment...................... 34

Limits on number of items in the cell ............................................................................ 35

Packing slip rule............................................................................................................ 37

Personal copy of newspaper, media clippings ................................................................ 38

Prohibited content ........................................................................................................ 40

Hard cover ban.............................................................................................................. 42

Ban on electronic appliances ........................................................................................ 43

3.       Plaintiffs' equal protection claims are without merit...................................................... 44

4.       Gonzalez's claims for injunctive and declaratory relief should be dismissed as moot. ... 45

5.       Gonzalez cannot prove any compensable damages ........................................................ 46

CONCLUSION.................................................................................................................... 48

CERTIFICATE OF SERVICE..............................................................................................50

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................................... 1, 13

*Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996) ............................................ 4, 7, 8, 10, 26, 34

*Arsberry v. Illinois*, 244 F.3d 558 (7th Cir. 2001) ................................................................ 5

*Barbosa v. McCann*, 2009 WL 2913488, at *4 (N.D. Ill. Sept. 8, 2009) .................................... 14

*Beard v. Banks*, 548 U.S. 521 (2006) ................................................................................ 2

*Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979) ............................................... 3, 4, 5, 7, 13, 14, 36, 37

*Bennett v. Sheahan*, No. 99-2270, 1999 WL 967534, *4 (N.D. Ill. Oct. 5, 1999) ......................... 5

*Block v. Rutherford*, 468 U.S. 576 (1984) ........................................................................... 30

*Brown v. Gulash*, No. 07-370, 2009 WL 2144592, *5 (S.D. Ill. July 16, 2009) ........................... 5

*Campbell v. Clarke*, 481 F.3d 967 (7th Cir. 2007) ................................................................ 32

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................................... 1

*Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004 .................................................... 24

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ............................................... 44

*Connolly v. County of Suffolk*, 533 F.Supp.2d 236 (D.Mass.2008) ........................................... 14

*Cox v. Quinn*, No. 09-1050, 2010 WL 2679987, *2 (S.D. Ill. July 2, 2010) ................................ 5

*Crowder v. True*, 74 F.3d 812 (7th Cir. 1995) ..................................................................... 34

*Dixon v. Godinez*, 114 F.3d 640 (7th Cir. 1997) .............................................................. 18, 23

*Duran v. Elrod*, 760 F.2d 756 (7th Cir. 1985 ................................................................. 13, 14

*Farmer v. Brennan*, 511 U.S. 825 (1994) ...................................................................... 3, 4, 18

*Flynn v. Thatcher*, 819 F.3d 990 (7th Cir. 2016) .................................................................. 45

*French v. Owens*, 777 F.2d 1250 (7th Cir. 1985) .................................................................. 19

*Gardner v. Beale*, 780 F. Supp. 1073 (E.D.Va.1991) ............................................................. 21

*Garza v. Miller*, 688 F.2d 480 (7th Cir. 1982) ............................................................... 11, 33

*Granville v. Dart*, No. 09 C 2070, 2011 U.S. Dist.
LEXIS 25683, * (N.D. Ill. Mar. 11, 2011) ...................................................................... 48

*Gray v. Cannon*, 2013 U.S. Dist. LEXIS 98699, *9-36, 11 C 4870, 11 C 8503, 11 C 8505 (N.D.
Ill. Jul. 16, 2013) ................................................................................................... 42

*Greco v. Guss*, 775 F.2d 161, 169 (7th Cir. 1985) ............................................................... 10

*Green v. Ferrell*, 801 F.2d 765 (5th Cir.1986) ..................................................................... 20

*Guzman v. Sheahan*, 495 F.3d 852 (7th Cir. 2007) ............................................................ 2, 3

*Harris v. Fleming*, 839 F.2d 1232 (7th Cir. 1988) ............................................................ 8, 26

*Hernandez v. Florida Dep't of Corrections*, 281 Fed. Appx. 862 (11th Cir. 2008) .................... 21

*Hewitt v. Helms*, 459 U.S. 460 (1983) ............................................................................... 33

*Higgason v. Farley*, 83 F.3d 807 (7th Cir.1996) ........................................................... 7, 8, 45

*Holloway v. Magness*, 666 F.3d 1076 (8th Cir. 2012) ............................................................ 5

*Hudson v. Palmer*, 468 U.S. 517 (1984) ..................................................................... 9, 13, 18

*Jackson v. Frank*, 509 F.3d 389 (7th Cir. 2007) ................................................................. 40

*Johnson v. California*, 207 F.3d 650, 656 (9th Cir. 2000) .................................................. 5, 44

*Johnson v. Phelan*, 69 F.3d 144 (7th Cir. 1995) ............................................................... 4, 13

*Jones v. La. Dept of Pub. Safety & Corr.*, No. 08-CV-1507,
2009 WL 1310940, at *2 (W.D. La. May 11, 2009) ................................................... 15, 28, 38

*Kaufman v. McCaughtry*, 419 F.3d 678 (7th Cir. 2005) ......................................................... 42

*Kentucky v. Graham*, 473 U.S. 159 (1985) .................................................................. 2, 30

*Kimberlin v. U.S. Dept. of Justice*, 318 F.3d 228 (D.C. Cir. 2003) ............................... 44

*King v. Frank*, 371 F.Supp.2d 977 (W.D. Wisc. 2005) ................................................. 17

*Lewis v. Casey* that such evidence is necessary. 518 U.S. 343 (1996) ........................ 31

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ................................................. 9

*Mable v. Beard*, No. 3:10-1214, 2013 WL 2435295, * 5 (M.D. Penn. June 4, 2013) .................. 17

*Massey v. Helman*, 259 F.3d 641 (7th Cir. 2001) ..................................................... 8, 30

*May v. Libby*, 256 Fed. Appx. 825 (7th Cir. 2007) ...................................................... 28

*Mays v. Springborn*, 575 F.3d 643 (7th Cir. 2009) ..................................................... 24

*McBride v. Frank*, 2009 WL 2591618, at *5 (E.D. Wis. Aug.21, 2009) .......................... 17

*McDaniel v. Walsh*, No. 09-2170, 2011 WL 489787, at *5 (C.D. Ill. Feb. 7, 2011) ................... 14

*Meachum v. Fano*, 427 U.S. 215 (1976) ................................................................ 33, 34

*Mejia v. McCann*, No. 08 C 4534, 2010 WL 5149273, *7 (N.D. Ill. Dec. 10, 2010) ................ 48

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ...................................................... 2

*Munson v. Gaetz*, 673 F.3d 630 (7th Cir. 2012) ........................................................ 42

*Murdock v. Washington*, 193 F.3d 510 (7th Cir. 1999) .............................................. 9, 10

*Naki v. State*, No. CV-13-02189-PHX-JAT, 2015 WL 4647915,
    at *6 (D. Ariz. Aug. 5, 2015) ......................................................................... 15

*O'Donnell v. Thomas*, 826 F.2d 788 (8th Cir. 1987) ................................................... 15

*Overton v. Bazzetta*, 539 U.S. 126 (2003) ............................................................. 4, 35

*Pawelski v. Cooke*, 1991 WL 403181, at *4 (W.D. Wis. July 18, 1991) ......................... 17

*Pippin v. Adams Cty. Jail*, 851 F. Supp. 1228, (C.D. Ill. 1994) .................................... 43

*Rhodes v. Chapman*, 452 U.S. 337 (1982) ........................................................ 11, 13, 14

*Robinett v. Corr. Training Facility*, No. C 09-3845 SI (PR),
    2010 WL 2867696, at *2-4 (N.D. Cal. July 20, 2010) ...................................... 14

*Rowe v. Shake*, 196 F.3d 778 (7th Cir. 1999) .......................................................... 22

*Salem v. Kaupas*, No. 12-3141, 2014 WL 2699737, *2-3 (N.D. Ill. June 13, 2014) ............... 8, 17

*Shaw v. Murphy*, 532 U.S. 223 (2001) .................................................................... 28

*Sims v. Piaza*, 462 Fed. App'x 228 (3d Cir. 2012) ..................................................... 15

*Singer v. Raemisch*, 593 F.3d 529 (7th Cir. 2010) ................................................... 2, 35

*Smith v. Dart*, 803 F.3d 304 (7th Cir. 2015) ...................................................... 3, 4, 26

*Snipes v. DiTella*, 95 F.3d 586 (7th Cir. 1996) ......................................................... 18

*Soldal v. County of Cook*, 942 F.2d 1073 (7th Cir. 1991) .............................................. 9

*Stewart v. Beard*, 417 Fed. Appx. 117, 120 n.1 (3d Cir. 2011) ................................... 17

*Sturm v. Clark*, 835 F.2d 1009, 1013 (3d Cir. 1987) ................................................. 30

*Sutton v. Rasheed*, 323 F.3d 236 (3d Cir. 2003) ....................................................... 46

*Taylor v. Parratt*, 451 U.S. 527 (1981) .................................................................. 11

*Tenny v. Blagojevich*, 659 F.3d 578 (7th Cir. 2011) ..................................................... 5

*Thornburgh v. Abbott*, 490 U.S. 401 (1989) ........................................................ 30, 41

*Turner v. Safley*, 482 U.S. 78 (1987) .............................................................. 28, 34, 35

*Van Den Bosch v. Raemisch*, 658 F.3d 778 (7th Cir. 2011) ....................................... 36, 42

*Vasquez v. Frank*, 290 Fed. App'x 927 (7th Cir. 2008) ............................................. 15, 16

*Vill. Of Willowbrook v. Olech*, 528 U.S. 562 (2000) ................................................. 45

*Walker v. Dart*, 2010 WL 669448, No. 09 C 1752, *3 (N.D. Ill. Feb. 19, 2010) ................ 13, 48

*Weir v. Nix*, 890 F. Supp. 769, (S.D. Ill. 1995) ........................................................ 36

*Will v. Terhune*, 404 F. Supp.2d 1226, 1230-31 (E.D. Cal. 2005) .............................. 17

*Williams v. Lomen*, 2003 U.S. Dist. LEXIS 25054, 02-C-0070-C
  (W.D. Wis. Jan. 27, 2003) ................................................................... 37
*Wilson v. Seiter*, 501 U.S. 294 (1991) ............................................ 4, 11, 19, 23, 25, 26
*Young v. Beard*, No. 10-284, 2012 WL 1865596, at *5 )(W.D. Pa. May 22, 2012 ............... 17, 46
*Zimmerman v. Tribble*, 226 F.3d 568 (7th Cir. 2000) ....................................... 9, 11, 22

**Statutes**

42 U.S.C. § 1983 .................................................................................. 1
Fed. R. Civ. P. 56 ................................................................................. 1

**Rules**

Local Rule 56.1(a)(3) ............................................................................. 1

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM**

Plaintiffs Jason Gonzalez and Charles Bocock brought this action under 42 U.S.C. § 1983 against Brad Josephson, warden, and Stuart Taylor, deputy chief of operations, of Will County Jail in their official capacities. Bocock, a pre-trial detainee at the Jail, and Gonzalez, a former detainee, claim that several Jail policies and conditions of confinement amount to unconstitutional punishment. They seek damages, as well as injunctive and declaratory relief.

Defendants move for summary judgment under Rule 56 on all of plaintiffs' claims. The material facts about the Jail's policies and conditions of confinement are undisputed. And, as explained in the memorandum of law below, no reasonable jury could find that these policies and conditions amounted to punishment, because they are reasonably related to the Jail's legitimate objectives in maintain security, order and the safety of staff and detainees, and conserving resources. Thus, defendants are entitled to judgment as a matter of law. Moreover, Gonzalez's transfer to prison has rendered his claims for injunctive and decretory relief moot, and he has insufficient evidence to prove any damages, so his claims should be dismissed.

## FACTS

See Defendants' Statement of Undisputed Material Facts ("Def. Facts"), filed separately, under Local Rule 56.1(a)(3).

## LEGAL STANDARD

Summary judgment is proper if the moving party shows that there is no genuine dispute of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). To defeat a motion for summary judgment, the non-moving party must come forward with "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). Although the

court draws reasonable inferences from the facts in favor of the non-moving party, the court must "distinguish between inferences relating to disputed facts and those relating to disputed matters of professional judgment." *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) (citing *Beard v. Banks*, 548 U.S. 521, 530 (2006)). In making inferences related to matters of professional judgment, even if they are disputed, the court must give "deference to the views of jail authorities." *See id*. at 534-535 (citing *Beard*, 548 U.S. at 530).

## ARGUMENT

In this case, plaintiffs are suing Will County Jail warden Josephson and deputy chief Taylor only in their official capacities (Def. Facts ¶¶ 3-4). Claims brought against government officials in their official capacities are actually claims against the governmental entity itself. *See Kentucky v. Graham*, 473 U.S. 159 (1985); *Guzman v. Sheahan*, 495 F.3d 852, 859-860 (7th Cir. 2007). A governmental entity is liable for damages under Section 1983 only if plaintiffs can show that the alleged constitutional violation was caused by an official policy, custom, or practice. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 692 (1978). There are three ways in which this can be shown: (1) an express policy that, when enforced, causes a constitutional violation, (2) a widespread practice that, although not authorized by written law or official municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a constitutional injury was caused by a person with final policymaking authority. *Guzman*, 495 F.3d at 859.

Municipal policies can only be formulated by the official charged under state law with the authority and responsibility for acting as the final policymaker in the area of governance in question. *Guzman*, 495 F.3d at 859. Under Illinois law, the Will County Sheriff has ultimately responsibility for the operations of the Will County Jail. 730 ILCS 125/2. Accordingly, he is the

policymaker with respect policies governing detainees and jail operations. *Guzman*, 495 F.3d at 859 ("Illinois sheriffs have final policymaking authority over jail operations."). Thus, the claims against warden Josephson and deputy chief Taylor are equivalent to claims against the Will County Sheriff.

In this case, plaintiffs contend that express policies enforced at the Jail, and in some cases, widespread practices, caused their constitutional violations. Plaintiffs have not alleged that the Will County Sheriff himself caused their constitutional injuries.

An official capacity claim against jail officials also requires the plaintiffs to show that the policy, practice, or challenged action "was taken with deliberate indifference as to its known or obvious consequences." *Guzman*, 495 F.3d at 859. To show deliberate indifference, the policymaking official must have known of a substantial risk of serious injury and consciously must have disregarded that risk. *Id*. In other words, "a prison official cannot be found liable … unless the official knows of and disregards an excessive risk to inmate health or safety." *Id*.

**1.     The conditions of confinement do not violate the Fourteenth or Eighth Amendments.**

As pre-trial detainees, plaintiffs' conditions of confinement claims arise under the due process clause of the Fourteenth Amendment, rather than the Eighth Amendment, which applies to convicted prisoners. *See Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979). The Fourteenth Amendment prohibits conditions of confinement amounting to punishment of a pre-trial detainee, *id*. at 535, while the Eighth Amendment prohibits cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). But "there is little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions of confinement claims," so the standards merge and courts apply them without differentiation. *Smith v. Dart*, 803 F.3d 304, 309-10 (7th Cir. 2015).

Under both the Fourteenth and Eighth Amendment, the condition of confinement must be objectively so serious as to amount to a constitutional deprivation, and the defendant prison officials must subjectively act with a "sufficiently culpable state of mind." *Smith*, 803 F.3d at 309-10. A condition of confinement amounts to a constitutional deprivation when it results in the denial of a basic human need, such as "adequate food, clothing, shelter, and medical care." *Id*. (quoting *Farmer*, 511 U.S. at 832). The standard used to determine the culpability of the jail official is deliberate indifference, akin to criminal recklessness. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991); *Johnson v. Phelan*, 69 F.3d 144, 149-151 (7th Cir. 1995); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996).

Under both the Fourteenth and Eighth Amendments, a jail may impose non-arbitrary conditions or restrictions on pretrial detainees as long as they "do not amount to punishment, or otherwise violate the Constitution." *Bell*, 441 U.S. at 536-37. Not every policy or condition imposed during pretrial detention amounts to 'punishment' in the constitutional sense. *Id*. at 537. The court must determine whether a particular action was taken "for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id*. at 538. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental purpose, it does not, without more, amount to 'punishment.'" *Id*. at 540.

In evaluating whether a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental purpose, the court must give substantial deference to jail administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547; *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Because such matters are "peculiarly within the province and professional expertise of corrections officials, in

4

the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment." *Bell*, 441 U.S. at 540-41, n. 23 (internal citations and quotes omitted).

Applying these standards, as explained below, the Jail's policies and conditions of confinement are constitutional.

**Commissary prices and telephone rates**

Plaintiffs complain that their access to commissary items and telephone calls is restricted by the high prices and rates the Jail charges for them compared to prices and rates that the public or even inmates in Illinois prisons pay. Amended Complaint (Doc. 40) ¶ 71; Def. Facts ¶ 11. But neither commissary prices nor telephone rates charged by jails to detainees implicate any constitutional right. *See Tenny v. Blagojevich*, 659 F.3d 578, 581 (7th Cir. 2011) (finding no due process violation based on commissary overpricing due to no protected property interest in commissary items); *Arsberry v. Illinois*, 244 F.3d 558, 564-567 (7th Cir. 2001) (affirming dismissal of claims brought under First Amendment, equal protection and due process clauses of Fourteenth Amendment challenging exorbitant telephone rates charged to Illinois prison and jail inmates for failure to state a claim); *Holloway v. Magness*, 666 F.3d 1076, 1078-1081 (8th Cir. 2012) (affirming summary judgment on First Amendment claim challenging high telephone rates charged by prison); *Johnson v. California*, 207 F.3d 650, 656 (9th Cir. 2000) (rejecting First Amendment claim because "prisoners are [not] entitled to a specific rate for their phone calls."); *Cox v. Quinn*, No. 09-1050, 2010 WL 2679987, *2 (S.D. Ill. July 2, 2010) (Murphy, J.) (dismissing claim that commissary prices are too high); *Bennett v. Sheahan*, No. 99-2270, 1999 WL 967534, *4 (N.D. Ill. Oct. 5, 1999) (Holderman, J.) (no protected liberty or property interest in commissary privileges); *Brown v. Gulash*, No. 07-370, 2009 WL 2144592, *5 (S.D. Ill. July

16, 2009) (Gilbert, J.) (no due process or equal protection claim as to excessive commissary pricing). Thus, plaintiffs fail to state a claim as to the prices the Jail charges for commissary and telephone use; and defendants are entitled to judgment as a matter of law.

**Excessive lockdowns**

Plaintiffs complain that their timeouts (i.e., scheduled times they are allowed out of their cells daily) are frequently curtailed by unscheduled administrative lockdowns imposed by the Jail. Amended Complaint (Doc. 40) ¶ 72; Ex. I attached to Def. Facts (Bocock Dep.) pp. 185:14-187:14, 196:7-197. Lockdowns are periods of time when detainees are confined to their cells with the door locked, and are denied access to the dayroom or recreation area (Def. Facts ¶ 71). Plaintiffs are not complaining of scheduled lockdowns, which occur throughout the day, after meals, and during nighttime (Doc. 40 ¶ 72; Def. Facts ¶ 71). They are complaining about administrative lockdowns, which are unscheduled (Doc. 40 ¶ 72; Def. Facts ¶ 71).

Detainees at the Jail are made to lockdown spontaneously for administrative reasons when correctional officers need to respond to unplanned situations that constitute a threat to staff or inmate safety (Def. Facts ¶ 71). For example, detainees are locked down when fights break out in any part of the Jail, when there is a medical emergency or fire, or when the number of officers working in the Jail falls below the minimum required for operating the Jail (Def. Facts ¶ 71). When there is a fight in one cell block, the entire Jail is placed on lockdown to eliminate the risk of another fight breaking out in another cell block while the emergency response team is busy handling the first fight (Def. Facts ¶ 71). In short, the Jail's practice of unscheduled administrative lockdowns is reasonably related to the Jail's legitimate interest in ensuring the safety and security of staff and detainees.

Frequent lockdowns – even if they are "arbitrary and capricious" - do not violate the due process clause of the Fourteenth Amendment. *See Antonelli*, 81 F.3d at 1430 (affirming dismissal of detainee's claim for arbitrary and capricious lockdowns because detainees have "no general liberty interest in movement outside of his cell guaranteed by the Due Process Clause"); *Higgason v. Farley*, 83 F.3d 807, 809 (7th Cir.1996) (affirming summary judgment on lockdown claim). Because the unscheduled administrative lockdowns are reasonably related to the Jail's legitimate interest in maintaining jail security, they "do not, without more, constitute unconstitutional punishment." *Bell*, 441 U.S. at 540. Plaintiffs bear the burden of showing that the lockdowns amounted to "atypical or significant hardship" so as to constitute "punishment" under the Eighth Amendment. *Higgason*, 83 F.3d at 809.

Plaintiffs cannot meet their burden because the Jail's practice of unscheduled administrative lockdowns does not constitute an "atypical or significant hardship" so as to constitute punishment under the Eighth Amendment. *See id.* In *Higgason*, a prisoner alleged that inmates his cell-block were "'regularly' placed on lockdown, 'for almost every minor disruptive or violent incident,' more frequently and for longer periods of time than the general prison population, and more frequently even than disciplinary segregation." *Id*. The Seventh Circuit held that the frequent lockdowns did not violate the Eighth Amendment because they did not "deprive inmates of the minimal civilized measure of life's necessities, such as adequate food, clothing, shelter, medical care, and safety." *Id*. The court made clear that frequent lockdowns did not impose "atypical and significant hardship" on the prisoner. *Id*.

Like the prisoner in *Higgason*, plaintiffs in this case cannot show that frequent lockdowns imposed an "atypical and significant hardship in relation to the ordinary incidents of [their] confinement." *Id*. It is undisputed that these unscheduled lockdowns are intermittent in nature.

7

Plaintiffs were allowed out of their cells for a few hours every day on most days when they were housed in general population (Def. Facts ¶¶ 60-61, 63). During timeouts, detainees may use the shower facilities, watch television, use the telephone, exercise in the indoor or outdoor recreation areas, and socialize with others (Def. Facts ¶ 64). Plaintiffs contend the unscheduled lockdowns are disruptive and deprive them of their timeouts, but "[i]n modern prisons the denial of recreation time may deprive inmates of many desirable, entertaining diversions the lack of which would not raise a constitutional issue." *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988). In short, no reasonable jury could find that the Jail's practice of unscheduled administrative lockdowns amounts to punishment so as to violate the constitution; *Higgason*, 83 F.3d at 809; *Salem v. Kaupas*, No. 12-3141, 2014 WL 2699737, *2-3 (N.D. Ill. June 13, 2014) (Gettleman, J.) (granting summary judgment to Will County sheriff and warden on identical claim).

**Inmate handbook and grievance procedure**

Plaintiffs complain that the Jail's inmate handbook and grievance procedure is ambiguous and overbroad and do not have adequate safeguards to prevent misapplication by Jail staff. Amended Complaint (Doc. 40) ¶ 73; Def. Facts ¶¶ 110-16. But plaintiffs do not have a constitutionally protected right to a grievance procedure. *See, e.g., Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) (collecting cases); *Antonelli*, 81 F.3d at 1430-1431 (affirming dismissal of detainee's claim based on inadequate jail grievance procedures because a jail's grievance procedures do not give rise to a liberty interest protected by the due process clause). Thus, the alleged inadequacies in the inmate handbook or the grievance procedure do not state a claim.

Moreover, plaintiffs cannot show that defendants were deliberately indifferent, because it is undisputed that they do review the policies, procedures, and inmate handbook every year and revise them as necessary (Def. Facts ¶¶ 9-10).

**Loss of personal property**

Plaintiffs allege that the staff in the Jail's property has lost, stolen, or destroyed several items of their personal property stored in the property department. Amended Complaint (Doc. 40) ¶¶ 13, 50. This claim cannot succeed as a matter of law. To begin with, this is an official capacity suit. And there is no evidence that warden Josephson or deputy chief Taylor, much less the Sheriff, authorized any staff in the property department to take or destroy plaintiffs' property. Rather, it is Jail policy to provide space for the safe and secure storage of detainees' personal property and provide accountability for their personal property and valuables while they are detained (Def. Facts ¶ 45). So, the deprivation of plaintiffs' property was not of a type that would require a pre-deprivation hearing. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982). In other words, the alleged seizure was 'random and unauthorized.' *See Soldal v. County of Cook*, 942 F.2d 1073, 1075-76 (7th Cir. 1991) (en banc), rev'd on other grounds, 506 U.S. 56 (1992)) (involving eviction without a court order). It is well-settled there is no denial of due process when a plaintiff seeks a post-deprivation remedy for the negligent or intentional deprivation of property resulting from a random and unauthorized act of a governmental official, if the state provides an adequate post-deprivation remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (citing *Taylor v. Parratt*, 451 U.S. 527, 543-544 (1981)); *Murdock v. Washington*, 193 F.3d 510, 513 (7th Cir. 1999).

Here, it is Jail practice and procedure to replace or pay for the replacement of any item of a detainee's property that is lost, stolen, or goes missing from the property storage room (Def. Facts ¶ 54). The detainee may submit a grievance or request form notifying the Jail of the missing item (Def. Facts ¶ 54). The grievance is handled initially by the property sergeant, and

forwarded to deputy chief Taylor for approval (Def. Facts ¶ 54). Upon approval from Deputy

chief Taylor, the missing item is replaced (Def. Facts ¶ 54).

Additionally, the Seventh Circuit has recognized that Illinois law tort law provides

adequate post-deprivation remedies to redress unauthorized deprivations of property. *Greco v.*

*Guss*, 775 F.2d 161, 169 (7th Cir. 1985) (Illinois cause of action for conversion provides

adequate post-deprivation remedy); *Gable v City of Chicago*, 296 F.3d 531, 540 (7th Cir. 2002)

(holding that a replevin action under Illinois law provides due process for those seeking return of

their vehicles).

Because plaintiffs do not allege, and there is no evidence in the record, that Jail policy or

procedure authorized the deprivation of their property, or that they lacked an adequate remedy

under state law; they have not stated a claim under Section 1983. *Antonelli*, 81 F.3d at 1430

(affirming dismissal of detainee's claim based on loss of personal property); *Murdock*, 193 F.3d

at 513 (affirming dismissal of prisoner's claim for confiscation of property by officers).

**Higher educational and vocational programs**

Plaintiffs complain that the Jail denied them the opportunity to participate in higher

educational programs, vocational programs, and craft and hobby programs, even though the

Illinois Department of Corrections offers such programs, often free of charge, in its prisons to

convicted prisoners. Amended Complaint (Doc. 40) ¶¶ 22, 23, 64-66; Def. Facts ¶ 72. The Jail

does not provide such programs because the Jail's mission or goals do not include rehabilitation

of detainees or issues concerning rehabilitation because the Jail is a detention facility and not a

correctional facility (Def. Facts ¶¶ 7, 72). Importantly, the average length of stay of detainees at

the Jail is about 30 days, which makes it impractical for the Jail to offer such programs (Def.

Facts ¶¶ 5, 72). Even so, the Jail offers several educational, social, religious, and other programs,

services, and activities, to help maintain their physical, social, and emotional health (Def. Facts ¶¶ 73-77).

The Jail is not required to offer any more programs because pretrial detainees do not have a property or liberty interest under the Fourteenth Amendment in increased educational, vocational, or recreation programs. *See Garza v. Miller*, 688 F.2d 480, 485-86 (7th Cir. 1982); *accord Zimmerman v. Tribble*, 226 F.3d 568, 571-72 (7th Cir. 2000). And "there is no constitutional mandate to provide educational, rehabilitative, or vocational programs, in the absence of conditions that rise to a violation of the Eighth Amendment." *Rhodes v. Chapman*, 452 U.S. 337, 348 (1982) (deprivations of jobs and educational programs "simply are not punishment"); *Garza*, 688 F.2d at 486; *Zimmerman*, 226 F.3d at 571-72. Thus, the Jail's denial of opportunities to plaintiffs to pursue higher educational, vocational, and craft and hobby programs did not deprive them of any constitutional rights.

**Denial of electric appliances and other supplies**

Plaintiffs complain that the Jail does not allow plaintiffs to possess the following items: electric appliances like radios, televisions, laptops, digital audio players, hot pots, and hot plates; craft and hobby supplies; clothing and shoes; jewelry; ink-based writing instruments, and full-size pencils. Amended Complaint (Doc. 40) ¶¶ 18-21, 38, 63; Def. Facts ¶¶ 24, 66-68, 70.

If the constitution does not require jails to provide detainees with access to educational, recreational, and vocational programs, see *Garza*, 688 F.2d at 486; *Zimmerman*, 226 F.3d at 571-72, then it logically follows that it does not require jails to allow detainees access to electric appliances, or craft and hobby supplies. Moreover, the constitution does not mandate comfortable jails, and "only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*,

11

501 U.S. at 298 (internal citations and quotes omitted). Defendants have not found a case that has held that electric appliances, craft and hobby supplies, and jewelry are necessities in life such that their denial to detainees is sufficiently serious so as to violate the Eighth Amendment.

The Jail does not allow detainees to possess clothing or shoes from outside for several reasons. First, Jail policy recognizes need for detainees to wear uniform clothing in a correctional setting to maintain the status quo among detainees (Def. Facts ¶ 20). Second, the Jail also wants detainees to wear clothing that is color coordinated with the detainees' classification and housing unit assignments (Def. Facts ¶ 20). Third, non-jail clothing and shoes can be used as currency by detainees, which can pose a risk to the safety and security of the detainees and staff (Def. Facts ¶ 24). The Jail allows detainees to wear personal or civilian clothing for court appearances if ordered by the court (Def. Facts ¶ 24).

The Jail does not allow detainees to possess jewelry because it can be used as currency and can be fashioned into a weapon (Def. Facts ¶ 24).

The Jail does not allow detainees to possess ink pens or full-size pencils for security reasons. A pen or full-size no. 2 pencil can be used as a weapon, and wrapped with two or three other full-size pencils, can become a spike, a more dangerous weapon (Def. Facts ¶ 70). Instead, the Jail allows detainees to possess small-size pencils, the type used by golfers to mark their score cards (Def. Facts ¶ 70).

**Privacy in double occupancy cells**

Plaintiffs complain that they have been housed at times in double-occupancy cells where they share a single desk, chair, sink and uncovered toilet with another detainee, depriving them of privacy, especially when using the toilet. Amended Complaint (Doc. 40) ¶¶ 33, 69; Def. Facts

¶ 13; Ex. I attached to Def. Facts (Bocock Dep.) pp.123:8-125:8, 133. These conditions do not violate the constitution.

As an initial matter, detainees simply do not retain a right to privacy in their cells. *See Johnson,* 69 F.3d at 146 (no privacy rights in a jail) (citing *Hudson*, 468 U.S. at 526-30). As the Supreme Court explained in *Hudson*:

A prison shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. We strike the balance in favor of institutional security, which we have noted is central to all other correctional goals. A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yields to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

468 U.S. at 527.

Accordingly, "[g]uards take control of where and how prisoners live; they do not retain any right of seclusion or secrecy against their captors, who are entitled to watch and regulate every detail of daily life." *Johnson*, 69 F.3d at 146. As the Seventh Circuit has acknowledged, constant vigilance of inmates everywhere, regardless of whether they are naked, is essential to the safety and security of a jail. *Id.* Thus, plaintiffs' complaint about the lack of privacy arising from being housed with another detainee in the same cell does not state a claim. *See Walker v. Dart*, 2010 WL 669448, No. 09 C 1752, *3 (N.D. Ill. Feb. 19, 2010) (Anderson, J.) (dismissing detainee's claim based on jail rule prohibiting detainees from using a sheet or curtain to provide privacy while using the toilets in their cells).

Moreover, the constitution does not prohibit housing two detainees in the same cell. *Bell*, 441 U.S. at 526 (upholding double bunking of detainees in jail cells 75 square feet in size); *Rhodes*, 452 U.S. at 348-52 (upholding double bunking of prisoners in prison cells 63 square feet in size); *Duran v. Elrod*, 760 F.2d 756, 759-60 (7th Cir. 1985) (upholding double bunking of

13

detainees in jail cells 64 square feet in size). Here, the double occupancy cells in the Jail are about 102 square feet in size (Def. Facts ¶ 13). Thus, the sizes of the double-occupancy cells in the Jail are larger than those upheld by the Supreme Court in *Bell* and *Rhodes*, and the Seventh Circuit in *Duran*. Thus, the double-occupancy cells pass constitutional muster.

**Absence of ladders in cells**

Plaintiffs complain they have been housed in cells with bunk beds six feet off the ground with no accessible ladder or steps to reach the top bunk. Amended Complaint (Doc. 40) ¶¶ 8, 46; Def. Facts ¶¶ 14-16.

Several courts, including courts in this district, have held that ladderless bunk beds do not amount to an objectively serious condition so as to violate the constitution. *See, e.g.*, *Barbosa v. McCann*, 2009 WL 2913488, at *4 (N.D. Ill. Sept. 8, 2009) (dismissing conditions-of-confinement claim premised upon the lack of a ladder for an upper bunk and reasoning that, "[a]lthough it is inconvenient for plaintiff to use the toilet and sink to climb to his bunk because there was no ladder ... 'only those deprivations denying the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."); *accord McDaniel v. Walsh,* No. 09-2170, 2011 WL 489787, at *5 (C.D. Ill. Feb. 7, 2011) (granting summary judgment on claim that failure to provide inmate a ladder to climb onto his top bunk constituted deliberate indifference); *see also Connolly v. County of Suffolk*, 533 F.Supp.2d 236 (D.Mass.2008) (summary judgment granted for defendants because ladderless bunk beds did not meet objective component of Eighth Amendment in light of evidence that "[t]housands of ... inmates access bunk beds daily without the aid of a ladder and without incident" and only about a dozen injuries had been reported); *Robinett v. Corr. Training Facility*, No. C 09-3845 SI (PR), 2010 WL 2867696, at *2-4 (N.D. Cal. July 20, 2010) (collecting published and unpublished

14

cases); *Jones v. La. Dept of Pub. Safety & Corr.*, No. 08-CV-1507, 2009 WL 1310940, at *2 (W.D. La. May**Error! Bookmark not defined.** 11, 2009) (same); *Naki v. State*, No. CV-13-02189-PHX-JAT, 2015 WL 4647915, at *6 (D. Ariz. Aug. 5, 2015) (same).

Because a ladder to the top bunk is not one of life's necessities, plaintiffs' complaint about ladderless bunks fails to satisfy the objective component applicable to his claim. Moreover, the issue is moot, because Gonzalez is no longer detained in the Jail, and Bocock has received a bottom-bunk medical restriction from the doctor; so he will not have to use a top bunk anymore Def. Facts ¶ 17. For these reasons, defendants are entitled to summary judgment.

**24 hour cell illumination**

Plaintiffs complain that the lighting in the cells remains on at all times, and although the light can be dimmed, there is no option for a detainee to turn off the light. Amended Complaint (Doc. 40) ¶ 68.

The Seventh Circuit and other courts of appeals have held that continuous lighting in a jail or prison is reasonably related to legitimate penological goals, such as monitoring inmates and maintaining security. *Vasquez v. Frank*, 290 Fed. App'x 927, 929-30 (7th Cir. 2008); *Sims v. Piaza*, 462 Fed. App'x 228 (3d Cir. 2012) (citing *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) ("Continuous lighting has been held to be permissible and reasonable in the face of legitimate penological justifications, like the need for security and the need to monitor prisoners.").

Here, the Jail needs to maintain appropriate levels of cell-lighting during the day and night for maintaining security and safety of staff and inmates. In each cell of the Jail in which plaintiffs were housed, there are four light bulbs contained in one overhead light fixture (Def. Facts ¶¶ 25, 28). One is a low 9-watt (600 lumens) fluorescent night light bulb, which remains on

all the time, and cannot be turned off by the inmate or officer (Def. Facts ¶¶ 26, 29). The remaining three are 32 watt (2300 lumens) fluorescent bulbs (Def. Facts ¶¶ 27, 30). In the cells in the older housing units, the detainee can control two out of the three 32 watt bulbs through a switch on the fixture; and the third bulb is controlled by the correctional officer (Def. Facts ¶ 27). In the cells in the newer housing units, the three 32-watt bulbs are controlled by the correctional officers (Def. Facts ¶ 30). At night, between 10:30 p.m. and 6:30 a.m., the standard operating procedure in the Jail is for the officers to dim the lighting in the dayrooms and turn off all the 32-watt light bulbs under their control in the cells, so that only the 9-watt night light is left on in the cells (Def. Facts ¶ 34).

The Jail needs to have the one night light on at all times in the cells, so that there is at least some illumination for the officers on the night shift to be able to see detainees inside the cell, take count, and perform visual checks every 15 or 30 minutes (Def. Facts ¶¶ 32-34). During the day, the officers need the illumination from the 32-watt bulbs in the cells to perform their visual observations of inmates, physical inspections, searches, and shakedowns of cells for the safety and security of inmates and staff, as well as ensure that inmates are taking their medications properly (Def. Facts ¶¶ 31-33). In short, the levels of lighting in the cell are reasonably related to the Jail's legitimate interest in maintaining security and the safety of inmates and staff. *Vasquez*, 290 Fed. App'x at 929-30.

The undisputed evidence in this case is that one 9-watt fluorescent bulb (600 lumens) stays on for twenty-hours. In addition, correctional officers turn on one 32-watt fluorescent bulb from 7 a.m. to 11 p.m.  This level of lighting for security purposes falls within the range found constitutional by the Seventh Circuit and other courts. *See Vasquez*, 290 Fed. App'x at 929 (twenty-four hour lighting with one 9–watt fluorescent bulb does not objectively constitute an

16

extreme deprivation); *Stewart v. Beard*, 417 Fed. Appx. 117, 120 n.1 (3d Cir. 2011) (upholding verdict for defendants in claim involving low intensity 9-watt, 600 lumen bulbs that gave off less than two foot-candles of illumination); *Salem,* 2014 WL 2699737, * 3 (granting summary judgment to sheriff and warden after finding that one 9-watt night bulb that remained on 24/7 in Will County Jail did not impose an atypical and significant hardship); *Pawelski v. Cooke*, 1991 WL 403181, at *4 (W.D. Wis. July 18, 1991) ("Having a single 40 watt light bulb on 24 hours a day for security purposes amounts to no more than an inconvenience to the segregation inmates."), aff'd, 972 F.2d 352 (7th Cir.1992) (table opinion); *Mable v. Beard*, No. 3:10-1214, 2013 WL 2435295, * 5 (M.D. Penn. June 4, 2013) (two 28-watt fluorescent bulbs that remained on for eighteen hours and one 7-watt night light that remained on for six hours found permissible); *Young v. Beard*, No. 10-284, 2012 WL 1865596, at *5 )(W.D. Pa. May 22, 2012) (no Eighth amendment violation premised on continuous illumination by 15-watt security light); *McBride v. Frank*, 2009 WL 2591618, at *5 (E.D. Wis. Aug.21, 2009) (constant illumination from a 9–watt fluorescent bulb does not objectively deny "the minimal civilized measure of life's necessities."); *King v. Frank*, 371 F.Supp.2d 977, 984–85 (W.D. Wisc. 2005) (holding that constant exposure to a 9 watt fluorescent light which allows prison officials to observe inmates at night did not violate Eighth Amendment standards); *Will v. Terhune*, 404 F. Supp.2d 1226, 1230-31 (E.D. Cal. 2005) (holding that 24-hour illumination by 13-watt bulb was not objectively unconstitutional).

Finally, there is no evidence to show that defendants, much less the Sheriff, were deliberately indifferent. During his tenure as deputy chief of operations, There is no evidence that defendants, much less the Sheriff, were aware of any detainee diagnosed by medical staff with an illness or injury attributed to lighting conditions in the Jail's cells (Def. Facts ¶ 57).

17

Moreover, the Jail recently began replacing all the 9-watt night light bulbs in all cells in the Jail, including the older and newer housing units, with 7-watt (425 lumens) night light bulbs (Def. Facts ¶ 35). Thus, defendants are entitled to summary judgment on plaintiffs' claim challenging the lighting in the cells.

**Mattresses**

Plaintiffs complain that sleeping on thin mattresses on a concrete bunk has caused them pain, sleep deprivation, and psychological injury. Amended Complaint (Doc. 40) ¶¶ 27, 57.

Prison conditions may be uncomfortable and harsh without violating the Eighth Amendment. *See Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). The constitution does not permit inhumane prison conditions, but neither does it "mandate comfortable prisons." *Snipes v. DiTella*, 95 F.3d 586, 590 (7th Cir. 1996)(citing *Farmer*, 511 U.S. at 832). Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson*, 503 U.S. at 8-9.

Here, the mattresses in the Jail are about 4-5 inches thick and comfortable when they are new (Def. Facts ¶ 23). They get worn out and flattened and are at most 2 inches, and less comfortable, as they get older (Def. Facts ¶ 23). During his three years at the Jail, Bocock has had older green mattresses for about eight months, mostly at the beginning of his stay; the rest of the time, he has had the newer blue mattresses (Def. Facts ¶ 23). Jail policy dictates that if a mattress is worn out, the detainee may request for a new one, and the officer is supposed to replace it (Def. Facts ¶ 23). But even if (for argument's sake) plaintiffs can show that officers were not replacing old, worn out mattresses as needed, there is no evidence that warden Josephson or deputy chief Taylor, much less the Sheriff, knew about it. This is an official

18

capacity suit, so defendants cannot be held liable merely because their subordinates are failing to follow the policy.

Finally, plaintiffs have no evidence from any medical professional that sleeping on the allegedly thin mattresses caused them an injury (Def. Facts ¶¶ 127, 135).

**Food**

Plaintiffs complain that there is a gap of about 14 hours between dinner and breakfast, with no option for other meals in between except food purchased from the commissary. Amended Complaint (Doc. 40) ¶¶ 15, 53; Def. Facts ¶ 56. The constitution requires jails to provide detainees with a nutritionally adequate diet. *See Wilson*, 501 U.S. at 303; *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985).

It is Jail policy to provide detainees adequate nutrition in the form of three well-balanced nutritional meals, amounting to at least 2000 calories, daily (Def. Facts ¶ 55). At least two of the three meals provided daily are hot (Def. Facts ¶ 55). Per Jail procedure, a registered dietitian reviews annually the menus and meals, to ensure that they meet the nationally recommended dietary allowances for basic nutrition for appropriate age groups (Def. Facts ¶ 55). There is a gap of up to 14 hours between dinner in the evening and breakfast the next morning. During that time period, detainees are allowed to eat food items procured from the commissary (Def. Facts ¶ 56).

There is no evidence that the Jail maintains a 14-hour gap with the intent to punish detainees. Rather, the reason the Jail cannot reduce the 14-hour time period is that it does not have kitchen staff available during that time period (Def. Facts ¶ 56). The kitchen staff leaves at 7 p.m., after dinner service is completed between 5:00-6:30 p.m., and returns the next morning (Def. Facts ¶ 56). Breakfast is served at 6:30 a.m. It used to be served at 6:00 a.m., but was

19

pushed back to 6:30 a.m. in response to plaintiffs' complaint to the Department of Corrections (Def. Facts ¶ 56).

The 14-hour gap does not violate the constitution. *See Green v. Ferrell*, 801 F.2d 765, 770–71 (5th Cir.1986). In *Green*, detainees complained that the jail served only two meals a day. The district court ordered injunctive relief, ordering the jail to serve three meals a day; with the third meal to be in the form of a mid-day or bedtime light meal. On appeal, the Fifth Circuit reversed that order. The appeals court noted that none of the detainees had alleged any medical problems caused by being served only two meals, and the mere fact that experts might recommend three meals a day does "not create constitutional standards under the eighth amendment.' 801 F.2d at 770-71.

Compared to *Green,* where the appeals court stated that even on a regular, permanent basis, two meals a day may be adequate, here the Jail provides detainees with three meals a day. Moreover, like the detainees in *Green*, plaintiffs here do not have any medical evidence to show that the 14-hour gap between dinner and breakfast harmed their health. Although the record indicates both plaintiffs lost weight, there is no evidence that their weight loss was caused by the 14-hour gap between the meals (Def. Facts ¶¶ 127, 136-41). Plaintiffs have no evidence that they were diagnosed with any medical condition attributable to poor nutrition or lack of calories (Def. Facts ¶¶ 127, 136-41). It is undisputable that Gonzalez frequently went on hunger strikes (Def. Facts ¶¶ 137-141). At one point, medical staff believed that Gonzalez was purposely not eating to manipulate his weight (Def. Facts ¶ 141). Gonzalez testified he had access to food items that other detainees procured from the commissary and gave him (Def. Facts ¶ 141). He testified that at one point when he ate all his meals and snacks, he gained weight (Def. Facts ¶ 141).

At least one court has held that even a longer gap between meals did not violate the constitution. *See Gardner v. Beale*, 780 F. Supp. 1073, 1075 (E.D.Va.1991) (holding that providing prisoner with only two meals per day, with an 18-hour interval between dinner and brunch, did not satisfy objective component of Eighth Amendment standard), aff'd, 998 F.2d 1008 (4th Cir.1993); *see also Hernandez v. Florida Dep't of Corrections*, 281 Fed. Appx. 862, 865-66 (11th Cir. 2008) (affirming dismissal of Eighth Amendment claim where prisoner was routinely deprived of lunch five days a week for about five months, but did not allege that he was deprived of the other two meals or that he suffered physical harm from the deprivation).

Finally, there is no evidence of deliberate indifference on the part of the warden or deputy chief, much less the Sheriff. Since assuming his position as deputy chief of operations, Taylor is neither aware nor has he been informed by the Jail's medical staff, or anyone else, of any detainee diagnosed by medical staff with an illness or injury attributed to the 14-hour gap between dinner and breakfast (Def. Facts ¶ 57). So, it cannot be said that Jail officials knew of and disregarded an excessive risk to inmate health or safety. In short, plaintiffs have insufficient evidence for a reasonable jury to return a verdict in their favor.

**Untimely delivery of mail**

Plaintiffs complain that at unspecified times their mail was delayed by up to three weeks. Amended Complaint (Doc. 40) ¶¶ 11, 48; Ex. I attached to Def. Facts (Bocock Dep) pp. 137:5-12, 141:6-149:13.

Jail policy requires all incoming and outgoing mail to be inspected for contraband (Def. Facts ¶ 84). According to the Jail's written standard operating procedure on mail, incoming and outgoing letters should not to be held for more than 24 hours and books and periodicals should not be held for more than 48 hours excluding weekends, holidays, or emergency situations (Def.

Facts ¶ 100). All incoming and outgoing mail is logged electronically in the inmate mail logs, so that it can be tracked (Def. Facts ¶ 100). After the mail clerk scrutinizes incoming mail for impermissible content and contraband, she places the mail in the inmate mailboxes for officers to pick up and deliver to detainees (Def. Facts ¶ 100). Jail procedure requires corrections officers assigned to housing units to pick up and deliver mail to detainees on every shift (Def. Facts ¶ 100).

The undisputed evidence in this case shows that, at most, plaintiffs experienced sporadic short –term delays in receiving mail and subscriptions (Def. Facts ¶¶ 102-03). Bocock testified that many times during his detention he has received mail up to two to three weeks after it had been sent by family (Def. Facts ¶ 102). He has also experienced delays in receiving news magazines to which he subscribes (Def. Facts ¶ 102). On many occasions, however, Bocock has received mail on time, sometimes on the same day that it arrived at the Jail (Def. Facts ¶ 102). Gonzalez testified he missed a deadline to submit a fictional story in a writing contest one time because of a delay in receiving mail (Def. Facts ¶ 103). Plaintiffs do not contend that any legal mail was delayed or not delivered (Def. Facts ¶ 133).

But these relatively sporadic and short-term delays and disruptions in non-legal mail are insufficient to state a claim under the First Amendment. *Zimmerman,* 226 F.3d at 572; *Rowe v. Shake*, 196 F.3d 778, 782-783 (7th Cir. 1999) (relatively short-term and sporadic delays in receiving non-legal mail are insufficient to state a First Amendment claim). In *Rowe*, the prisoner alleged that about 34 items of incoming mail within a three month period were delayed, from 2 to 26 days. *Id*. at 780. The court, however, deemed these delays to be sporadic and short-term. Like the prisoner in *Rowe*, plaintiff Bocock in this case complains of receiving some items at most 2-3 weeks after they were sent. Like the prisoner in *Rowe*, plaintiffs do not claim that any

legal mail was delayed. In short, plaintiffs have insufficient evidence from which a reasonable jury could conclude that the alleged mail delay violated their constitutional rights.

There is also no evidence of deliberate indifference on the part of the defendants. Deputy Chief Taylor is not aware of, nor was he notified of any significant delays in the delivery of mail to detainees (Def. Facts ¶ 105). If there was a significant delay, i.e. about three weeks from the date of the postmarked mail, he would expect the mail clerk to bring it his attention (Def. Facts ¶ 105). He recalls one time when the mail clerk informed him that there was a new mail delivery person and for a few days the mail was being delivered to the Jail 2-3 days later than usual, which put the jail behind in delivering mail to the detainees (Def. Facts ¶ 105).

Thus, defendants are entitled to summary judgment.

**Heating**

Plaintiffs complain of inadequate heating in the Jail, particularly during the winter of 2014-15. Amended Complaint (Doc. 40) ¶ 62.

Low cell temperature does not, in and of itself, violate the constitution, but it may establish a violation in combination with some other condition when they have a "mutually enforcing effect that produces the deprivation of a single, identifiable human need such as warmth – for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson*, 501 U.S. at 304-05. Accordingly, to assess whether cold cell temperatures constitute cruel and unusual punishment, courts consider factors including "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Dixon,* 114 F.3d at 644.

However, where a detainee fails to show that he was forced to remain in the cold for long periods of time, or does not establish that he suffered unusual deprivations, his complaint does not rise to the level of a constitutional violation. *Mays v. Springborn*, 575 F.3d 643, 648-49 (7th Cir. 2009) (prisoner who had hurt ears, numb hands, feeling of frostbite, and caught colds because he was never issued adequate winter clothing showed only that he was subject to the "usual discomforts of winter," not the objectively serious harm required to state an Eighth Amendment claim); *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (no Eighth Amendment violation where prisoner exposed to temperatures between 80 and 86 degrees all day during the summertime in Florida, noting that the cells were ventilated and prisoner was not exposed to direct sunlight).

Here, the record shows that the heating malfunctioned during the winter of 2014-15, there was a particular frigid stretch because of the polar vortex. This was shortly Stuart Taylor assumed the position of deputy chief of operations (Def. Facts ¶ 40). He recalls there were complaints from detainees during that frigid stretch (Def. Facts ¶ 40). Taylor testified that the jail is large and it was abnormally frigid outside (Def. Facts ¶ 40). Bocock recalls there was another time in the winter of 2013 when conditions were unbearably cold for a week or so, but there is no other evidence in this record about that (Def. Facts ¶ 42).

Bocock estimates it took a week or so for the heating to be fixed after the malfunction in 2014-15 (Def. Facts ¶ 42). Gonzalez estimates 30 days, but concedes that the grievance forms more accurately reflect the time (Def. Facts ¶ 44). Jail records show that on three occasions in February 2015, the maintenance department received work orders generated from D-Pod in which the officer or detainees were complaining about it being too cold (Def. Facts ¶ 41). All three were assigned to a technician (Def. Facts ¶ 41). Copies of the work orders indicate that all

three were "completed" on the same day they were received (Def. Facts ¶ 41). Another work order was received from D-Pod on August 27, 2015 complaining about it being too cold in cell D-26 (Def. Facts ¶ 41). The copy of this work order indicates it was "completed" on August 28, 2015 (Def. Facts ¶ 41).

All detainees are issued a wool blanket, and it is Jail policy to provide detainees with sufficient blankets as needed for comfort (Def. Facts ¶ 21). In addition, detainees are also provided long-sleeved thermal vests upon request (Def. Facts ¶ 22). Both plaintiffs have requested and been issued thermal vests at various times during their detention (Def. Facts ¶ 22). Gonzalez testified that during those days in February 2015 when the heating malfunctioned he did not ask for extra blankets because he did not know you could request for more blankets (Def. Facts ¶ 44). But Jail staff allowed him to wear a lot of extra clothes and he probably also had on a thermal vest (Def. Facts ¶ 44).

In a conditions-of-confinement claim, the detainee also has to show that the jail officials acted or failed to act with a sufficiently culpable state of mind, i.e., with deliberate indifference. *See Wilson*, 501 U.S. at 297-304. So, if a prison heating system malfunctions accidentally during a cold winter, a detainee has no basis for an Eighth Amendment claim. *Id.*, at 300. This is exactly what happened in this case in the particularly frigid stretch in the winter of 2014-15. The heating system malfunctioned. There is no evidence that the Jail administrators disregarded it. In fact, the Jail has policies and procedures in place to ensure that the facility is inspected by staff and maintained in good repair (Def. Facts ¶¶ 36-39). When there are multiple complaints, the command staff has maintenance staff check the heating system immediately (Def. Facts ¶ 40). Taylor and Bocock recall that the maintenance staff checked the temperatures in the housing units (Def. Facts ¶¶ 40, 42). And as can be seen from the work orders, the maintenance staff

responded to the complaints and requests and resolved the situation promptly (Def. Facts ¶ 41). Finally, Jail policy allows for staff to issue extra blankets as needed, in addition to thermal vests (Def. Facts ¶¶ 21-22). For these reasons, there is insufficient evidence to hold the defendants liable on this particular claim. The court should grant summary judgment.

**Lack of outdoor access**

Plaintiffs complain that they have been deprived of access to the outdoors for prolonged periods of time. Amended Complaint (Doc. 40) ¶ 61.

The Supreme Court and the Seventh Circuit have explained that the lack of access to the outdoors does not violate the constitution in and of itself. Rather, it may violate the constitution only when it deprives the detainee of the ability to exercise. *See Wilson*, 501 U.S. at 304-05 (explaining that outdoor exercise required when prisoners otherwise confined in small cells almost 24 hours a day, but not required when prisoners otherwise had access to dayroom 18 hours per day); *Smith,* 803 F.3d at 313 (affirming dismissal of complaint alleging lack of outside recreation in the absence of allegation that the detainee was unable to exercise in his cell or in the common areas of the jail); *Antonelli*, 81 F.3d at 1432 ("Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened."); *Harris*, 839 F.2d at 1236 (no violation for deprivation of outdoor exercise when indoor exercise allowed).

In this case, each housing unit has a recreation area (Def. Facts ¶ 60). Of the older housing units, some have outdoor recreation areas but no indoor recreations area (Def. Facts ¶ 60). D Pod has both outdoor and indoor recreation areas. All the newer housing units have indoor recreation areas, but no outdoor recreation areas (Def. Facts ¶ 60). Plaintiffs have been housed in the older and newer housing units during their detention (Def. Facts ¶¶ 60-61).

The indoor recreation areas are about 30 feet by 40 feet in size, with large windows, equipped with basketball hoops and basketballs (Def. Facts ¶ 61). Detainees can also use the indoor recreation area to exercise (Def. Facts ¶ 61). Detainees may use the indoor recreation area whenever they want on their scheduled time out of their cells, provided there are not too many detainees in that area all at once (Def. Facts ¶ 61). Detainees are generally allowed timeout for a few hours a day (Def. Facts ¶ 63). It is undisputed that plaintiffs were allowed to exercise in their cell and in the indoor recreation areas, even when they were housed in units that lack outdoor recreation areas (Def. Facts ¶ 62).

Because it is undisputed that plaintiffs were allowed to exercise indoors during the times they were housed in the units that did not have access to the outdoors, they cannot succeed on this claim; and defendants are entitled to judgment as a matter of law.

**Rule prohibiting detainees from having legal paperwork with another inmate's name**

Plaintiffs complain that the Jail prohibits them from having legal paperwork with other detainees' names or signatures. Amended Complaint (Doc. 40) ¶ 40; Ex. I (Bocock Dep.) pp. 16-19, 128:8-129:22, 130:17-131:11.

Jail policy prohibits inmates from having legal paperwork with other detainees' names or signatures because it is Jail policy to prevent detainees from acting as jail house lawyers i.e., engaging in the unauthorized practice of law, which is illegal (Def. Facts ¶ 80). Here, both plaintiffs are jailhouse lawyers. During a search, the Jail recovered a brochure for their "law firm," which advertised the legal services they offered, along with the fees charged for their services (Def. Facts ¶ 83).

The Jail also prohibits from writing letters or corresponding with other detainees in the Jail because of concerns that inmates may circulate petitions and organize themselves in groups

that may undermine the ability of Jail staff to control them or maintain order and security (Def. Facts ¶ 81). Another concern is that such correspondence may be used to communicate messages in code about matters that that could pose a threat to Jail security and the safety of staff or other inmates (Def. Facts ¶ 81).

The Supreme Court upheld restrictions on inmate-to-inmate written correspondence in *Turner v. Safley*, 482 U.S. 78, 93 (1987). The Court has also upheld prohibitions on meetings of prisoner "labor unions" and inmate solicitation and bulk mailings concerning the unions. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119 (1977). The Court has also held that inmates do not have a special First Amendment right to provide legal assistance to fellow inmates. *Shaw v. Murphy*, 532 U.S. 223, 225-232 (2001) (applying *Turner* test and upholding restrictions on a jailhouse lawyer's correspondence to another inmate even though it contained legal advice). In *Shaw*, the Court recognized the "menace to prison discipline" posed by jail house lawyers. *Id.* at 231. The Court also recognized that prisoners may abuse legal correspondence by communicating in code and passing information that could pose a threat to jail security. *Id.* And the Seventh Circuit has held that a prison rule that bans inmates from circulating petitions among themselves so that officers maintain control over prisoners is a legitimate response to the security concern posed by group activity. *May v. Libby*, 256 Fed. Appx. 825, 829 (7th Cir. 2007).

Plaintiffs also cannot show that the rule caused them harm. Bocock testified it prevented him from borrowing or using other detainees' legal work, such as draft motions, in his civil cases (Def. Facts ¶ 82). But the Jail has an adequate law library, he is represented by an attorney in his criminal cases, and there is no evidence that he suffered any actual harm in any of his legal cases (Def. Facts ¶¶ 78-79, 82). For these reasons, summary judgment is warranted.

28

**No access to internet or email**

Plaintiffs complain that the Jail denies them the opportunity to access the internet or send or receive email. Amended Complaint (Doc. 40) ¶¶ 24, 67; Def. Facts ¶ 67.

The Jail does not allow detainees to access the internet or send or receive emails because is to maintain safety and security (Def. Facts ¶ 67). The Jail restricts all communication by detainees to paper correspondence, visits, and telephone because these means are easier to monitor (Def. Facts ¶ 67). All incoming and outgoing telephone calls to or from detainees are monitored and recorded, except for privileged and confidential communication with clergy or attorneys (Def. Facts ¶ 67). Deputy Chief Taylor testified that in his judgment it is hard to monitor the internet or communication through email (Def. Facts ¶ 67). But plaintiffs can receive visitors, send and receive unlimited mail, and use the phone to call persons outside.

Plaintiffs have a right to communicate with persons outside the jail, subject to reasonable limitations arising from the legitimate security and administrative interests of the jail. Use of email is a means of exercising this right. But where, as here, the detainees have an alternate means of exercising this right, allowing them to access internet and email will require the Jail to allocate additional resources, which is not warranted. For these reasons, defendants are entitled to summary judgment.

**Regulations concerning on attorney and clergy visits**

Plaintiffs complain that the Jail does not allow attorneys to make contact visits with them without a court order. Amended Complaint (Doc. 40) ¶¶ 17, 55. Plaintiffs also complain that the Jail does not allow detainees to take any paperwork or religious texts with them to the video visitation rooms and contact rooms when they visit their attorneys or clergy. *Id*. at ¶¶ 25-26, 39, 56.

Jails have considerable discretion in determining the time, place, duration, and conditions of visitation. *See Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Block v. Rutherford*, 468 U.S. 576, 588-91 (1984) (holding policy banning contact visits with pretrial detainees constitutional). Accordingly, jails may impose reasonable restrictions on an attorney's right to access their inmate-clients in the prison. *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989). This includes reasonable restrictions on attorneys' visits to a jail. *Massey v. Wheeler*, 221 F.3d 1030, 1036-37 (7th Cir. 2000) (citing *Sturm v. Clark*, 835 F.2d 1009, 1013 (3d Cir. 1987)).

It is Jail policy to provide detainees confined in the facility adequate visitation from clergy and attorneys at reasonable hours subject only to limitations to maintain safety and security (Def. Facts ¶ 117). Visits are of two types, video visits and contact visits (Def. Facts ¶ 117). No court order is needed for a video visitation by any visitor. Attorneys may come for a video visitation visit without an appointment, but visitation is allowed on a first come first served basis (Def. Facts ¶ 117).

Contact visits are visits where the detainee and the visitor are allowed to meet in a common area without glass or any obstruction that would prevent physical contact. Contact visits are not allowed under normal circumstances, so as not to compromise the safety and security of the Jail. Family, friends, clergy, and attorneys are allowed to make contact visits with detainees provided they obtain a court order and schedule the visit in advance. The reasons for requiring a court order are tied to security and safety concerns and to conserve jail resources. The Jail has only one contact room for a full contact visit and three other contact rooms with a window with pass-through slots for the attorney to pass documents back and forth to the detainee to read or sign. So, the spots available for such visits are limited. Compared to video visitation visits, contact visits are also more labor intensive in terms of what the officers have to do while moving

30

detainees to and fro and monitoring them to ensure security and safety and the exchange of contraband. An officer has to escort a detainee and remain on the scene (though not inside the room during the visit) at all times during a contact visit. By requiring a court order, the Jail can make sure they can schedule staff properly (Def. Facts ¶ 118).

Jail policy prohibits detainees from taking paperwork or any other material into the contact rooms and video visitation rooms when meeting with legal representatives or religious advisers. The reasons for this policy are tied to security and safety concerns, and to conserve staff resources. If detainees were allowed to carry paperwork or books, the paperwork and books would need to be inspected every time to ensure that there is no contraband or impermissible information or letters or other material that could jeopardize jail security or order. Conducting such inspections every time a detainee is moved to and from contact rooms and video visitation rooms will unduly burden staff resources (Def. Facts ¶ 119).

Attorneys and religious advisers are allowed to bring to the contact rooms and video visitation rooms paperwork or other material pertinent to the detainee's representation, subject to the usual routine security screening for contraband. Attorneys are allowed to pass documents to detainees to read or sign during a contact visit. Detainees are also allowed to send and receive privileged, uncensored correspondence (legal mail) to or from their attorneys in sealed envelopes through U.S. Mail. Detainees are also allowed to make and receive private, unmonitored phone calls to or from their attorneys or clergy (Def. Facts ¶ 120).

Plaintiffs admit that the rules requiring attorneys to get a court order and prohibiting detainees from taking paperwork to visits with the attorney have not caused any harm in their legal cases (Def. Facts ¶¶ 121-22). The Supreme Court held in *Lewis v. Casey* that such evidence is necessary. 518 U.S. 343, 351-55 (1996); *see also Campbell v. Clarke*, 481 F.3d 967, 968 (7th

Cir. 2007) (holding that a prisoner must allege that "a lack of access to legal materials has undermined," or caused to founder, "a concrete piece of litigation"). In short, the Jail's policies are reasonably related to its legitimate objectives in maintaining security and conserving resources, there are reasonable alternatives in place for detainees, and plaintiffs cannot show harm, these policies do not violate the constitution.

**Restrictions on stationery supplies**

Plaintiffs complain that the Jail prohibits detainees from receiving stationery supplies from family or friends, even though such supplies are available in the Jail commissary. Amended Complaint (Doc. 40) ¶¶ 16, 54.

The Jail does not allow detainees to receive stationery supplies through the mail or from family, friends, or others outside the Jail to prevent detainees from smuggling in drugs or other contraband through stationery supplies that could endanger the safety and security of staff and detainees. For example, drugs can be affixed to the gummed areas of the envelope or adhesive stickers or labels. This policy also helps conserve staff resources by reducing the number of incoming items they have to scrutinize for contraband. Detainees are allowed to purchase pre-screened stationery supplies such as pencils (small sized), erasers, paper, letter pads, envelopes, greeting cards, postage stamps through the Jail commissary (Def. Facts ¶ 69).

Because the policy is reasonably related to the Jail's legitimate objectives in maintaining security and conserving staff resources, the policy does not violate the constitution.

**Restrictions on food items in cells**

Plaintiffs complain that the Jail does not allow them to take back sealed food items from their meal trays into the cell, even though the same items can be bought in the commissary. Amended Complaint (Doc. 40) ¶¶ 14, 52.

Detainees are not allowed to keep any food items from their meals trays in their cell. This includes salt/pepper packets or any other component of the meal. Detainees are allowed, however, to keep sealed food items available at the commissary in their cells. The reason for this policy is that food items can be used as currency and the Jail does not want detainees to possess or hoard any items that can be used as currency. The Jail does not want detainees to have items that can be used as currency because it could be used for gambling, for example, which is illegal inside the Jail. Additionally, the policy furthers the safety and security of detainees, because a detainee could use such items as currency to pay a detainee for 'services' such as hurting or injuring another detainee. Allowing detainees to keep in their cells food items they procure from the commissary does not pose the same level of risk, because the detainee has to pay for the items and there is a record of the purchase that can be traced back to him (Def. Facts ¶¶ 58-59).

Because the policy is reasonably related to the Jail's legitimate objectives in maintaining security and conserving staff resources, the policy does not violate the constitution.

**Classification procedures**

Plaintiffs complain that they were moved or reclassified frequently without cause or due process. Amended Complaint (Doc. 40) ¶ 51. The Jail has policies and procedures concerning classification and housing (Def. Facts ¶¶ 106-07).

Prisoners have no protected liberty interest in being confined at a certain security level. *Hewitt v. Helms*, 459 U.S. 460, 468–69 (1983); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (holding that the transfer of an inmate to another prison with more burdensome conditions of confinement does not implicate due process). Accordingly, decisions concerning the security classification and housing "are entirely within the discretion of prison authorities." *Garza*, 688

F.2d at 488 (citing *Meachum,* 427 U.S. at 228). Therefore, plaintiffs' challenge to the Jail's classification procedures cannot survive summary judgment.

To the extent plaintiffs' claim is based on being denied the full amount of time out of cells allowed by the Jail rules for persons placed in administrative segregation, the claim must be dismissed because a detainee has no liberty interest in movement outside of his cell. *Antonelli*, 81 F.3d at 1430. Accordingly, even if plaintiffs were given less time out than mandated by the Jail rules in administrative segregation, it does not implicate a constitutionally protected liberty interest. *Crowder v. True*, 74 F.3d 812, 814-15 (7th Cir. 1995).

Moreover, the warden and deputy chief have been sued only in their official capacity. So the claim is essentially against the Sheriff. Here, plaintiffs are not challenging the Jail's express policies, but rather particular decisions taken by the classification sergeant and officers. But plaintiffs have no evidence suggesting that even the warden or deputy chief, much less the Sheriff, played any role in the particular decisions. For these reasons, the defendants are entitled to summary judgment.

**2.      The Jail policies plaintiffs challenge do not violate the First Amendment.**

Although detention does not automatically deprive an offender of First Amendment protections, the constitution allows greater restriction of those protections in the jail context. *Turner*, 482 U.S. at 84-84. A jail regulation that burdens fundamental rights is nonetheless valid if it is reasonably related to a legitimate penological objective and is not an exaggerated response to those objectives. *Id*. at 89. To determine if a regulation is reasonable courts must consider the following: (1) whether there is a rational relationship between the prison regulation and the legitimate governmental interest offered; (2) whether alternative means exist to exercise the restricted right; (3) whether and to what extent accommodation of the right will affect prison

34

staff, inmates' liberty, and prison resources; and (4) whether the regulation is an exaggerated response to prison concerns and if there is a ready alternative that would accommodate the right. *Id*. at 89-91. The burden of proving the invalidity of the regulation is weighty and rests with the inmate. *Singer*, 593 F.3d at 534. Courts "must accord substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and determining the most appropriate means to accomplish them." *Id*. (citing *Overton*, 539 U.S. at 132).

Although all four factors set forth in *Turner* are important, "the first one can act as a threshold factor regardless which way it cuts." *Singer*, 593 F.3d at 534. So, "[w]here . . . there is only minimal evidence suggesting that a prison's regulation is irrational, running through each factor at length is unnecessary." *Id*. (internal quotation omitted).

Applying the *Turner* test to the Jail rules plaintiffs challenge in this case shows that these policies are constitutional.

**Limits on number of items in the cell**

Plaintiffs challenge the Jail rule limiting the amount of items of personal property, including items made of paper that a detainee may keep in the cell. Amended Complaint (Doc. 40) ¶¶ 9, 32; Def. Facts ¶ 47. In general population housing units, a detainee is allowed to keep a total of three religious texts, three reading books, three personally owned school/educational books in addition to certain schoolbooks, six magazines, ten letters, two greeting cards, and twenty photographs (Def. Facts ¶ 47). In addition, a detainee may keep legal papers in his cell in a quantity not to exceed the capacity of his property bin (Def. Facts ¶ 47).

The reasons behind the Jail policy limiting the quantity of items a detainee may keep in his cell are tied to security, safety, sanitation, and fire hazard concerns, and to conserve staff

resources: reducing the amount of flammable material inside the cell to minimize fire hazard; reducing the amount of material that can be used by detainees to clog toilets and cause floods; reducing the risk of theft, trading of property, and disputes over property between detainees; and reducing the amount of waste generated in the jail (Def. Facts ¶ 49).

Thus, the Jail policy limiting the number of items in the cell is rationally related to legitimate objectives. *See Bell*, 441 U.S. 547 (maintaining institutional security and preserving internal order are essential goals); *Weir v. Nix*, 890 F. Supp. 769, (S.D. Ill. 1995) (upholding prison regulation imposing a 25-book limit for fire safety reasons); *Van Den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011) (crime deterrence and the safety of inmates are legitimate penological interests).

There are alternatives for detainees to exercise their right to access more books and publications. Detainees may send books and other items of personal property in excess of the cell-limits to the Jail's property section for storage, and rotate items (Def. Facts ¶ 48). So, for example, a detainee can send three books from his cell to the property section and replace them with three other books previously stored in his property section or newly ordered from authorized publishers or owned by the Jail (Def. Facts ¶ 48). In this way, the Jail policy is designed to accommodate the detainees' reading needs while meeting its legitimate objectives.

Allowing detainees to keep piles of property items lying around in the cell is not feasible as it may obstruct or inhibit correctional officers' view or movement when they have to visually inspect from outside the cell or enter the cell in case of emergency (Def. Facts ¶ 49). Providing more storage space in the cells is not feasible for safety and security reasons (Def. Facts ¶ 49). Providing more storage bins would increase the number of places where inmates can hide contraband, including items that could threaten the safety and security of other inmates and staff

36

(Def. Facts ¶ 49). Nevertheless, the Jail makes an exception for pro se detainees who may have more legal papers than can fit with all their other items in one property bin (Def. Facts ¶ 49). To accommodate those detainees, the Jail issues an additional property bin for them to store excess legal papers, if needed (Def. Facts ¶ 49).

For these reasons, the Jail policy limiting items in the cell is constitutional. *See Williams v. Lomen*, 2003 U.S. Dist. LEXIS 25054, 02-C-0070-C (W.D. Wis. Jan. 27, 2003) (holding that a seven-book limit did not impose a substantial burden on plaintiffs' free exercise rights).

**Packing slip rule**

Plaintiffs challenge the Jail policy prohibiting detainees from receiving books and magazines without a packing slip from the distributors. Amended Complaint (Doc. 40) ¶¶ 10, 34; Def. Facts ¶ 87.

As a matter of Jail policy, detainees are allowed to receive books and magazines only through the postal service (or Fedex or similar delivery service) from legitimate publishing companies, subscription services, or book distributors, such as Amazon.com and Barnes and Noble (Def. Facts ¶ 86). Detainees are not allowed to received books and magazines from family or friends (Def. Facts ¶ 86). The packing slip requirement ensures that the publications are indeed directly from authorized publishers or distributors, and removes any doubt of the material having come from other sources (Def. Facts ¶ 87). This rule is tied to safety and security concerns. It prevents detainees from smuggling in drugs, impermissible information, or contraband through these items that could endanger the safety and security of staff and detainees; for example, blotter drugs can be inserted onto pages of publications (Def. Facts ¶ 89).

In *Bell*, the Court upheld a "publisher's only" rule prohibiting receipt of hardcover books unless mailed directly from publishers. 441 U.S. at 550-51 (explaining that "the restriction is a

rational response by prison officials to an obvious problem."). Jail policy is to relax the packing slip requirement on a case by case basis in certain circumstances (Def. Facts ¶ 87). For example, if a detainee receives a publication from an authorized source such as Amazon, and the package is clearly marked as such, but there is no packing slip with it, deputy chief Taylor would allow the item to be delivered to the detainee (Def. Facts ¶ 87). This shows that the Jail's rule is not an exaggerated response to the problem it is trying to combat. Allowing detainees to receive books and magazines from other sources will impose a burden on the Jail's resources, as explained below. There are alternatives for detainees. Fiction and non-fiction paperback books for recreational reading are available in each cell-housing unit (Def. Facts ¶ 77). For these reasons, the policy is constitutional. *See Jones v. Salt Lake County*, 503 F.3d 1147, 1158 (10th Cir. 2007) (concluding that ban on ordering books from outside source was logically related to interest in reducing contraband).

**Personal copy of newspaper, media clippings**

Plaintiffs challenge the Jail's policy prohibiting detainees from subscribing to a newspaper or receiving a newspaper from other sources, and from receiving clippings of newspapers, magazines, and other media. Amended Complaint (Doc. 40) ¶¶ 9, 31; Def. Facts ¶ 88.

The reasons for these rules are the same as those behind the publisher's only and packing slip rules: safety and security concerns (Def. Facts ¶ 89). These rules prevent detainees from smuggling in drugs, impermissible information, or contraband through these items that could endanger the safety and security of staff and detainees (Def. Facts ¶ 89). They also prevent detainees from receiving articles that could contain something pertinent to the criminal case for

which they are being detained; for example, information on witnesses or victims, which the detainees could use to retaliate against them (Def. Facts ¶ 89).

Another reason behind the prohibition on receiving publications, newspapers, clippings of printed material, media articles, or pages torn from books, magazines from family, friends, or other sources is to conserve staff resources. It is Jail policy and procedure to search incoming mail for contraband that may jeopardize the order and security of the Jail (Def. Facts ¶ 84). The average daily detainee population in the Jail in recent years has been about 700-800 detainees (Def. Facts ¶ 90). The total number of incoming and outgoing pieces of mail averages about 200-600 per day, 1000-3000 per week, 150,000 a year (Def. Facts ¶ 90). About a third of the mail received consisted of books (Def. Facts ¶ 90). The Jail employs one full-time mail clerk, who is responsible for opening and inspecting all incoming mail for cash, check, money orders, and contraband, and scrutinizing the mail for content prohibited under the rules and content that threatens the safety or security of the jail (Def. Facts ¶ 90). The mail clerk also sorts the mail, processes the removed contraband, notifies detainees when incoming letters are withheld in part or full, and drops off the mail to the inmate mailboxes for delivery to the housing units (Def. Facts ¶ 90).

Allowing detainees to receive publications, newspapers, press clippings or pages torn from publications from family, friends, or other sources will increase the workload for the mail clerk as he or she has to scrutinize all the clippings, including photographs for contraband or impermissible content (Def. Facts ¶ 90). This will require hiring more employees to process incoming mail (Def. Facts ¶ 90). The Jail's operating budget does not currently allow any additional hiring.

Another reason detainees are not allowed to subscribe to newspapers is also to conserve staff resources (Def. Facts ¶ 91). Deputy Chief Taylor foresees detainees starting subscriptions but then stopping payment, resulting in the publisher contacting staff with issues concerning outstanding payments and other related issues (Def. Facts ¶ 90). Another reason is to reduce the amount of flammable material that the detainee keeps inside his cell to minimize the risk of fire (Def. Facts ¶ 90).

Thus, the Jail's policies are reasonably related to legitimate objectives. As previously noted, jail security and minimizing fire hazards are legitimate goals. In addition, a jail's economic interest in conserving staff resources is also a legitimate objective. *See Jackson v. Frank*, 509 F.3d 389, 391-392 (7th Cir. 2007) (upholding prison regulation banning inmates from receiving individual, commercially published photographs because of burden on prison officials in inspecting each photograph for prohibited content).

Detainees have alternate means of getting the news. The Jail subscribes to USA Today, and provides a copy of the newspaper to each housing unit. Detainees may read the newspaper during their timeouts in the dayroom (Def. Facts ¶ 64-65). There also are two televisions in the dayrooms of the housing units (Def. Facts ¶ 64). Detainees are also allowed to get news magazines from recognized publishers (Def. Facts ¶ 86, 102).

**Prohibited content**

Plaintiffs challenge the Jail's policy on prohibiting detainees from receiving mail or publications with certain content. Amended Complaint (Doc. 40) ¶¶ 12, 35.

As a matter of Jail policy, detainees are prohibited from receiving any books, periodicals, or photographs containing the following: pornographic images; nude or semi-nude pictures that contain frontal nudity; images showing genitalia, nipples or the anus; images showing sexual

acts; and pornographic books or literature that contain depictions of sexual acts as the major theme or subject matter of the book (Def. Facts ¶ 95). Detainees are also prohibited from receiving any books, periodicals, or photographs containing the following: gang related books or literature; inflammatory hate type literature; material on explosives, construction of weapons, booby traps, or martial arts; road maps or atlases; and any material deemed a threat to the safety and security of staff and detainees (Def. Facts ¶ 97).

Publications containing pornography or obscenity are prohibited to protect the safety of detainees and staff (Def. Facts ¶ 96). The aim of the policy is to reduce the risk of sexual assaults (Def. Facts ¶ 96). Some detainees have poor impulse control and if they get their hands on pornographic or obscene material, it may arouse them and increase the risk of sexual assaults (Def. Facts ¶ 96). Even if the pornographic material is ordered by someone who has good impulse control, once the material comes inside, it is hard to stop it from circulating among other detainees who do not (Def. Facts ¶ 96). Many detainees are housed in double occupancy cells (Def. Facts ¶ 96). Detainees are also allowed to interact with other in the dayroom in their housing units (Def. Facts ¶ 96).

The Jail maintains a list of unacceptable publications, which is circulated to detainees (Def. Facts ¶ 98). The list is no all-inclusive, and the mail clerk reviews all other publications received by detainees on a case-by-case basis (Def. Facts ¶ 98).

The Supreme Court has rejected a challenge to a prison policy with criteria similar to the policy the plaintiffs challenge here. *See Thornburgh*, 490 U.S. at 405-419 (upholding regulation allowing the prison from rejecting a publication determined to be detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity; contain a non-exhaustive list of criteria that may support rejection of a publication; require the warden to

review separately each issue of a subscription publication; and provide procedural safeguards for both the recipient and sender); *see also Van Den Bosch*, 658 F.3d at 785 (citing with approval *Kaufman v. McCaughtry*, 419 F.3d 678, 685 (7th Cir. 2005) (affirming district court's dismissal of prison officials who refused to distribute publications deemed pornographic); *Munson v. Gaetz*, 673 F.3d 630, 633-634 (7th Cir. 2012) (upholding ban on prisoners from receiving publications containing information about drugs, weapons, and gangs); *Gray v. Cannon*, 2013 U.S. Dist. LEXIS 98699, *9-36, 11 C 4870, 11 C 8503, 11 C 8505 (N.D. Ill. Jul. 16, 2013) (Feinerman, J.) (holding that prison inmates do not have a First Amendment right to receive photographs that depict "nudity or sexual activity.").

The Jail construes and applies this policy in a reasonable manner. It is Jail procedure for the mail clerk to consider the context of the publication containing sexual content and use her judgment while applying the mail policy to determine whether the sexual content is impermissible (Def. Facts ¶ 99). The mail clerk testified she looks for specific context to try to decipher the intent of the writing rather than what the actual words are saying (Def. Facts ¶ 99). For example, if there is a book of classic literature with a small reference to a sexual act or minor sexual content, the mail clerk would generally allow the detainee to get the book (Def. Facts ¶ 99). In her six years as mail clerk, Kim Adam's practice was to only restrict books or publications that were pretty obviously in violation of the rule (Def. Facts ¶ 99). In short, the Jail's response to the problems it is trying to combat is not exaggerated or overbroad. The Jail's policy is constitutional.

**Hard cover ban**

Plaintiffs challenge the Jail policy that prohibits detainees from receiving or possessing hard cover books, books with leather or vinyl covers, or books with spiral binding. Amended

Complaint (Doc. 40) ¶ 36; Def. Facts ¶ 92. The reasons for this policy are tied to security and safety concerns. Because of the material, these books can be used as a weapon (Def. Facts ¶ 92). Such books can also be manipulated; detainees can cut open the covers, hide drugs, razors, or other contraband in the spines or under the covers, then press the covers back in a manner that makes it hard to detect (Def. Facts ¶ 92). The spiral binding in spiral bound books can also be used as a weapon or for some other impermissible purpose (Def. Facts ¶ 92).

The Jail policy provides detainees with an alternate means of exercising their right to receive and read books. Detainees are permitted to receive or possess authorized books in paperback form (Def. Facts ¶ 92). For these reasons, the policy is constitutional. *See Pippin v. Adams Cty. Jail,* 851 F. Supp. 1228, (C.D. Ill. 1994) (upholding jail's ban against hardcover books because they can be wielded as a weapon and used to hide contraband).

**Ban on electronic appliances**

Plaintiffs challenge the Jail's policy prohibiting detainees from purchasing or having electric appliances like radios, televisions, laptops, and tablets. Amended Complaint (Doc. 40) ¶¶ 18, 38; Def. Facts ¶ 66. The Jail does not allow detainees to possess electric appliances because the Jail is a detention facility designed and built to house pre-trial detainees who are there for a short duration (Def. Facts ¶ 66). In contrast to a prison, where inmates may serve sentences spanning several years, the average length of stay for detainees at the Jail is about 30 days (Def. Facts ¶ 66). For this reason, the Jail is not equipped with electric outlets in any of the cells (Def. Facts ¶ 66). And given the short duration of time the majority of detainees stay at the Jail, it is not feasible to put such items on the commissary list for purchase (Def. Facts ¶ 66). Finally, hotpots and hot plates are disallowed because the items could pose a risk to the safety and security of detainees and staff (Def. Facts ¶ 66).

43

Detainees have alternate means of exercising their right. There are two televisions in the dayrooms of the housing units (Def. Facts ¶ 64). Detainees are also allowed to get news magazines from recognized publishers (Def. Facts ¶ 86, 102). The Jail subscribes to USA Today, and provides a copy of the newspaper to each housing unit. Detainees may read the newspaper during their timeouts in the dayroom (Def. Facts ¶ 64-65).

Because the Jail's cells are currently not equipped with power outlets, ordering the Jail to install outlets will impose a significant cost on the Sheriff, and the Jail will also have to bear increased costs of electricity in future, when detainees use those appliances. Thus, the Jail's restrictions are also reasonably related to its legitimate interest in saving costs incurred in housing detainees. *See Kimberlin v. U.S. Dept. of Justice*, 318 F.3d 228, 232-34 (D.C. Cir. 2003) (taking cost into consideration and holding that prison ban on electric musical instruments did not implicate or violate prisoners' First Amendment rights).

**3.** **Plaintiffs' equal protection claims are without merit.**

Plaintiffs also contend that the Jail imposes many restrictions on pretrial detainees that Illinois prisons do not impose on convicted prisoners. They claim that by treating detainees differently from convicted prisoners in Illinois prisons, the defendants violated the equal protection clause. This contention is without merit. The equal protection clause of the Fourteenth Amendment requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To establish such a claim, a detainee must show that: (1) he is similarly situated with prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest, such as race. If a suspect classification, such as race, or a fundamental right is implicated, a court must apply strict scrutiny to that claim. *Johnson*, 543 U.S. at 506-07. But, where, as here, the disparate

44

treatment is not based on a suspect class, the court may evaluate only whether there was a rational basis for how the plaintiff was treated. *See Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "Prison classifications are presumed to be rational and will be upheld if any justification for them can be conceived." *Flynn v. Thatcher*, 819 F.3d 990, 991-92 (7th Cir. 2016).

In this case, as explained above, the Jail is a detention facility and not a correctional facility, so its goals do not include rehabilitation of detainees or issues concerning rehabilitation (Def. Facts ¶¶ 7, 72). That is why it does not offer higher educational or vocational programs (Def. Facts ¶ 72). Moreover, as a detention facility it is designed and built to house pretrial detainees who are there for a short duration. In contrast to a prison, where inmates may serve sentences spanning several years, the average length of stay for detainees at the Jail is about 30 days (Def. Facts ¶¶ 5, 72). For this reason, the Jail is not even equipped with electric outlets in any of the cells (Def. Facts ¶ 66). In other words, it does not have the infrastructure to allow detainees to have electronic items in their cells. And given the short duration of time the majority of detainees stay at the Jail, it is not feasible to put such items on the commissary list for purchase either (Def. Facts ¶ 66). So, there are rational reasons for the Jail to treat detainees differently than the way Illinois prisons treat prisoners. Thus, plaintiffs cannot survive summary judgment on their equal protection claims.

**4.      Gonzalez's claims for injunctive and declaratory relief should be dismissed as moot.**

When a detainee is transferred from a jail to a prison, his request for injunctive relief and declaratory relief against the jail officials are rendered moot. *Higgason*, 83 F.3d at 811. Here, Gonzalez filed this lawsuit while he was detained at the Will County Jail. In September 2015, however, Gonzalez was transferred to the custody of the Illinois Department of Corrections in

45

September 2015 (Def Facts ¶ 1). There is no realistic possibility that he will be detained in Will County Jail again and be subject to the policies or actions of which he complains here. Thus, his claims for injunctive and declaratory relief are now moot and should be dismissed. *See, e.g., Young v. Lane*, 922 F.2d 370, 373 (7th Cir. 1991) (concluding that past exposure to illegal conduct at a prior facility, without threat of repetition, did not present a case or controversy that might warrant equitable relief); *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) ("An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims.").

**5. Gonzalez cannot prove any compensable damages**

Gonzalez also claims damages for past violations of his constitutional rights, but he has no evidence to prove that any of the Jail's policies or conditions of confinement caused his injuries. He suffered no harm to any of his criminal or civil cases as a result of the loss of any of his property items (Def. Facts ¶ 130). Other than the inconvenience of using small-sized pencils, Gonzalez suffered no harm from the rule prohibiting detainees from possessing pens or full-sized pencils (Def. Facts ¶ 131). Gonzalez testified that the cold conditions resulted in discomfort and at times sleep deprivation. He also caught a cold a few times. One time in D-Pod and a couple of times in M-Pod, he was so cold that the staff gave him an extra blanket and hot Theraflu (Def. Facts ¶ 132). Gonzalez admits that the Jail policy prohibiting detainees from possessing certain content did not result in any harm to any of his legal cases. Gonzalez received and sent all his legal mail; none of it was withheld, except one outgoing mail was withheld because it was addressed to a private person (Def. Facts ¶ 133). Gonzalez claims he suffered pain and soreness in his hips and back from sleeping on the thin old green mattresses. But no medical professional has diagnosed Gonzalez with any ailment, medical conditions, or symptoms attributed to a bad

46

mattress (Def. Facts ¶ 135). Gonzalez claims he suffered psychological harm, including depression, panic attacks, and anxiety; weight loss; sleep deprivation; lethargy; and malaise as a result of the conditions of confinement in the Jail. But he did not seek any medical care for any of these problems. No medical professional diagnosed Gonzalez with any psychological condition attributed to lack of access to the outdoors. The medical department arranged for counselors and psychologists to talk to him. But Gonzalez did not cooperate with them and refused treatment for the first few years of his detention (Def. Facts ¶ 134, 136).

He claims he suffered weight loss, but he does not have evidence to show that the weight loss was caused by any policies and conditions of confinement. Throughout his detention in the Jail, Gonzalez did not like being housed in a cell with another detainee, so much so that he would commit rule infractions so that he would be disciplined and sent to D-Pod, or go on hunger strikes so that he would be sent to the medical or M-Pod. In both D-Pod and M-Pod, detainees are housed in cells individually (Def. Facts ¶ 137). During his detention in the Jail, Gonzalez went on numerous hunger strikes. Whenever a detainee goes on a hunger strike, he is transferred to the medical unit, M-Pod and housed in a cell individually. He went on hunger strike because he wanted to be housed individually in a cell or because he did not like the food served by the Jail. After going on hunger strikes, Gonzalez would be closely monitored by medical staff (Def. Facts ¶ 138). Gonzalez agrees that he experienced a lot of stress, anxiety, and depression because his own mother and other members of his family testified against him in his criminal case in which he eventually plead guilty to murder (Def. Facts ¶ 139). The medical staff was aware of Gonzalez's weight loss, and monitored his weight every other week or monthly and periodically checked his health. The medical staff also provided him with snacks and nutritional supplements at times when they determined it was necessary (Def. Facts ¶ 140). Gonzalez testified that at

times during his detention, when Gonzalez ate all his meals and had access to snacks and other food from the commissary given to him by detainees, he gained weight. At other times, Gonzalez claims he lost weight even when he was not on hunger strike and was eating all his meals. The medical staff in 2015 accused Gonzalez of manipulating his weight by not eating on purpose. Gonzalez suspected he had hyperthyroidism, like other members of his family. About a week before Gonzalez was transferred from the Jail to the prison, he asked the medical staff to test him for hyperthyroidism (Def. Facts ¶ 141).

On this record, without any medical evidence to support his contention that he lost weight because of Jail policies or conditions, Gonzalez cannot survive summary judgment. *See Granville v. Dart*, No. 09 C 2070, 2011 U.S. Dist. LEXIS 25683, * (N.D. Ill. Mar. 11, 2011) (Leinenweber, J.) (granting summary judgment because "plaintiff's subjective belief that mold and mildew caused his headaches and shortness of breath, without any evidence to substantiate that belief, is insufficient for the matter to proceed to a trial."); *Mejia v. McCann*, No. 08 C 4534, 2010 WL 5149273, *7 (N.D. Ill. Dec. 10, 2010) (Conlon, J.) (same); *Walker v. Dart*, No. 09 C 1752, 2010 WL 3307079, * (N.D. Ill. Aug. 19, 2010) (Holderman, J.) (same).

## CONCLUSION

For the foregoing reasons, the court should grant summary judgment to defendants on all claims and dismiss this case.

Respectfully submitted,

**BRAD JOSEPHSON and**
**STUART TAYLOR**

By:      *s/Bhairav Radia*
         Defendants' attorney

Bhairav Radia, #6293600
O'Halloran Kosoff Geitner & Cook, LLC

650 Dundee Road, Suite 475
Northbrook, Illinois 60062
Phone: (847) 291-0200
Fax: (847) 291-9230
Email: bradia@okgc.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JASON MICHAEL GONZALEZ et al.,   )
   )
           Plaintiffs,   )     Case No.: 14 CV 4366
   )
           v.   )     Honorable Jorge L. Alonso
   )
BRAD JOSEPHSON and STUART   )
TAYLOR,   )
   )
           Defendants.   )

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2016 I electronically filed Defendants' Motion for Summary Judgment and Memorandum with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following registered participant(s):

Patrick R. Gareis
pgareis@ghlaw-llp.com

By:  *s/Bhairav Radia*
      One of their attorneys
      O'Halloran Kosoff Geitner & Cook, LLC
      650 Dundee Road, Suite 475
      Northbrook, Illinois 60062
      Telephone:  (847) 291-0200
      Fax: (847) 291-9230
      E-mail:  bradia@okgc.com