N THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JASON MICHAEL GONZALEZ et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 14 CV 4366 |
| | ) | |
| v. | ) | Honorable Jorge L. Alonso |
| | ) | |
| BRAD JOSEPHSON and STUART | ) | |
| TAYLOR, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' L.R. 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants Brad Josephson and Stuart Taylor, through their attorney, submit the following statement of undisputed material facts under Local Rule 56.1(a)(3) in support of their motion for summary judgment.

Filed in support of this statement of undisputed material facts are true and accurate copies of the following documents:

**Exhibit A:**     **Defendants' answer to Plaintiffs' amended complaint**

**Exhibit B:**     **Plaintiff Gonzalez's answers to Defendants' requests to admit**

**Exhibit C:**     **Plaintiff Bocock's answers to Defendants' requests to admit**

**Exhibit D:**     **Transcript of deposition of Stuart Taylor, including deposition exhibits:**
Dep. Ex. 1:     Deposition notice
Dep. Ex. 2:     Some policies from Jail Policy and Procedure Manual (Will 4193-4281)
Dep. Ex. 3:     Inmate Handbook June 2015 edition (Will 1900-1936)
Dep. Ex. 4:     Reports of annual Jail inspections conducted by Dept. of Corrections (2012-2015)
Dep. Ex. 5:     Significant changes made to Inmate Handbook in 2015 (highlighted)
Dep. Ex. 6:     Significant changes made to Inmate Handbook in 2014 (highlighted)
Dep. Ex. 7:     First Amended Complaint (Doc. #40)
Dep. Ex. 8:     List of commissary items available for purchase by detainees (Will 1950-1961)
Dep. Ex. 9:     Flier advertising services Plaintiffs offered to detainees as jailhouse lawyers
Dep Ex. 10:     Defendants' answers to Plaintiffs' interrogatories

**Exhibit E:**    **Affidavit of Stuart Taylor**

**Exhibit F:**    **Other relevant policies from Jail Policy Manual (Will 4450-4561)**

**Exhibit G:**    **American Correctional Association Accreditation Report (2016) (Will 4599-4678)**

**Exhibit H:**    **Transcript of deposition of Jason Gonzalez, including deposition exhibits:**
Dep. Ex. 1:    First Amended Complaint (Doc. # 40)
Dep. Ex. 2:    Gonzalez housing history as of 9/15/15 (Will 2187-2190)
Dep. Ex. 3:    Various Gonzalez requests and grievances (non-seq bates- numbers)
Dep. Ex. 4:    Various incident reports concerning Gonzalez (non-seq bates- numbers)
Dep. Ex. 5:    Gonzalez compliment concerning property department (Will 1285)
Dep. Ex. 6:    Gonzalez grievance (Will 1294)
Dep. Ex. 7:    Gonzalez compliment concerning food (Will 948)
Dep. Ex. 8:    Gonzalez motion for transfer of property (Will 1937-1949)
Dep. Ex. 9:    Gonzalez visitor & mail log as of 3/7/14 (Will 992-1044)
Dep. Ex. 10:   Gonzalez visitor & mail log as of 10/29/15 (Will 2059-2139)
Dep. Ex. 11:   Extracts from Gonzalez's medical records (Will 2682-3263) (filed under seal per HIPAA order)

**Exhibit I:**    **Transcript of deposition of Charles Bocock, including deposition exhibits:**
Dep. Ex. 1:    First Amended Complaint (Doc. # 40)
Dep. Ex. 2:    Inmate Handbook 2012 edition (Will 506-570)
Dep. Ex. 3:    Inmate Handbook 2014 edition (Will 636-706)
Dep. Ex. 4:    Inmate Handbook June 2015 edition (Will 1900-1936)
Dep. Ex. 5:    Bocock housing history report as of 6/22/16 (2 pages, not bates-numbered)
Dep. Ex. 6:    Bocock visitor & mail log as of 10/29/2015 (Will 2140-2174)
Dep. Ex. 7:    Bocock medical records (Will 3288-3314) (filed under seal per HIPAA order)
Dep. Ex. 8:    Flier advertising services Plaintiffs offered to detainees as jailhouse lawyers

**Exhibit J:**    **Transcript of deposition of Kim Adam, including deposition exhibits:**
Dep. Ex. 1:    Policy #4100 (Inmate mail/correspondence) (Will 4242-4249)
Dep. Ex. 2:    Inmate Handbook June 2015 edition (Will 1900-1936)
Dep. Ex. 3:    List of non-acceptable books and periodicals
Dep. Ex. 4:    Bocock visitor & mail log as of 5/5/2015 (Will 1436-1497)
Dep. Ex. 5:    Gonzalez visitor & mail log as of 5/5/2015 (Will 1091-1160)
Dep. Ex. 6:    Various request and grievance forms of Plaintiffs re: mail (non-seq bates nos.)
Dep. Ex. 7:    Bocock visitor & mail log as of 6/23/16 (116 pages, not bates-numbered)
Dep. Ex. 8:    Gonzalez visitor & mail log as of 6/23/16 (75 pages, not bates-numbered)

**Exhibit K:** **Transcript of deposition of Michelle Moffett, including deposition exhibits:**
Dep. Ex. 1:    Deposition notice
Dep. Ex. 2:    Policy #4160 (Inmate grievances) (Will 4253-4258)
Dep. Ex. 3:    Policy #4180 (Exercise and leisure time) (Will 4261-4263)
Dep. Ex. 4:    Policy #4270 (Inmate rights) (Will 4270-4272)
               & #4240 (TVs and video) (Will 4269)
Dep. Ex. 5:    Excerpt from Inmate Handbook June 2015 edition (Will 1900, 1902)
Dep. Ex. 6:    Excerpt from Inmate Handbook June 2015 edition (Will 1900, 1902-1905)
Dep. Ex. 7:    Excerpt from Inmate Handbook June 2015 edition (Will 1900, 1906-1911)
Dep. Ex. 8:    Excerpt from Inmate Handbook June 2015 edition (Will 1900, 1911)
Dep. Ex. 9:    Excerpt from Inmate Handbook June 2015 edition (Will 1900, 1930-1931)
Dep. Ex. 10:   Gonzalez grievances and responses (various) (non-seq bates- numbers)
Dep. Ex. 11:   Gonzalez grievances and responses (various) (non-seq bates- numbers)
Dep. Ex. 12:   Gonzalez grievances and responses (some) (non-seq bates- numbers)
Dep. Ex. 13:   Gonzalez grievances and responses (some) (Will 2331-2336)
Dep. Ex. 14:   Bocock housing history report as of 6/22/16 (2 pages, not bates-numbered)
Dep. Ex. 15:   Gonzalez housing history report as of 9/15/15 (Will 2187-2190)
Dep. Ex. 16:   Gonzalez grievance and response (one) (Will 2265)

**Exhibit L:** **Transcript of deposition of Mary Zaragoza, including deposition exhibits:**
Dep. Ex. 1:    Policy #5060 (Property disposal/storage) (Will 4273-4281)
Dep. Ex. 2:    Inmate Handbook June 2015 edition (Will 1900-1936)
Dep. Ex. 3:    Inmate request form (Will 2227)
Dep. Ex. 4:    Inmate request form (Will 2300)
Dep. Ex. 5:    Inmate request form (Will 2234)
Dep. Ex. 6:    Inmate request form (Will 2295)

**Exhibit M:** **Affidavit of Mark Colwell**

**Exhibit N:** **Work orders pertaining to complaints of cold (Will 4595-4598)**

3

## JURISDICTION AND VENUE

The court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question). Venue is proper in this district under 28 U.S.C. § 1391(b) as the events giving rise to Plaintiffs' claims occurred in this district. Ex. A (Answer to amended complaint) ¶¶ 1-2.

## PARTIES

1. Plaintiff Jason Gonzalez was a pre-trial detainee at the Will County Adult Detention Facility (hereafter, "Will County Jail" or the "Jail') from about September 22, 2009 to September 15, 2015, when he was transferred to the custody of the Illinois Department of Corrections. Ex. A (Answer to amended complaint) ¶ 1; Ex. H (Gonzalez Dep.) p.6:8-19.

2. Plaintiff Charles Bocock is a pre-trial detainee at Will County Jail. He has been detained at the Jail since June 10, 2013. He is a British citizen and a legal resident of the United States. Ex. I (Bocock Dep.) pp.5:21-6,13:14-14:4.

3. Defendant Brad Josephson is the warden of Will County Jail. The warden administers the Jail, and reports directly to the Sheriff of Will County. Josephson was appointed warden in about December 2014. He succeeded Michael O'Leary, who was the warden of the Jail when Plaintiffs' filed their initial Complaint. Plaintiffs substituted O'Leary with Josephson as a defendant in their amended complaint. Josephson has been sued in his official capacity only. Ex. A (Answer to amended complaint) ¶ 3; Ex. B (Gonzalez's answers to Defendants' requests to admit) ¶¶ 1-2; Ex. C (Bocock's answers to Defendants' requests to admit) ¶¶ 1-2; Ex. D (Taylor Dep.) pp. 8:7-9:1, 17:12-16.

4. Defendant Stuart Taylor is the deputy chief of operations at the Will County Jail. He is in charge of the day-to-day operations of the Jail, except for support services, and reports directly to the warden. Taylor was appointed deputy chief by the Sheriff in about December

4

2014. He has been employed at the Jail for about 21 years, and has previously held the positions of corrections officer, sergeant, and lieutenant. Taylor succeeded Brian Fink, who was the deputy chief of operations when Plaintiffs' filed their initial Complaint. Plaintiffs substituted Fink with Taylor as a defendant in their amended complaint. Taylor has been sued in his official capacity only. Ex. A (Answer to amended complaint) ¶ 4; Ex. B (Gonzalez's answers to Defendants' requests to admit) ¶¶ 1-2; Ex. C (Bocock's answers to Defendants' requests to admit) ¶¶ 1-2; Ex. D (Taylor Dep.) pp. 8:7-9:1, 28:10-29:1.

## FACTS

5.     Will County Jail is a medium to maximum security detention facility located in Joliet, Illinois. The Jail opened in 1990 and the facility was expanded in 2008. The Jail has the capacity to house about 887 detainees. It receives approximately 9000-10,000 detainees annually. The average daily population was about 849 in 2014, 770 in 2014, and 782 in 2015. The average length of stay of detainees at the Jail is about 30 days. Ex. D (Taylor Dep.) p. 31:13-22; Ex. E (Taylor Affidavit) ¶ 9; Ex. G (ACA accreditation report (2016)) at Will 4628.

6.     The Will County Sheriff is ultimately responsible for the administration and operation of Will County Jail. The Sheriff has appointed a warden to direct and administer the Jail on a day to day basis. The Sheriff has also appointed a deputy chief of operations, who is in charge of day to day operations of the jail, and a deputy chief of support services, who is in charge of day to day support services. Under the chain of command established by the Sheriff, the deputy chiefs report directly to the warden, and the warden reports directly to the Sheriff. In the extended absence of the warden, the responsibility and authority for command of the Jail passes first to the deputy chief of operations, then to the deputy chief of support services, then to the watch commander. The Jail employs about 212 correctional officers, 18 correctional

sergeants, six correctional lieutenants, and 41 civilian staff. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual at Will 4193; Ex. E (Taylor Affidavit) ¶ 9; Ex. F (Other relevant policies from Jail Policy and Procedure Manual) at Will 4455-4461.

7.      As noted in its mission statement, the primary purpose and role of the Jail is to provide the highest degree of security for the citizens of Will County; ensure the safety of the staff who work at the Jail and the detainees entrusted to the care of the Sheriff; ensure the appearance of detainees for trial; and provide secure, constitutional, and humane care for the detainees. Rehabilitation of detainees is not part of the Jail's mission or purpose. Ex. D (Taylor Dep.) pp. 16:10-22:3; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4193-4194.

8.      It is the policy and goal of the Will County Sheriff to ensure that the Jail complies with federal and state laws, including the Illinois County Jail Standards, established by the Illinois Department of Corrections; and the accreditation standards of the American Correctional Association ("ACA") and National Commission for Correctional Healthcare ("NCCH"), both of whom have awarded accreditation status to the Jail. The ACA accreditation standards reflect good correctional practices, current case law, new knowledge, and the experience of jails across the country with their application. The Jail is inspected periodically by the Department of Corrections and is in fact in compliance with the Illinois County Jail Standards. The Jail is periodically inspected by ACA auditors, and is in fact in substantial compliance with the ACA accreditation standards. Ex. D (Taylor Dep.) pp.37:18-43:8, 150:8-151:18; Dep. Ex. 4 attached to Taylor Dep (Dept. of Corrections Jail inspection reports (2012-2015) at Will 1962-2058; Ex. G (ACA accreditation report (2016)) at Will 4599-4678.

9.       The policies and procedures governing the day to day operation of the Jail and staff, which express the management philosophy and goals of the Jail, are contained in a Policy and Procedure Manual. Information on conditions of confinement and rules governing detainees during their detention in Will County Jail are also reflected in the Policy and Procedure Manual. The Policy and Procedure Manual is reviewed annually and revised as needed to ensure compliance with federal, state, and local laws; the accreditation standards of the ACA and NCCH; and the goals of the Jail. Ex. D (Taylor Dep.) pp. 16-17, 23-26; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual (Will 4193-4281)); Ex. F (Other relevant policies from Jail Policy and Procedure Manual) at Will 4450-4454.

10.       Rules governing detainees during their detention in Will County Jail, as well as information concerning the conditions of confinement, including rights and privileges, are set forth in the Inmate Handbook, with which Plaintiffs are familiar. The rules listed in the Inmate Handbook are designed to maintain order, discipline, safety, and security in the jail. The Inmate Handbook is reviewed annually and revised or updated as necessary by a group comprising the warden, deputy chief of operations, deputy chief of support services, and the compliance deputy. In the time period relevant to this lawsuit, the Inmate Handbook was revised and updated in 2012, 2014, and 2015. Ex. D (Taylor Dep.) pp. 34-36, 43:18-59:20, 144:19-146:14; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015 edition (Will 1900-1936)); Dep. Ex. 5 attached to Taylor Dep. (Significant changes made to Inmate Handbook in 2015 (highlighted)); Dep. Ex. 6 attached to Taylor Dep. (Significant changes made to Inmate Handbook in 2014 (highlighted)); Ex. I (Bocock Dep.) pp. 41:22-43:19.

11.       The Jail contracts with private vendors Correct Care Solutions (CCS), to provide medical care to detainees; Securus, to provide phone services to detainees; and Keefe Inc., to

provide commissary to detainees. The Jail offers a variety of snack items, personal hygiene items, and writing supplies for purchase through the commissary, subject to rules set forth in the Inmate Handbook. Prices of commissary items are higher than the prices outside the Jail, because of the fees and costs involved in procuring the items from the vendor and providing the items to the detainees. Ex. D (Taylor Dep.) p. 98: 10-24; Ex. E (Taylor Affidavit) ¶ 10; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1917-1919; Dep. Ex. 8 attached to Taylor Dep. (List of commissary items) at Will 1950-1955.

**Cells and housing units**

12.     All cell housing units (or pods) in the Jail have a common dayroom surrounded by or facing cells. The older housing units, A-F, each have 46 single occupancy cells. The newer housing units, such as G-L, each have 28 double occupancy cells. The correctional officers' stations are located in the dayroom allowing for full observation, supervision, and personal interaction with detainees 24 hours a day, in line with the Jail's 'direct supervision' management philosophy set forth in its policy manual. Ex. D (Taylor Dep.) pp. 20:14-22:3, 59:21-60:20; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4195-4197; Dep. Ex. 4 attached to Taylor Dep. (Dept. of Corrections Jail inspection reports) at Will 2029.

13.     The cells in the older housing units, A-F, are 11.3 feet long and 7 feet wide, with a ceiling height of 8 feet. The cells in the newer housing units, such as G-L, are 12.8 feet long and 8 feet wide, with a ceiling height of 8 feet. Each cell in the older housing units, A-F, has a concrete or metal bunk, desktop, shelf, and a prison-type uncovered toilet and sink combination with piped hot and cold water. Each cell in the newer housing units, such as G-L, has two concrete or metal bunks, desktop, a small metal stool attached to the floor, shelf, and an

uncovered toilet and sink combination with piped hot and cold water. There is no partition or enclosure around the toilet for privacy in the cell because it would give the detainees a place to hide or obstruct the officer's view of the entire cell, preventing them from seeing the detainees when they check the cell. Ex. E (Taylor Affidavit) ¶ 11; Ex. D (Taylor Dep.) pp. 60:21-62:23, 65:4-11, 113:18-114:2, 129:1-17; Dep. Ex. 4 attached to Taylor Dep. (Dept. of Corrections Jail inspection reports) at Will 2039; Ex. I (Bocock Dep.) pp. 123:8-125:8, 192:7-11.

14.     The top bunk in the newer cells, such as G-L, is about six feet high off the floor. There are no ladders in the cell. To get on or off the top bunk, the detainee may step on the stool or desktop. There are no ladders or steps to access the top bunk. Generally, detainees are assigned to cells, not specific bunks within the cell; and the detainees decide who sleeps on which bunk. Ex. A (Answer to amended complaint) ¶ 8; Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) p. 8, no. 23; Ex. I (Bocock Dep.) pp. 84:10-14, 90-91; Ex. H (Gonzalez Dep.) pp. 21:16-22:4.

15.     Bocock was assigned to a one-person cell for the first year or so in the Jail. Since then, he has been housed in a two-person cell for most of his time. Bocock estimates that of all the time he has been assigned to a two-person cell, he has had a top bunk for about 30-40% of the time. He testified he has slipped a dozen times while getting on or off the top bunk. Bocock testified that some of the stools in the cells are wobbly. He has not complained about the stools to Jail staff. Of those times, he slipped completely and fell on the ground about three or four times. As a result, he claims he has had some bruising and muscle twist, which caused pain for a day or two, but has not suffered any injuries serious enough to call a nurse.  Ex. I (Bocock Dep.) pp. 87-89:1, 92:17-95:18; Dep. Ex 5 attached to Bocock deposition (Bocock's housing history report).

16.     During his detention in the Jail, Gonzalez had a top bunk only during the time he was housed in I-Pod. Since July 2012 until his transfer to the IDOC, Gonzalez was housed in I-Pod for about 40 days in 2013 and five and a half months in 2014. During the times he was housed in I-Pod, Gonzalez had to use the top bunk only for a month or two, but not too much more than that. Gonzalez testified that he had no problem getting on or off the top bunk, but you had to climb over a 2-3 inch lip on the side of the bunk, which hurt your hands or knees. Gonzalez testified that at times he banged his knee or elbow while getting on or off the top bunk, resulting in soreness and temporary discomfort. One time he slammed his finger onto the lip and the finger was swollen for a week, causing discomfort. He saw the nurse, who gave him an ice pack. Ex. H (Gonzalez Dep.) pp. 22:16-25:9; Ex. 2 attached to Gonzalez Dep. (Gonzalez's housing history) at Will 2187-2190.

17.     If a detainee cannot get on or off the top bunk because of some physical problems or limitations, the detainee will be specifically assigned to the lower bunk, if the jail doctor determines it is needed. This is called a bottom bunk restriction. Bocock has been given a bottom bed restriction by the jail doctor in summer 2016 on account of his hernia. Ex. I (Bocock Dep.) 86-87:6, 91:22-92:16.

18.     When Plaintiffs filed this lawsuit, a rule in the inmate handbook prohibited detainees from stepping on the desktop in their cell for any reason. A detainee could be disciplined for violating the rule if, for example, he stepped on the desk to get on or off the top bunk. When this was brought to the attention of the group of Jail officials that reviews the rules in the inmate handbook annually, the rule was changed. With effect from June 2015, the rules do not prohibit detainees from stepping on the desktop to get on or off the top bunk. Bocock was never formally disciplined for breaking the old rule. Ex. D (Taylor Dep.) pp. 36:8-22, 43:22-

44:12, 49:23-51:1; Ex. 5 attached to Taylor Dep. (Significant changes to Inmate Handbook in 2015); Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1924; Ex. I (Bocock Dep.) pp. 90-91.

19.     The cells in the older housing units, consisting of A-F pods, have a window to the outside, but the dayrooms do not have windows. The cells in the newer housing units, such as G-L pods, do not have a window, but there are large windows in the dayrooms and indoor recreation areas, which allow natural light to enter. Ex. D (Taylor Dep.) pp. 65:12-66:12, 67:10-69:9, 125:17-126:7. Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) at p. 7, no. 20; Ex. K (Moffett Dep.) pp. 27:16-28:11; Ex. I (Bocock Dep.) pp. 52:11-53:21.

**Clothing and bedding**

20.     It is the policy of the Jail to issue all detainees with clothing during their confinement. The policy recognizes the need for detainees to wear uniform clothing in a correctional setting and to maintain the status quo. It is also Jail policy to provide clothing to detainees that is color coordinated with the detainees' classification and housing unit assignments. Ex. F (additional policies) at Will 4519-4522, 4523; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1914.

21.     All detainees are issued a mattress, two bed sheets, and a wool blanket. It is Jail policy to provide detainees with sufficient blankets as needed for comfort. Detainees are issued the following items twice a week: towel, uniform top, uniform bottom, socks, underwear, tee shirt, and wash cloth. Ex. F (additional policies) at Will 4520; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1914, 1925; Ex. I (Bocock Dep.) p. 28-29.

22.     Detainees are also issued long-sleeved thermal vests upon request. Bocock has had a thermal vest at various times during his detention. Gonzalez had a thermal vest most of the time during his detention. Ex. D (Taylor Dep.) p. 128:1-10; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1914; Ex. H (Gonzalez Dep.) pp. 80:3-81:17; Ex. I (Bocock Dep.) pp. 23:19-28:10.

23.     The mattresses are about 4-5 inches thick and comfortable when they are new. They get worn out and flattened and are at most 2 inches, and less comfortable, as they get older. The old mattresses are mostly worn out and flattened. If a mattress is worn out, the detainee may request for a new one, and the officer is supposed to replace it. During his three years at the Jail, Bocock has had older green mattresses for about eight months, mostly at the beginning of his stay; the rest of the time, he has had the newer blue mattresses. Gonzalez testified that he slept on the older green mattress for much of his detention in the Jail, but did get to sleep on the newer blue mattresses from 2012 for some stretches of time, including when he was in I-Pod for about six months. Ex. A (Answer to amended complaint) ¶ 27; Ex. D (Taylor Dep.) p. 113:18-114:5; Ex. F (additional policies) at Will 4520; Ex. L (Moffett Dep.) pp.106-107:1; Ex. I (Bocock Dep.) pp. 28:11-31, 179:17-180:7; Ex. H (Gonzalez Dep.) pp. 115:3-118:9.

24.     As a matter of Jail policy, detainees are not allowed to buy clothing, shoes, or jewelry to wear inside the Jail. In addition for the need to have detainees wear uniform, color-coordinated clothing, there are three main reasons behind this policy. First, as a practical matter, the majority of detainees stay at the jail for a short duration of time. Second, non-jail clothing, shoes, and jewelry can be used as currency by detainees, which can pose a risk to the safety and security of the detainees and staff. Third, jewelry can be fashioned into weapon. The Jail allows detainees to wear personal or civilian clothing for court appearances if ordered by the court. Ex.

A (Answer to amended complaint) ¶ 21; Ex. D (Taylor Dep.) pp. 105:19-106:5; Ex. F (additional policies) at Will 4519-4522, 4523-4525.

**Cell lighting**

25.     In the older housing units in use, i.e., A-F blocks, there are four light bulbs in each detainee cell. All four light bulbs are contained in one overhead light fixture. The light fixture is located above the bunk/bed and runs in the same direction length-wise as the bunk/bed. SHU and Tenders dorm which are not in use have different lighting from A-F. Ex. M (Colwell Affidavit) ¶ 4.

26.     One of the four light bulbs in the cells in A-F blocks is the night light bulb, located on top of the overhead fixture, facing upwards. This night bulb remains on all the time. Neither a detainee nor any correctional officer can turn the night bulb off. The night bulb is commonly known in the industry as a low wattage biax compact fluorescent bulb bearing model or part number F9BX/SPX27 and F9BX/827. The relevant specifications for F9BX/SPX27 and F9BX/827 are: Wattage: 9 watt; Length: 6.59 inches; Lumens (mean): 600; Color rendering: 2700K. Ex. M (Colwell Affidavit) ¶ 5.

27.     Of the remaining three light bulbs in the old cells in A-F blocks, two are on the bottom of the overhead fixture, facing downwards; and one is on the top of the fixture, facing upwards. These three light bulbs are standard fluorescent light bulbs, commonly known in the industry as a standard 4 foot fluorescent light bulb bearing model or part number F32T8/SP41. The relevant specifications for Part # F32T8/SP41 are: Wattage: 32 watt; Length: 4 feet; Lumens (mean): 2300; Color rendering: 4100K. There is a switch on the side of the light fixture which the detainee can turn on and off. The switch controls the two bulbs on the bottom of the fixture. The detainee can turn the bottom two light bulbs on or off whenever he or she wants. In cell-

blocks A, B, C, and dayroom two of F, the correctional officer controls the remaining top bulb, and turns it on or off per the Jail's day/night schedule. In cell block D, E, and day rooms 1 and 3 F the officer controls all lights except the night bulb, and turns them on or off per the Jail's day/night schedule. Ex. M (Colwell Affidavit) ¶ 6.

28.     The cell blocks G-L in the newer housing units also have four light bulbs in each detainee cell.  All four light bulbs are contained in one overhead F32 light fixture. In G-L the F32 light fixture is located above the desk and runs in a 90 degree angle to the direction, length-wise, of the bunks, except for cells 1, 2, 27, and 28, in which the F32 light fixture is located at the foot of the bunks and on the same wall as the bunks. (There is another difference in lighting in Cells 1, 2, 27, and 28 of G-L pods, as is explained in a paragraph below.) M Pod/Block has the fixture located parallel to the bunk/bed. N Dorm and W Dorm just have general F32T8SP41 lighting in the dorm area above the bunk beds and dayroom area.  Ex. M (Colwell Affidavit) ¶7.

29.     One of the four light bulbs in the cells in G-M blocks is the night light bulb, located on the bottom of the overhead fixture, facing downwards. This night bulb remains on all the time. Neither a detainee nor any correctional officer can turn the night bulb off. The night bulb is commonly known in the industry as a low wattage biax compact fluorescent bulb bearing model or part number F9BX/SPX27 and F9BX/827. The relevant specifications for F9BX/SPX27 and F9BX/827 are: Wattage: 9 watt; Length: 6.59 inches; Lumens (mean): 600; Color rendering: 2700K. Ex. M (Colwell Affidavit) ¶ 8.

30.     The remaining three light bulbs in the cells in G-L blocks are located with two facing up and one facing down.  M Pod has one bulb facing up and two facing down.  These three light bulbs are controlled and turned on or off by the corrections officers. These three light bulbs are standard fluorescent light bulbs, commonly known in the industry as a standard 4 foot

fluorescent light bulb bearing model or part number F32T8/SP41. Cells 1, 2, 27, and 28 in G-L pods are a little different in that they have an additional light fixture above the toilet. This light fixture uses F17/T8/SP41 bulbs that are controlled by the officer and turn on and off the same time as the other F32 bulbs in the other fixture. The relevant specifications for Part # F32T8/SP41 are: Wattage: 32 watt; Length: 4 feet; Lumens (mean): 2300; Color rendering: 4100K. Ex. M (Colwell Affidavit) ¶¶ 9-10.

31. During the day, the officers need the illumination from the 32-watt bulbs in the cells to perform their visual observations of inmates, physical inspections, searches, and shakedowns of cells for the safety and security of inmates and staff, as well as ensure that inmates are taking their medications properly. Ex. E (Taylor Affidavit) ¶ 20.

32. It is the policy of the Jail to perform a visual observation of each inmate through a security check at least once every 30 minutes when the inmates are confined to their cells. Performing frequent visual observations of inmates is important to ensure the inmate's general well-being as well as to identify any 'at risk' inmate showing violent or self-destructive behavior. Ex. E (Taylor Affidavit) ¶ 15.

33. Performing visual inspections of the cells is crucial to prevent the introduction of weapons or other contraband into the Jail, detect the presence of weapons, escape devices, or other contraband within the Jail, identify potential security defects or breaches, discourage theft or malicious waste or destruction of Jail property, and assure adherence to Jail rules. Ex. E (Taylor Affidavit) ¶ 17.

34. Between about 10:30 p.m. and 6:30 a.m., the standard operating procedure is for the correctional officers to dim the lighting in the dayrooms and turn off the 32-watt bulbs that they control in the cells, so that only the night light is left on in the cells. The Jail needs to have

the one night light bulb on in each cell at all times so that there is at least some illumination for the officers on the night shift to be able to see inmates inside the cell, take count, and perform their visual cell checks every 15 or 30 minutes. It would not be as effective to use a flashlight (instead of leaving the night light on), because it is hard to see every part of the cell with only flashlight given the layout and furniture in the cell. Ex. D (Taylor Dep.) pp. 63:16-64:7; Ex. E (Taylor Dep.) ¶ 19; Ex. I (Bocock Dep.) 79:9-80:17, 81:23-82:5.

35.     Recently, the Jail began replacing all the 9-watt night light bulbs in all cells in the Jail, including the older and newer housing units, with 7-watt night light bulbs. These are also low wattage biax compact fluorescent bulbs bearing model or part number F7BX/827/ECO. The relevant specifications for F7BX/827/ECO are: Wattage: 7 watt; Length: 5.39 inches; Lumens (mean): 425; Color rendering: 2700K. The replacement of the night light bulbs will continue in a phased manner. Whenever any 9-watt night light bulb in a cell stops working or needs to be replaced, the Jail will replace it with the new 7-watt night light bulb. Until the end of August 2016, the old 9-watt night light bulbs have been replaced with the new 7-watt night light bulbs in about twenty cells in the Jail. Ex. M (Colwell Affidavit) ¶¶ 12-13.

**Heating and ventilation**

36.     It is Jail policy to provide a safe and sanitary living and working environment for detainees and staff. Accordingly, the Jail has established procedures and rules to ensure that the cells, housing units, and other areas of the Jail are clean and in good repair. Ex. F (Other relevant policies from Jail Policy and Procedure Manual) at Will 4476-4489.

37.     It is Jail policy to inspect on a regular basis, all aspects of the facility's operations and physical plant to ensure the integrity of the facility's security, safety, and sanitation, and by doing so, guarantee a safe and secure environment for both staff and inmates. Jail sergeants are

required to conduct a daily patrol of all areas occupied by detainees. Corrections officers are required to inspect their housing units and immediately address all housekeeping or maintenance problems. The officers may refer minor repairs directly to the maintenance unit by generating a work order. If an officer or sergeant cannot address or correct a problem, are required to refer the problem to the in-duty custodial staff or watch commander. Maintenance staff is required to inspect boilers and furnaces once a shift. Ex. F (other relevant policies from Policy Manual) at Will 4476-4480, 4485-4489.

38.　　It is Jail policy to maintain a systematic plan for maintenance of the facility. The Jail has written procedures concerning maintenance. The maintenance supervisor is responsible for maintenance and repair activities in the Jail, and supervises a team of maintenance workers. Requests for routine maintenance or repair work are made by work order. The maintenance supervisor is required to review all work orders and assign maintenance staff to complete the work. Ex. F (other relevant policies from Policy Manual) at Will 4485-4489.

39.　　Jail policy requires the a proper ventilation system that provides at least fifteen (15) cubic feet of continuous air per minute of circulated air, with a minimum of five cubic feet of outside air. Air quality and quantities shall be documented by an outside qualified source on at least a bi-annual basis. Ex. F (other relevant policies from Policy Manual) at Will 4489.

40.　　During the winter of 2014-15, there was a particular frigid stretch because of the polar vortex. This was shortly Stuart Taylor assumed the position of deputy chief of operations. He recalls there were complaints from detainees during that frigid stretch. Taylor testified that the jail is large and it was abnormally frigid outside. When there are multiple complaints, the command staff has maintenance staff check the heating system immediately. Taylor recalls that the maintenance staff checked the temperatures in the housing units. He estimates the lowest the

17

temperatures in the Jail during the winter is not lower than 68 degrees. During the audit of the Jail conducted by the American Correctional Association in November 2015, the audit team found the environmental conditions to be pleasant. The audit team found that the temperature and lighting in the Jail was within normal limits, and the airflow throughout the building was good. Ex. D (Taylor Dep.) pp. 126:11-128:24; Ex. G (ACA accreditation report 2016) at Will 4631; Ex. H (Gonzalez Dep.) pp. 77:21-79:14.

41.     Jail records show that on three occasions in February 2015, i.e., February 20, 25, and 26, the maintenance department received work orders generated from D-Pod in which the officer or detainees were complaining about it being too cold. All three were assigned to a technician. Copies of the work orders indicate that all three were "completed" on the same day they were received. Another work order was received from D-Pod on August 27, 2015 complaining about it being too cold in cell D-26. The copy of this work order indicates it was "completed" on August 28, 2015. Ex. N (copies of work orders) at Will 4595-4598.

42.     Bocock testified that a lot of times the temperature fluctuates in the Jail, so that it feels to hot or too cold to him. But there were two particular time periods when it was severely cold. One was in the winter of 2013, and the other was during the winter of 2014-15. He estimates that the duration of severe cold during each of those times was about a week or more before the Jail staff resolved the problem. Bocock had a wool blanket during both incidents. During the particular incident in 2013 winter, he remembers some officers would allow the detainees to take their blankets into the dayroom, but some would not allow. During the particular 2014-15 winter incident, he remembers jail staff coming inside the housing units and cells and taking temperature readings. Ex. I (Bocock Dep.) pp. 95:19-101:11.

43.     Bocock testified that he felt unbearably cold or hot at times when there were problems with the cooling or heating in his housing unit. The cold was more bearable because he could wrap a blanket around him, but the heat was less bearable because you couldn't remove your clothes. He did not suffer any long term harm to his health. Ex. I (Bocock Dep.) pp. 101:12-103:1.

44.     Gonzalez testified that he and other detainees submitted several grievances complaining about the freezing conditions in D-Pod during the winter of 2014-15. Eventually, staff addressed the matter and estimates they turned the heat up to 60 degrees. Gonzalez estimates it took 30 days, but admits that the grievance forms more accurately reflect the time-frame. Gonzalez testified he did not ask for extra blankets because he did not know you could request for more blankets. But Jail staff allowed him to wear a lot of extra clothes and he probably also had on a thermal vest. Ex. H (Gonzalez Dep.) pp. 78-82.

**Property storage and limits**

45.     It is Jail policy to provide space for the safe and secure storage of detainees' personal property and provide accountability for their personal property and valuables while they are detained. The Jail's property department is staffed by clerks and overseen by the property sergeant, Mary Zaragoza. The Jail has a property storage room where various personal belongings of inmates are stored. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4273-4281; Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) pp. 6-7, no. 18; Ex. L (Zaragoza dep.) pp. 7-10.

46.     All detainees are issued a 14 gallon plastic property bin to store items of personal property in their cell. All commissary items and property items that a detainee is allowed to keep in the cell must be stored in the property bin, with exceptions specified in the Inmate Handbook.

Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1901, 1924; Ex. L (Zaragoza Dep.) pp. 11-12, 16.

47.     It is Jail policy to limit the amount of authorized items of personal property, including items made of paper, such as books, magazines, mail, greeting cards, and photographs that a detainee may keep in the cell. In general population housing units, a detainee is allowed to keep a total of three religious texts, three reading books,  three personally owned school/educational books in addition to schoolbooks provided by the Center for Correctional Concerns, six magazines, ten letters, two greeting cards, and twenty photographs. In addition, a detainee may keep legal papers in his cell in a quantity not to exceed the capacity of his property bin. Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1925-1927; Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) pp. 6-7, no. 18; Ex. L (Zaragoza Dep.) pp. 12-13, 18-20.

48.     Detainees may send books and other items of personal property in excess of the cell-limits to the Jail's property section for storage. So, for example, a detainee can send three books from his cell to the property section and replace them with three other books previously stored in his property section or newly ordered from authorized publishers or owned by the Jail. Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) pp. 6-7, no. 18; Ex. L (Zaragoza Dep.) pp. 12-13, 23; Ex. I (Bocock Dep.) p. 155:17-157.

49.     The reasons behind the Jail policy limiting the quantity of items a detainee may keep in his cell are tied to security, safety, sanitation, and fire hazard concerns, and to conserve staff resources: reducing the amount of flammable material inside the cell to minimize fire hazard; reducing the amount of material that can be used by detainees to clog toilets and cause floods; reducing the risk of theft, trading of property, and disputes over property between

20

detainees; and reducing the amount of waste generated in the jail. Allowing detainees to keep piles of property items lying around in the cell is not feasible as it may obstruct or inhibit correctional officers' view or movement when they have to visually inspect from outside the cell or enter the cell in case of emergency. Providing more storage space in the cells is not feasible for safety and security reasons. Providing more storage bins would increase the number of places where inmates can hide contraband, including items that could threaten the safety and security of other inmates and staff. Nevertheless, the Jail makes an exception for pro se detainees who may have more legal papers than can fit with all their other items in one property bin. To accommodate those detainees, the Jail issues an additional property bin for them to store excess legal papers, if needed. Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) pp. 6-7, no. 18; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4232; Ex. L (Zaragoza Dep.) pp. 11:22-12:7; Ex. D (Taylor Dep.) pp. 115:1-20; Ex. E (Taylor Affidavit) ¶ 24.

50.     The property department gets numerous requests from detainees to swap out property from their cell with property from the storage room. Both Gonzalez and Bocock accumulated very large amounts of possessions during their detention at the Jail. They made scores of requests to send or get property items during their detention. The property sergeant and clerks do their best to find their items, but at times it has been difficult because of the large volume and nature of the items. Both Gonzalez and Bocock complimented the property sergeant and clerk for how good they were at their jobs. In October 2014, the property clerk went above and beyond to help find a book Gonzalez requested. Recently, one of the property clerks helped index and itemize Bocock's legal paperwork so that it would be easier to track and locate. Ex. L

(Zaragoza Dep.) pp. 25-28; Ex. I (Bocock Dep.) pp. 163:19-164:2, 164:12-165; Ex. H (Gonzalez Dep.) pp. 64-65:15; Ex. 5 attached to Gonzalez Dep. at Will 1285.

51.     Sometimes detainees' property is lost in the Jail. It can happen for various reasons; for example, because the property wasn't bagged in a timely or proper fashion by the officer in the housing unit, resulting in some items being misplaced or stolen by detainees. It can also get lost in the property room because it is mislabeled, although the property section does have a system of labeling property. Property sergeant Zaragoza has not found that any of Gonzalez's or Bocock's property was stolen by any property clerks she supervises. Ex. L (Zaragoza Dep.) pp. 28-29, 35:1-11, 49:3-13.

52.     The property clerks try to fulfill requests for property swaps on the same shift or day that they receive the request. Sometimes requests can take more than a day to fulfill because, for example, they are tending to their other duties. In case of detainees with very large amounts of property, such as Gonzalez and Bocock, the delay could result from the large amount of material the clerks have to sift through to locate items. The Jail procedure calls for requests to be fulfilled within 5 days. The property sergeant testified that in her experience it does not take the property section more than five days to fulfill detainee requests. Ex. L (Zaragoza Dep.) pp. 30-32, 35.

53.     Bocock testified that delays in getting back items he requests from the property department are very common. Occasions when the property department has not been able to find Bocock's items are less common. Bocock has complained to the property department many times. Gonzalez and Bocock testified that sergeant Zaragoza and her property clerk were both very reasonable and helpful to them. Ex. I (Bocock Dep.) pp. 161:1-163:7, 164:12-165; Ex. H (Gonzalez Dep.) pp. 64-65:14; Ex. 5 attached to Gonzalez Dep. at Will 1285.

54.     It is Jail practice and procedure to replace or pay for the replacement of any item of a detainee's property that is lost, stolen, or goes missing from the property storage room. The detainee may submit a grievance or request form notifying the Jail of the missing item. The grievance is handled initially by the property sergeant, and forwarded to deputy chief Taylor for approval. Upon approval from Deputy Chief Taylor, the missing item is replaced. Detainee property has gone missing from the property room on occasion in the past. But Deputy chief Taylor is not aware whether any of Gonzalez's or Bocock's property was lost or stolen from the property room. Ex. D (Taylor Dep.) pp. 93:20-95:20; Ex. L (Zaragoza Dep.) pp. 32:15-24, 49:14-50:9; Ex. H (Gonzalez Dep.) pp.56:13-58:14.

**Food**

55.     It is Jail policy to provide detainees adequate nutrition in the form of three well-balanced nutritional meals, amounting to at least 2000 calories, daily. At least two of the three meals provided daily are hot. Per Jail procedure, a registered dietitian reviews annually the menus and meals, to ensure that they meet the nationally recommended dietary allowances for basic nutrition for appropriate age groups. Only menus approved by the dietitian are utilized by the food service staff. Special diets for therapeutic or religious reasons are available. An annual food survey is conducted to get input from detainees concerning food preferences. Gonzalez complimented the Jail for improvements in the food in October 2013. Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1901; Ex. F (Other relevant policies from Jail Policy and Procedure Manual) at Will 4198-4204; Ex. D (Taylor Dep.) pp. 135:7-137:2; Ex. H (Gonzalez Dep.) pp. 89:9-90:15; Ex. 7 attached to Gonzalez Dep. at Will 948.

56.     There is a gap of up to fourteen hours between dinner in the evening and breakfast the next morning. During that time period, detainees are allowed to eat food items procured from

the commissary. The reason the Jail cannot reduce the 14-hour time period is that it does not have kitchen staff available during that time period. The kitchen staff leaves at 7 p.m., after dinner service is completed between 5:00-6:30 p.m., and returns the next morning. Breakfast is served at 6:30 a.m. It used to be served at 6:00 a.m., but was pushed back to 6:30 a.m. in response to Plaintiffs' complaint to the Department of Corrections. Ex. A (Answer to amended complaint) ¶ 15; Ex. D (Taylor Dep.) pp. 99:16-100:10; Ex. F (Other relevant policies from Jail Policy and Procedure Manual) at Will 4203; Ex. I (Bocock Dep.) 51, 192:15-194:3, 193:17-194:3, 195:22-196:3.

57.     Since assuming his position as deputy chief of operations, Stuart Taylor is neither aware nor has he been informed by the Jail's medical staff, or anyone else, of any detainee diagnosed by medical staff with an illness or injury attributed to the 14-hour gap between dinner and breakfast or lighting conditions in the Jail's cells. An audit of the Jail by the American Correctional Association in November 2015 found no evidence of any documented illnesses attributed to food service operations in the preceding 12 months. Ex. E (Taylor Affidavit) ¶ 23; Ex. G (ACA accreditation audit report (2016) at Will 4665.

58.     As a matter of Jail policy and practice, if a detainee chooses not to eat a specific food item from any meal provided to him, the detainee is required to throw it away. Detainees are not allowed to keep any food items from their meals trays in their cell. This includes salt/pepper packets or any other component of the meal. Detainees are allowed, however, to keep sealed food items available at the commissary in their cells. The reason for this policy is that food items can be used as currency and the Jail does not want detainees to possess or hoard any items that can be used as currency. The Jail does not want detainees to have items that can be used as currency because it could be used for gambling, for example, which is illegal inside the

24

Jail. Additionally, the policy furthers the safety and security of detainees, because a detainee could use such items as currency to pay a detainee for 'services' such as hurting or injuring another detainee. Allowing detainees to keep in their cells food items they procure from the commissary does not pose the same level of risk, because the detainee has to pay for the items and there is a record of the purchase that can be traced back to the detainee. Ex. A (Answer to amended complaint) ¶ 14; Ex. D (Taylor Dep.) pp. 95:21-98:9; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1913.

59.     Once a single serving commissary item is opened it must be consumed or disposed of. Portions of an individual food item may not be saved. A single serving commissary food item is defined as any package that contains one or more food items and/or any package that has food items sold with separately wrapped seasoning packets. Examples of single serving food items include Pop Tarts and Ramen noodles. This rule does not include multiple serving items, such as hard candy, that are individually wrapped. The reason for this rule is that if food is left sitting out in the cell, it can attract insects; and if some items, like canned tuna, if left opened too long, can make the detainee sick. Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1918; Ex. D (Taylor Dep.) p. 53:7-22.

**Recreation and leisure**

60.     Each housing unit has a recreation area. Of the older housing units, consisting of A-F pods, A, B, C, E, and F pods have outdoor recreation areas but no indoor recreations area. D Pod has both outdoor and indoor recreation areas. The newer housing units, such as G-L, have indoor recreation areas, but no outdoor recreation areas. Ex. G (ACA accreditation report) at Will 4628; Ex. H (Gonzalez Dep.) pp. 10-18; Ex. I (Bocock Dep.) pp. 44-45:9, 49:22-24; Ex. H (Gonzalez Dep.) pp. 10-11, 17-20:11.

61.     The indoor recreation areas are about 30 feet by 40 feet in size, equipped with basketball hoops and basketballs. Detainees can also use the indoor recreation area to exercise. Detainees may use the indoor recreation area whenever they want on their scheduled time out of their cells, provided there are not too many detainees in that area all at once. They may use the outdoor recreation area with the permission of the corrections officer, except after sunset and during inclement weather. When Bocock was housed in B-Pod in 2013, detainees were not allowed to use the outdoor recreation area during the fall/winter time during inclement weather. Bocock has never been denied the use of the indoor recreation area during his detention (except when something is broken or dirty in there), and has used the indoor recreation area on and off throughout his detention. Ex. D (Taylor Dep.) pp. 69:10-71:16; Ex. I (Bocock Dep.) pp. 51:24-60:13.

62.     There is no policy or rule prohibiting detainees from exercising in their cells, except that detainees are not allowed to use any of the furniture or fixtures as part of their workout. Bocock exercises on and off in his cell. Ex. I (Bocock Dep.) pp. 55:12-57:2; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1924.

63.     Timeouts are scheduled periods of time when detainees are allowed out of their cell and into the dayroom. It is Jail policy to maintain a schedule that allows detainees timeouts to participate in recreational activities and other programs, but also provides for an orderly and safe living and working environment. Per the Jail schedule, detainees are locked in their cells at night from about 10:30 p.m. to about 6:30 a.m. During the day, detainees in general population housing units are scheduled to be allowed outside their cells for about two and a half hours in the morning, about two and a half hours in the afternoon; and about three and a half hours in the evening/night. Bocock testified that in I-Pod, the detainees are allowed outside the cell for about

26

two and a half hours in the morning, about forty-five minutes to one hour and forty five minutes in the afternoon, and about two to two and a half hours at night. The scheduled timeouts are curtailed in case of administrative lockdowns or other security needs. Ex. D (Taylor Dep.) pp. 69:22-70:10; Ex. F (Other relevant policies from Jail Policy and Procedure Manual) at Will 4473-4475; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1911; Ex. I (Bocock Dep.) pp. 46:24-51:1, 79:9-14.

64. During timeouts, detainees may use the shower facilities, watch television, use the telephone, exercise in the indoor or outdoor recreation areas, and socialize with others. There are two televisions in the dayrooms of the housing units. Television programming is at the corrections officer's discretion. A newspaper and board games are also generally available for use in the dayroom. Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1911; Ex. D (Taylor Dep.) pp. 69:10-71:16; Ex. I (Bocock Dep.) pp. 119:10-123:7; Ex. H (Gonzalez Dep.) pp. 71:14-74:15; Ex. 6 attached to Gonzalez Dep. at Will 1294.

65. The Jail subscribes to *USA Today*, and provides a copy of the newspaper to each housing unit. Detainees may read the newspaper during their timeouts in the dayroom, but are not allowed to take the newspaper inside their cells. The reason for this rule is to ensure that the newspaper, which is for the use of all detainees in a housing unit, is available for others to use. If detainees are allowed to take the newspaper inside the cell, and the detainee conceals it, corrections officers would need to do shakedowns or searches of the entire housing unit to find it. Another reason detainees are not allowed to take newspapers inside their cells is to minimize the amount of paper in the cells. If there are stacks of paper in the cell, it can become a fire hazard. Even a single newspaper can pose a fire hazard. Deputy Chief Taylor testified that in the past he has known detainees to fashion toilet paper into a wick and use the outlet in the dayroom

to spark or light it, and then take it to their cells. Such a wick burns very slowly. In the past, Taylor has known detainees to use the wick to smoke in their cells, when smoking was allowed. But in his judgment this could still pose a problem because a detainee could light a fire to cause a distraction and then something bad can happen somewhere else. Additionally, if there are stacks of paper in the cell, it can also get in the way of corrections officers if they have to enter the cell in response to an emergency. Ex. D (Taylor Dep.) pp. 148:1-149:15; Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) pp. 4-5, no. 13; Ex. I (Bocock Dep.) p. 120:6-18; Ex. H (Gonzalez Dep.) pp. 71:14-74:15.

66.    As a matter of Jail policy and practice, detainees at Will County Jail are not allowed to purchase or own electronic items such as radios, televisions, tablets, laptops, digital audio players, hotpots, hot plates for use within the Jail. These items are disallowed because the Jail is a detention facility designed and built to house pre-trial detainees who are there for a short duration. In contrast to a prison, where inmates may serve sentences spanning several years, the average length of stay for detainees at the Jail is about 30 days. For this reason, the Jail is not equipped with electric outlets in any of the cells. And given the short duration of time the majority of detainees stay at the Jail, it is not feasible to put such items on the commissary list for purchase. Finally, hotpots and hot plates are disallowed because the items could pose a risk to the safety and security of detainees and staff. Ex. A (Defendants' Answer to Complaint) ¶¶ 18-19; Ex. D (Taylor Dep.) pp. 103:17-105:7.

67.    As a matter of policy, the Jail does not allow detainees access to the internet or e-mail. The reason behind this policy is to maintain safety and security. The Jail restricts all communication by detainees to paper correspondence, visits, and telephone because these means are easier to monitor. All incoming and outgoing telephone calls to or from detainees are

monitored and recorded, except for privileged and confidential communication with clergy or attorneys. Deputy Chief Taylor testified that in his judgment it is hard to monitor the internet or communication through email. Ex. A (Answer to amended complaint) ¶ 24; Ex. D (Taylor Dep.) p. 107:6-111:9.

68.    As a matter of Jail policy and practice, detainees at Will County Jail are not allowed to purchase and own any craft or hobby supplies. They are allowed to purchase and possess color pencils, sketch pads, playing cards, pinochle cards, UNO cards, and word search books from the Jail commissary. Ex. D (Taylor Dep.) p. 105:8-18; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1925; Dep. Ex. 8 attached to Taylor Dep. (List of commissary items) at Will 1951.

69.    As a matter of Jail policy and practice, detainees at Will County Jail are not allowed to receive stationery supplies through the mail or from family, friends, or others outside the Jail. This policy is in place to prevent detainees from smuggling in drugs or other contraband through stationery supplies that could endanger the safety and security of staff and detainees. For example, drugs can be affixed to the gummed areas of the envelope or adhesive stickers or labels. This policy also helps conserve staff resources by reducing the number of incoming items they have to scrutinize for contraband. Detainees are allowed to purchase pre-screened stationery supplies such as pencils (small sized), erasers, paper, letter pads, envelopes, greeting cards, postage stamps through the Jail commissary. Ex. D (Taylor Dep.) pp. 100:20-102:7; Dep. Ex. 10 attached to Taylor Dep. (Defendants' answer to interrogatories) p. 5, no. 15; Dep. Ex. 8 attached to Taylor Dep. (List of commissary items) at Will 1951.

70.    As a matter of policy, the Jail does not allow detainees to possess ink-based pens or full- size pencils. The Jail allows detainees to possess small-size pencils, the type used by

golfers to mark their score cards. These golf-size pencils are available for purchase from the commissary. The Jail provides indigent detainees with pencils and paper. The reason for this policy is that a pen or full-size no. 2 pencil can be used as a weapon, and wrapped with two or three other full-size pencils, can become a spike, a more dangerous weapon. The golf-size pencils do not have a metal collar or eraser on the non-writing end. The detainee buys the eraser separately. Ex. D (Taylor Dep.) pp. 101:2-102:7; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1920; Ex. H (Gonzalez Dep.) pp. 65:15-66:12.

**Lockdowns**

71.     Lockdowns are periods of time when detainees are confined to their cells with the door locked. Access to the dayroom is prohibited during lockdowns. Scheduled lockdowns occur throughout the day, after meals and during nighttime. Administrative lockdowns can be unscheduled or spontaneous, because of unplanned incidents. For example, any time there is a fight, fire, medical emergency, or minimum staffing falls below the operational number set by the deputy chief of operations, the watch commander may place the entire Jail on lockdown. If there is a fight in one housing unit, the policy is to put the entire Jail on lockdown because the Jail wants to eliminate the risk of another fight breaking out in another housing unit while the emergency response team is busy handling the first fight. The emergency response team consists of officers assigned to duties they can leave immediately in an emergency, such as booking. Detainees can also be placed on lockdown as a penalty for violating Jail rules. Once lockdown is lifted, the corrections officer resumes the normal operations of the housing unit. Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015 ed.) at Will 1910; Ex. D (Taylor Dep.) pp. 130:24-132:3; Ex. F (other relevant policies from Policy Manual) at Will 4468-69, 4474; Ex. I (Bocock Dep.) pp. 185:14-187:14, 196:7-197.

**Other programs and services available to detainees**

72.     The Jail does not provide detainees with opportunities to participate in higher educational programs, vocational programs, or craft or hobby programs. As a matter of policy, the Jail's mission or goals do not include rehabilitation of detainees or issues concerning rehabilitation because the Jail is a detention facility and not a correctional facility. Moreover, the average length of stay of detainees at the Jail is about 30 days, which makes it impractical for the Jail to offer such programs. Ex. A (Defendants' answer to amended complaint) ¶ 22; Ex. D (Taylor Dep.) pp. 22, 31:13-22, 106:8-107:5; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4194, 4260-4261 (paragraph N).

73.     Nevertheless, it is Jail policy and practice to offer detainees the opportunity to participate in several educational, social, religious, and other programs, services, and activities, to help maintain their physical, social, and emotional health. The Jail contracts with the Center for Correctional Concerns, a catholic order of the Franciscan Sisters, to provide these services to detainees. Participation in these services is voluntary, but it is a privilege, not a right. Ex. D (Taylor Dep.) p. 106:8-19; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4208-4210, 4260-4261 (paragraph N); Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1927; Ex. I (Bocock Dep.) pp. 111:14-21, 118:5-119:9.

74.     The Jail provides detainees with the following educational programs and services through the Center for Correctional Concerns: GED preparation and testing; adult literacy skills (reading and math); English as a second language; and enrichment classes, covering coping skills, job skills, basic computer skills, and typing. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4209; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1927; Ex. I (Bocock Dep.) pp. 111:22-113:21, 118:5-119:9.

75.     The Jail provides detainees with the following religious services through the Center for Correctional Concerns: Christian church services; bible study courses and classes; contact with Catholic priest or other clergy; contact with clergy from detainee's church through video visitation upon approval; spiritual counseling and information; religious texts – Bible or Koran; prayer rugs, upon payment of fee and approval by CCC; and devotional material distributed monthly. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4209; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1928; Ex. I (Bocock Dep.) pp. 114, 118:5-119:9.

76.     The Jail provides detainees with the following social and counseling services through the Center for Correctional Concerns: individual counseling on several issues, including depression, substance abuse, AAA and narcotics Anonymous, HIV/AIDS, loss/grieving, anger control, and domestic abuse; copies of legal materials for detainees who are acting pro se for criminal cases adjudicated in Will County (copying fee applies); reentry planning; and mental health court brochure; and emergency services and referrals. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4209; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1928; Ex. I (Bocock Dep.) pp. 118:5-119:9.

77.     The Jail provides detainees with library services through the Center for Correctional Concerns. Recreational paperback books are available for detainees at their housing units. In addition, detainees can submit requests for specific titles, and based on availability and donations received by the Jail, these items are made available. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4209; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1928; Ex. I (Bocock Dep.) pp. 118:5-119:9.

32

**Law library**

78.     It is Jail policy to maintain an adequate, up-to-date law library and to allow all detainees access to courts, their personal legal materials, and their legal reference materials. The Jail's law library is stocked with books. In addition, each housing unit has a computer equipped with the LexisNexis law library program, through which detainees housed in that unit have access to law and other legal information for legal research or creating legal correspondence. Detainees may print legal research or legal correspondence from the printer attached to the law library computer in their housing unit.  Access to the law library computer is easily available on a daily basis. Detainees are allowed to use the law library computer during the times they are allowed out of their cells. Detainees also are able to print from the law library computers. Detainees do not pay for copies; the cost is borne by the Jail through profits from the commissary. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4230-4232; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1919; Ex. G (ACA accreditation audit report 2016) at Will 4637; Ex. I (Bocock Dep.) pp.129:23-132:8.

79.     Bocock testified that the Jail's LexisNexis law library computer program is good for the most part and is an adequate research tool. Detainees can access rules, including the rules of the Illinois Supreme Court; most federal cases from all the circuits; Illinois appellate and Supreme Court cases; and other resources. Ex. I (Bocock Dep.) pp.129:23-130:16.

80.     Detainees are allowed to use the law library computer only for their own legal research. Detainees are not allowed to assist or be assisted by other detainees with legal research or legal work. The Inmate Handbook informs detainees that if a detainee is illiterate, he or she should let the corrections officer know, and legal assistance for that detainee will be dealt with

33

on a case by case basis. The reason for this rule is that the Jail does not want detainees acting as or purporting to be jail house lawyers for other detainees. Detainees may assist another detainee verbally to a certain extent, for example, to provide a phone number for a licensed attorney, and things of that nature, but they are not allowed to assist or represent them legally. Ex. D (Taylor Dep.) pp. 46:20-47:18, 57:7-58:18, 119:22-121:14; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4228-4229, 4232; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1919.

81.     Detainees are not allowed to possess paperwork belonging to another detainee or correspond with other detainees because of concerns that they may circulate petitions and organize themselves in groups that may undermine the ability of staff to control them or maintain order and security. Another concern is that they may communicate in code about matters that could pose a threat to staff or other detainees. An inmate council petition was found in Gonzalez's cell one time. Gonzalez testified he and other detainees were trying to form a group that would represent detainees in matters with the Jail.  Ex. A (Answer to amended complaint) ¶ 40; Ex. E (Taylor Affidavit) ¶ 12; Ex. H (Gonzalez Dep.) pp. 47-48; Ex. 4 attached to Gonzalez Dep. at Will 2200.

82.     Bocock alleges that the rule prohibiting a detainee from possessing legal paperwork with another detainee's name on it has prevented him from borrowing or using other detainees' legal work, such as draft motions, in his civil cases. In 2015, Bocock procured his own copy of the Prisoner Self-Help Litigation Manual, a thousand-page book written by two civil rights lawyers that is considered the bible in prisoner litigation cases. Bocock is represented by an attorney in the pending criminal cases for which he is being detained. Ex. I (Bocock Dep.) pp. 16-19, 128:8-129:22, 130:17-131:11.

34

83. Both Gonzalez and Bocock are jailhouse lawyers. They have helped many detainees with legal matters. One time officers found a brochure advertising various legal services under the name of the firm Gonzalez and Bocock, and listing the fees for the services. Ex. H (Gonzalez Dep.) pp. 49-50; Ex. I (Bocock Dep.) pp. 165:19-172:10; Dep. Ex. 8 attached to Bocock Dep. (law firm brochure).

**Mail**

84. It is Jail policy and procedure to search incoming and outgoing mail for contraband or content that may jeopardize the order and security of the Jail. Legal or privileged mail is opened and inspected for contraband in the presence of the detainee. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4242-4249; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook) at Will 1904, 1920-1923; Ex. J (Adam Dep.) p. 21.

85. Detainees are prohibited from writing letters or corresponding with other detainees in the Jail because of concerns they may circulate petitions and organize themselves in groups that may undermine the ability of Jail staff to control them or maintain order and security. Another concern is that detainees would use correspondence to communicate messages in code about matters that that could pose a threat to Jail security and the safety of staff or other detainees. Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook) at Will 1921; Ex. E (Taylor Affidavit) ¶ 25.

86. As a matter of Jail policy, detainees are allowed to receive books and magazines only through the postal service (or Fedex or similar delivery service) from legitimate publishing companies, subscription services, or book distributors, such as Amazon.com and Barnes and Noble. Detainees are not allowed to received books and magazines from family or friends. Books and magazines received from family or friends are stored in the property room until the detainee

is released from Jail. Ex. A (Answer to amended complaint) ¶ 10; Dep. Ex. 2 attached to Taylor

Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4246; Dep. Ex. 3 attached to

Taylor Dep. (Inmate Handbook) at Will 1922; Ex. D (Taylor Dep.) pp. 83:24-84:12; Ex. J (Adam

Dep.) pp. 26:21-27.

87.     Detainees are not allowed to receive books and magazines without a packing slip

from the distributors. The packing slip requirement ensures that the publications are indeed

directly from authorized publishers or distributors, and removes any doubt of the material having

come from other sources. Jail policy is to relax the packing slip requirement on a case by case

basis in certain circumstances. For example, if a detainee receives a publication from an

authorized source such as Amazon, and the package is clearly marked as such, but there is no

packing slip with it, deputy chief Taylor would allow the item to be delivered to the detainee. Ex.

D (Taylor Dep.) pp. 84:12-85, 116:24-117:11, 122:1-17; Dep. Ex. 10 attached to Taylor Dep.

(Defendants' answers to interrogatories) p. 4, no. 13.

88.     As a matter of Jail policy, detainees are not allowed to subscribe to or receive

their own copy of newspapers. Nor are they allowed to receive any clippings of media or internet

articles, or pages torn from books, newspapers, or magazines. Any such material received by the

Jail is stored in the property department until the detainee is released. Ex. A (Answer to amended

complaint) ¶¶ 9, 30; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook) at Will 1921; Dep.

Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) p. 4, no. 13.

89.     One reason for the publishers' only rule; packing slip rule; the rule not allowing

detainees to receive any books, magazines, newspapers, or publications from family, friends, or

other sources; and the rule not allowing detainees to receive clippings of printed material, media

articles, or pages torn from books or magazines from family, friends, or other sources is tied to

36

safety and security concerns. These rules prevent detainees from smuggling in drugs, impermissible information, or contraband through these items that could endanger the safety and security of staff and detainees. For example, blotter drugs can be inserted onto pages of publications. They also prevent detainees from receiving articles that could contain something pertinent to the criminal case for which they are being detained; for example, information on witnesses or victims, which the detainees could use to retaliate against them. Ex. D (Taylor Dep.) p. 84:12-85:6, 114:8-24, 116:24-117:11; Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) p. 4, no. 13; Ex. J (Adam Dep.) p. 27:17-24, 42:18-43:4.

90.     Another reason behind the prohibition on receiving publications, newspapers, clippings of printed material, media articles, or pages torn from books, magazines from family, friends, or other sources is to conserve staff resources. The average daily detainee population in the Jail in recent years has been about 700-800 detainees. The total number of incoming and outgoing pieces of mail averages about 200-600 per day, 1000-3000 per week, 150,000 a year. About a third of the mail received consisted of books. The Jail employs one full-time mail clerk, who is responsible for opening and inspecting all incoming mail for cash, check, money orders, and contraband, and scrutinizing the mail for content prohibited under the rules and content that threatens the safety or security of the jail. The mail clerk also sorts the mail, processes the removed contraband, notifies detainees when incoming letters are withheld in part or full, and drops off the mail to the inmate mailboxes for delivery to the housing units. Allowing detainees to receive publications, newspapers, press clippings or pages torn from publications from family, friends, or other sources will increase the workload for the mail clerk as he or she has to scrutinize all the clippings, including photographs for contraband or impermissible content. This will require hiring more employees to process incoming mail. The Jail's operating budget does

not currently allow any additional hiring. Dep. Ex. 10 attached to Taylor Dep. (Defendants'

answers to interrogatories) pp. 4-5, no. 13; Ex. J (Adam Dep.) pp. 12:20-16, 20:20-23, 29-30; Ex.

E (Taylor Affidavit) ¶ 9.

91.     One reason detainees are not allowed to subscribe to newspapers is to conserve

staff resources.  Deputy Chief Taylor foresees detainees starting subscriptions but then stopping

payment, resulting in the publisher contacting staff with issues concerning outstanding payments

and other related issues. Another reason is to reduce the amount of flammable material that the

detainee keeps inside his cell to minimize the risk of fire. Ex. D (Taylor Dep.) pp. 85:21-87:21;

Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) pp. 4-5, no. 13.

92.     As a matter of Jail policy, detainees are not allowed to receive or possess hard

cover books, books with leather or vinyl covers, or books with spiral binding. The reasons for

this policy are tied to security and safety concerns. Because of the material, these books can be

used as a weapon. Such books can also be manipulated; detainees can cut open the covers, hide

drugs, razors, or other contraband in the spines or under the covers, then press the covers back in

a manner that makes it hard to detect. The spiral binding in spiral bound books can also be used

as a weapon or for some other impermissible purpose. Detainees are permitted to receive or

possess authorized books in paperback form. Ex. A (Answer to amended complaint) ¶ 36; Dep.

Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4268;

Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook) at Will 1922; Ex. D (Taylor Dep.) pp.

58:19-59:17, 117:12-24; Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to

interrogatories) p. 5, no. 14; Ex. J (Adam Dep.) pp. 55:21-56:6.

93.     Until recently, the New World Translation of the bible, which is used by

Jehovah's Witnesses, was available only with a vinyl cover, not in paperback. As a result,

Bocock could not receive a copy of that text. But now the text is available in paperback and Bocock's clergy is going to send him a copy. Bocock has had regular subscriptions to the Watchtower and Alive magazines, which are religious magazines. Ex. I (Bocock Dep.) pp. 114-117, 125:9-126:3.

94.     Gonzalez became a Jehovah's Witness in the middle of 2011. He received a leather-bound copy of their bible, the New World Translation of the Holy Scriptures, in 2012. Initially the Jail staff initially allowed him to keep the bible in the cell. Subsequently on some occasions the bible was seized from Gonzalez's cell and sent to the property section by officers enforcing the rule prohibiting leather-bound books. But after every seizure, Gonzalez requested it back from the property section, and Sergeant Zaragoza returned his bible to him. Gonzalez received a paperback copy of the same bible in 2014, and had one until his transfer to prison. He sent or received copies of his bible several times in 2013, 2014, and 2015. Ex. H (Gonzalez Dep.) pp. 25:18-36:20; Ex. 3 attached to Gonzalez Dep. (Will 958, 960, 962, 1182, 1190, 1211, 1282, 2185, 2270).

95.     As a matter of Jail policy, detainees are prohibited from receiving any books, periodicals, or photographs containing the following: pornographic images; nude or semi-nude pictures that contain frontal nudity; images showing genitalia, nipples or the anus; images showing sexual acts; and pornographic books or literature that contain depictions of sexual acts as the major theme or subject matter of the book. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4246; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook.) at 1921-1922; Ex. D (Taylor Dep.) pp. 89:5-91:13; Ex. J (Adam Dep.) pp.30:8-31:5.

96.     Publications containing pornography or obscenity are prohibited to protect the safety of detainees and staff. The aim of the policy is to reduce the risk of sexual assaults. Some detainees have poor impulse control and if they get their hands on pornographic or obscene material, it may arouse them and increase the risk of sexual assaults. Even if the pornographic material is ordered by someone who has good impulse control, once the material comes inside, it is hard to stop it from circulating among other detainees who do not. Many detainees are housed in double occupancy cells. Detainees are also allowed to interact with other in the dayroom in their housing units. Ex. D (Taylor Dep.) pp. 91:15-92:12; Ex. J (Adam Dep.) pp. 31:8-33.

97.     As a matter of Jail policy, detainees are prohibited from receiving any books, periodicals, or photographs containing the following: gang related books or literature; inflammatory hate type literature; material on explosives, construction of weapons, booby traps, or martial arts; road maps or atlases; newspapers of any kind; and any material deemed a threat to the safety and security of staff and detainees. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4246-4247; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook) at Will 1921-1922; Ex. D (Taylor Dep.) pp. 89:5-91:13; Ex. J (Adam Dep.) pp.39-40.

98.     The Jail maintains a list of unacceptable publications, which is circulated to detainees. The list is no all-inclusive, and the mail clerk reviews all other publications received by detainees on a case-by-case basis. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4247; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook) at 1922; Ex. J (Adam Dep.) pp. 38-39, 41, 68-69:4.

99.     It is Jail procedure for the mail clerk to consider the context of the publication containing sexual content and use her judgment while applying the mail policy to determine

40

whether the sexual content is impermissible. The mail clerk testified she looks for specific context to try to decipher the intent of the writing rather than what the actual words are saying. For example, if there is a book of classic literature with a small reference to a sexual act or minor sexual content, the mail clerk would generally allow the detainee to get the book.  In her six years as mail clerk, Kim Adam's practice was to only restrict books or publications that were pretty obviously in violation of the rule. Ex. J (Adam Dep.) pp. 29:2-16, 34:4-36; Ex. D (Taylor Dep.) pp. 92:13-93:15.

**Mail delivery**

100.    According to the Jail's written standard operating procedure on mail, incoming and outgoing letters should not to be held for more than 24 hours and books and periodicals should not be held for more than 48 hours excluding weekends, holidays, or emergency situations. All incoming and outgoing mail is logged electronically in the inmate mail logs, so that it can be tracked. After the mail clerk scrutinizes incoming mail for impermissible content and contraband, she places the mail in the inmate mailboxes for officers to pick up and deliver to detainees. Jail procedure requires corrections officers assigned to housing units to pick up and deliver mail to detainees on every shift. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4243; Ex. F (Other relevant policies from Jail Policy and Procedure Manual) at Will 4475; Ex. J (Adam Dep.) p. 22.

101.    The mail clerk prioritizes incoming mail for the purpose of processing. Legal mail is processed first, priority mail is processed second, and then regular mail including books, magazines, and other publications. The mail clerk testified that it takes her two to three hours to process legal mail and drop it off for the officers to pick up. Ex. J (Adam Dep.) pp.88-89.

102.     Bocock testified that he received all items listed in his mail log except those noted as "sent to property" or "returned to sender." He also testified that many times during his detention he has received mail up to two to three weeks after it had been sent by family. The one time he specifically remembers is when a deposition handbook was delivered three weeks after it was sent. Plaintiffs ordered it because they were going to give depositions in a civil case, but then the deposition was rescheduled, so the delay did not harm their legal interests. As to harm caused by delays in receiving other mail, Bocock testified that it is upsetting to learn from his family that they had sent him letters and other things, but he had not yet received them. Also, Bocock is an avid reader of magazines, which are sometimes his only access to news, so it is frustrating to get behind on the news when his magazines don't reach him on time. On many occasions, Bocock has received mail on time, sometimes on the same day that it arrived at the Jail. Ex. I (Bocock Dep.) pp. 137:5-12, 141:6-149:13.

103.     Gonzalez testified that he received all items listed in his mail log except where indicated in the remarks section as "sent to property" or "returned to sender" or some other note indicating the item was withheld. Gonzalez testified he missed a deadline to submit a fictional story in a writing contest one time because of a delay in receiving mail. Ex. H (Gonzalez dep.) pp. 95:20-101:17, 109:9-110:6; Ex. 9 & Ex. 10 attached to Gonzalez Dep. (Gonzalez's mail logs) at Will 992-1044 & Will 2059-2139.

104.     The mail clerk testified that from time to time she received complaints about delay in mail or missing mail. When she gets a complaint, she would check the detainee's mail log to see if it indicated that item had been received and placed in the inmate mailboxes. If so, she would inform the detainee of the dates the mail had been received and dropped off for the officers to distribute. If the mail log reflected that the item had not been received, she would

inform the detainee. Sometimes the mail would not be picked up by the officers timely for whatever reason. Ex. J (Adam Dep.) p. 16-20, 24.

105.    Deputy Chief Taylor is not aware of, nor was he notified of any significant delays in the delivery of mail to detainees. If there was a significant delay, i.e. about three weeks from the date of the postmarked mail, he would expect the mail clerk to bring it his attention. He recalls one time when the mail clerk informed him that there was a new mail delivery person and for a few days the mail was being delivered to the Jail 2-3 days later than usual, which put the jail behind in delivering mail to the detainees. Ex. D (Taylor Dep.) pp. 87:24-89:4.

**Classification & housing assignments**

106.    It is Jail policy to classify detainees based on several factors to determine their security status (i.e., minimum, medium, or maximum security) and the appropriate cell block and cell to house them. The classification unit, headed by a classification sergeant, considers factors such as the detainee's gender, behavior, how the detainee gets along with staff and other detainees, available cell or bed space, medical or mental health needs, the safety and security of the Jail, the detainee's criminal history, and the detainee's past behavior at the Jail. Ex. D (Taylor Dep.) pp. 22:23-23:14; Ex. K (Moffett Dep.) pp. 29-31, 113; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4194; Ex. F (Other relevant policies from Jail Policy and Procedure Manual) at Will 4549-4561; Dep. Ex. 3 attached to Taylor Dep.(Inmate Handbook June 2015 ed.) at Will 1903-1904.

107.    As a matter of Jail policy, Jail officials may reclassify or transfer a detainee to another housing unit for administrative reasons, including maintaining order and control in cell housing units. For example, if a detainee becomes a 'barn boss' or leader of a cell block, the classification unit may transfer him to another general population cellblock to remove his

influence in the cellblock. Under jail policy and procedure, reclassification to another general population cell block is not discipline. Ex. D (Taylor Dep.) p. 124.

108.    There are very few cells in the newer housing units where detainees can be housed on single-occupancy basis, so the Jail gives priority to older detainees, detainees with medical issues, and other special needs cases. Ex. K (Moffett Dep.) pp. 30-31.

109.    Bocock has been transferred or moved to different housing units about 20 times in three years at the Jail. The classification sergeant testified that this number of transfers is normal. Gonzalez was transferred or moved 43 times from late July 2012 to late May 2015. This is an abnormal number of transfers. The reason Gonzalez's number of transfers is abnormally high is because he went on hunger strikes, medical pod, or disciplined on numerous occasions. Ex. K (Moffett Dep.) pp. 82-84, 87:19-90.

**Discipline & Grievances**

110.    It is Jail policy to maintain discipline among detainees, and to that end, establish detainee rules that specify conduct or acts prohibited within the Jail and the range of penalties that can be imposed for various degrees of violation. The detainee rules, categorized as minor rules and major rules, as well as the related procedures governing discipline are included in the inmate handbook and policy manual. Detainees are required to obey Jail rules during their detention and may be disciplined if they break them. It is Jail policy to regulate detainee discipline and to use disciplinary procedures to control detainees and promote desirable changes of behavior. The Jail's policy requires staff to apply it equally, consistently, and progressively. Ex. F (additional policies) at Will 4526-4530, 4531-4537; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook) at 1906-1910.

111.    In some instances, like the pre-2015 rule prohibiting detainees from standing on the desk in their cell, the detainee rules are not clear or overbroad. In such cases, the Jail recognizes that the rules have to be clarified or changed to remove ambiguity. Sometimes, rules are changed in response to input from officers or complaints from detainees. Ex. D (Taylor Dep.) p.132:4-133:12, 144:19-146:14.

112.    Disciplinary action may include the following: verbal warning, lockdown (confinement to cell), restriction of privileges, paying for damage to Jail property, transfer to administrative segregation status pending disciplinary hearing, criminal charges, reduction of good time (for sentenced offenders). Disciplinary penalties are progressive, with each violation resulting in more serious discipline. Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015 ed.) at Will 1906-1910; Ex. F (additional policies) at Will 4526-4530, 4531-4537; Ex. K (Moffett Dep.) 92-105.

113.    If a detainee violates a major rule or multiple minor rules, he is notified of the charges, and may be transferred to the restrictive housing unit (D-Pod) and placed on administrative segregation status, pending a disciplinary hearing. It is Jail procedure to hold the hearing not later than five days from the time the detainee is charged with a disciplinary violation. Disciplinary hearings are conducted by a panel of one or more members of Jail staff. Detainees are allowed to call witnesses (detainees or staff) on their behalf during disciplinary hearings. If the hearing board finds the detainee not guilty of the charge, he is returned to the same housing unit where he was housed. If the hearing board finds a detainee guilty of the rule violation, the detainee is sentenced to a period of time in disciplinary segregation and possibly administrative segregation. Ex. D (Taylor Dep.) pp. 74:20-78:2; Dep. Ex. 3 attached to Taylor

Dep. (Inmate Handbook 2015 ed.) at Will 1906-1910; Ex. F (additional policies) at Will 4526-4530, 4531-4537; Ex. K (Moffett Dep.) pp. 79:12-81:20, 92-105, 108-09.

114.    After a detainee completes serving his time in disciplinary segregation, he is first sent to the intake pod or reclassification area to reclassified and moved to another general population housing unit. The detainee may not be sent to the same general population housing unit from which he went to disciplinary segregation. Where the detainee is sent depends on where the jail has available bed space for him. Ex. D (Taylor Dep.) pp. 122:18-125:13; Ex. K (Moffett Dep.) pp. 103-105.

115.    It is Jail policy to provide all detainees with a procedure to grieve conditions of confinement and discipline with at least one level of appeal and to provide the means to express and address any grievances that may arise. The detainee grievance procedures are included in the Inmate Handbook. Detainees are allowed to grieve the following: alleged violations of the Illinois County Jail Standards, alleged misconduct or mistreatment by staff, alleged denial of right, alleged denial of programs and services, alleged sexual abuse or sexual harassment. Detainees are not allowed to grieve the following: the Jail schedule, any Jail security measures including administrative lockdowns, cell or housing assignments, the housing unit to which the detainee is assigned, incidents or events that do not involve the detainee, unless the incident is sexual abuse or sexual harassment, the final decision resulting from the grievance appeal, and the final decision resulting from an appeal of the disciplinary hearing board's decision. Ex. D (Taylor Dep.) pp. 71:17-74:19, 77:9-78:4, 149:16-20; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4253-4258; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015 ed.) at Will 1930-1931.

116.     Appeals from disciplinary board hearing decision and initial denial of grievances by the classification sergeant or other supervisors are reviewed and decided by deputy chief Taylor. If the detainee does not submit an appeal, the grievance would not reach deputy chief Taylor's desk, unless the issue involved something serious, like an excessive use of force. Ex. D (Taylor Dep.) pp. 71:17-74:19, 77:9-78:4.

**Attorney and Clergy Visitation**

117.     It is Jail policy to provide detainees confined in the facility adequate visitation from clergy and attorneys at reasonable hours subject only to limitations to maintain safety and security. Visits are of two types, video visits and contact visits. Video visits take place via a closed circuit television monitor. The visitor sits at a booth in the video visitation center while the detainee sits in the video visitation station in housing unit. For video visitation, visitors need to schedule their visits by making a reservation with jail staff at the video visitation center in advance. No court order is needed for a video visitation by any visitor. Attorneys may come for a video visitation visit without an appointment, but visitation is allowed on a first come first served basis. Ex. D (Taylor Dep.) pp. 102:17-103:4; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4211-4227; Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) p. 8, no. 24; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1923; Ex. I (Bocock Dep.) pp. 106-107:6.

118.     Contact visits are visits where the detainee and the visitor are allowed to meet in a common area without glass or any obstruction that would prevent physical contact. Contact visits are not allowed under normal circumstances, so as not to compromise the safety and security of the Jail. Family, friends, clergy, and attorneys are allowed to make contact visits with detainees provided they obtain a court order and schedule the visit in advance. The reason for requiring a

court order is tied to security and safety concerns and to conserve jail resources. The Jail has only one contact room for a full contact visit and three other contact rooms with a window with pass-through slots for the attorney to pass documents back and forth to the detainee to read or sign. So, the spots available for such visits are limited. Compared to video visitation visits, contact visits are also more labor intensive in terms of what the officers have to do while moving detainees to and fro and monitoring them to ensure security and safety and the exchange of contraband. An officer has to escort a detainee and remain on the scene (though not inside the room during the visit) at all times during a contact visit. By requiring a court order, the Jail can make sure they can schedule staff properly. Ex. D (Taylor Dep.) pp. 102:17-103:16, 113:3-17; Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4218-4221, 4224-4227; Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) pp. 8-9, no. 24; Dep. Ex. 3 attached to Taylor Dep. (Inmate Handbook 2015) at Will 1915 (movement), 1923; Ex. I (Bocock Dep.) pp. 107:18-108:10.

119.     Jail policy prohibits detainees from taking paperwork or any other material into the contact rooms and video visitation rooms when meeting with legal representatives or religious advisers. The reasons for this policy are tied to security and safety concerns, and to conserve staff resources. If detainees were allowed to carry paperwork or books, the paperwork and books would need to be inspected every time to ensure that there is no contraband or impermissible information or letters or other material that could jeopardize jail security or order. Conducting such inspections every time a detainee is moved to and from contact rooms and video visitation rooms will unduly burden staff resources. Dep. Ex. 10 attached to Taylor Dep. (Defendants' answers to interrogatories) pp. 5-6, no. 16; Ex. D (Taylor Dep.) pp. 111:10-112:16.

120.     Attorneys and religious advisers are allowed to bring to the contact rooms and video visitation rooms paperwork or other material pertinent to the detainee's representation, subject to the usual routine security screening for contraband. Attorneys are allowed to pass documents to detainees to read or sign during a contact visit. Detainees are also allowed to send and receive privileged, uncensored correspondence (legal mail) to or from their attorneys in sealed envelopes through U.S. Mail. Detainees are also allowed to make and receive private, unmonitored phone calls to or from their attorneys or clergy. Dep. Ex. 2 attached to Taylor Dep. (Extracts from Jail Policy and Procedure Manual) at Will 4226, 4228; Ex. D (Taylor Dep.) pp. 108:7-111:9, 112:7-113:17; Ex. H (Gonzalez Dep.) p. 37:1-9, 112:20-24; Ex. I (Bocock Dep.) pp. 107:7-17, 110:1-12.

121.     Bocock's criminal defense attorney has never told him that the rule prohibiting detainees from bringing paperwork with him during a contact visit has harmed his legal interests. Bocock has met with clergy from the Jehovah's Witnesses regularly in the last 18 months. His clergy has brought the bible for the Jehovah's Witnesses with him during those visits. Ex. I (Bocock Dep.) 109:8-23, 117.

122.     Gonzalez has suffered no harm to his interests in any legal proceedings or cases in which he was represented by an attorney because of the rule requiring attorneys to get a court order for a contact visit with their detainee-clients or the rule prohibiting detainees from taking paperwork with them during a contact or video visit with their attorneys. Ex. H (Gonzalez Dep.) pp. 110:14-113:9.

123.     Gonzalez met with clergy from the Jehovah's Witnesses two or three times a month before his transfer to prison. He also regularly received the Watchtower magazine off the Jehovah's Witnesses. Ex. H (Gonzalez Dep.) p. 37:10-38:5, 51:8-52:19.

124.     Deputy Chief Taylor has never spoken to Plaintiffs Gonzalez or Bocock or had any personal contact with them. Ex. D (Taylor Dep.) pp. 29:12-30:17.

**Lack of evidence of causation**

125.     Gonzalez is about 6 feet 2 inches tall. He weighed about 199 lbs. when he was booked into Will County Jail in September 2009. He weighed about 161.2 lbs. and his body mass index was 21.3 in December 2012. He weighed 166.4 lbs. and his body mass index was 29.4 in September 2013. He weighed 151.8 lbs. and his body mass index was 20 when he was transferred to the Illinois Department of Corrections in September 2015. His weight in June 2016 was 182 lbs. Ex. H (Gonzalez Dep.) pp. 6:8-7:1, 138-141:17; Dep. Ex. 11 attached to Gonzalez Dep. (Gonzalez's jail medical records) at Will 2742, 2744, 2745.

126.     Bocock is 5 feet 10.5 inches tall. Bocock weighed 260 lbs. when he was booked into the Jail in June 2013. In June 2014, he weighed 170.6 lbs. In June 2015, he weighed 184 lbs. In June 2016, he weighed 188 lbs. Ex. I (Bocock Dep.) 95:2-4, 176-177; Dep. Ex. 7 attached to Bocock Dep. (Bocock's jail medical records) at Will 3289, 3295, 3296.

127.     Bocock often takes naps during the day, especially during the times the detainees are locked down in their cells. He claims he feels malaise and lack of concentration because of sleep deficiency. He also claims he has suffered malaise, anxiety, depression, weight loss, vitamin D deficiency, lack of energy because of the lack of access to the outdoors and 24-hour cell illumination. He has neither sought any medical treatment for sleep deficiency or any other symptoms, nor has he been diagnosed by any medical professional with sleep deficiency or any of these other conditions. Bocock admits that the stress of being in Jail and facing criminal charges could also contribute to his weight loss. Ex. I (Bocock Dep.) pp. 60:14-71:15, 201:23-

203; Dep. Ex. 7 attached to Bocock Dep. (Bocock's jail medical records (Will 3288-3314) (filed under seal per HIPAA order)).

128.     Gonzalez claims that two bibles and two other books went missing from his property stored in Will County Jail. Gonzalez also claims that officers confiscated or threw away a lot of his possessions from his cell, which were not returned. Barring some envelopes, pencils, and paper, Gonzalez had not bought any of those possessions; he was indigent. Gonzalez acquired most of those possessions from detainees whom he had helped as a jail house lawyer. During his detention, Gonzalez helped scores of detainees with their legal issues. They would give him food or others items of commissary. As a result, he acquired and hoarded large amounts of food, snacks, or other commissary items in his cell in violation of the rules. Officers would seize or destroy these unauthorized possessions. Ex. H (Gonzalez Dep.) pp. 40:10-51:7, 54-56:1; Ex. 4 attached to Gonzalez Dep. (incident reports) at Will 1361, 1351-52.

129.     Gonzalez is not sure he complained to Jail officials about the officers confiscating or throwing away the contraband possessions. Gonzalez testified that on occasion if Jail staff lost something they would reimburse or replace the items. Gonzalez recalls he complained about an officer who destroyed some of his commissary items during a search of his cell. In response to his complaint, the Jail reimbursed him the cost of those items. A couple of times, the Jail replaced the items. Ex. H (Gonzalez Dep.) pp. 54:20-58.

130.     Gonzalez suffered no harm to any of his criminal or civil cases as a result of the loss of any of his property items. Ex. H (Gonzalez Dep.) pp. 59:14-63:20.

131.     Other than the inconvenience of using small-sized pencils, Gonzalez suffered no harm from the rule prohibiting detainees from possessing pens or full-sized pencils. Ex. H (Gonzalez Dep.) pp. 66:13-71:13.

132.    Gonzalez testified that the cold conditions resulted in discomfort and at times sleep deprivation.  He also caught a cold a few times. One time in D-Pod and a couple of times in M-Pod, he was so cold that the staff gave him an extra blanket and hot Theraflu. Ex. H (Gonzalez Dep.) pp. 85:15-86:20.

133.    Gonzalez admits that the Jail policy prohibiting detainees from possessing certain content did not result in any harm to any of his legal cases. Gonzalez received and sent all his legal mail; none of it was withheld, except one outgoing mail was withheld because it was addressed to a private person. Ex. H (Gonzalez Dep.) pp. 101:18-103:13.

134.    Gonzalez testified that the rule prohibiting detainees from receiving books and magazines without a packing slip from publishers harmed him psychologically by limiting his contact with the outside world. Because Gonzalez was indigent, he did not have money to buy magazines or books from publishers, and the Jail does not allow detainees to receive magazines or books from other sources. Ex. H (Gonzalez Dep.) pp. 107-109:6.

135.    Gonzalez claims he suffered pain and soreness in his hips and back from sleeping on the thin old green mattresses. No medical professional has diagnosed Gonzalez with any ailment, medical conditions, or symptoms attributed to a bad mattress. Ex. H (Gonzalez Dep.) pp. 114-115:2, 118:15-119:1.

136.    Gonzalez claims he suffered psychological harm, including depression, panic attacks, and anxiety; weight loss; sleep deprivation; lethargy; and malaise as a result of the conditions of confinement in the Jail. He did not seek any medical care for any of these problems. No medical professional diagnosed Gonzalez with any psychological condition attributed to lack of access to the outdoors. The medical department arranged for counselors and psychologists to talk to him. Gonzalez did not cooperate with them and refused treatment for the

52

first few years of his detention because they were trying to use his medical records in his criminal case. Ex. H (Gonzalez Dep.) pp. 120-122.

137.    Throughout his detention in the Jail, Gonzalez did not like being housed in a cell with another detainee, so much so that he would commit rule infractions so that he would be disciplined and sent to D-Pod, or go on hunger strikes so that he would be sent to the medical or M-Pod. In both D-Pod and M-Pod, detainees are housed in cells individually. Ex. H (Gonzalez Dep.) pp. 122:18-124:2, 137:10-16.

138.    During his detention in the Jail, Gonzalez went on numerous hunger strikes. Whenever a detainee goes on a hunger strike, he is transferred to the medical unit, M-Pod and housed in a cell individually. He went on hunger strike because he wanted to be housed individually in a cell or because he did not like the food served by the Jail. After going on hunger strikes, Gonzalez would be closely monitored by medical staff. Ex. H (Gonzalez Dep.) pp. 122:18-125:3, 128:19-129:17, 137-138; Ex. 11 attached to Gonzalez Dep. (Extracts from Gonzalez's jail medical records) at Will 2682-3263.

139.    Gonzalez agrees that he experienced a lot of stress, anxiety, and depression because his own mother and other members of his family testified against him in his criminal case in which he eventually plead guilty to murder. Gonzalez was diagnosed with bipolar disorder when he served in the military, and was discharged from the military on medical grounds in 2005. He did not seek or receive any treatment for any mental health conditions after his release from the military. Will Ex. H (Gonzalez Dep.) pp. 125-127:9, 146-149:6; Ex. 11 attached to Gonzalez Dep. (extracts from Gonzalez's jail medical records) at Will 2751.

140.    The medical staff was aware of Gonzalez's weight loss, and monitored his weight every other week or monthly and periodically checked his health. The medical staff also

provided him with snacks and nutritional supplements at times when they determined it was necessary. At times Gonzalez wouldn't eat for a week straight just to get those supplements. Ex. H (Gonzalez Dep.) pp. 124:9-125:3, 132:15-136:7, 142-143, 158-161; Ex. 11 attached to Gonzalez Dep. (extracts from Gonzalez's medical records) at Will 2682-3263.

141.    Gonzalez testified that at times during his detention, when Gonzalez ate all his meals and had access to snacks and other food from the commissary given to him by detainees, he gained weight. At other times, Gonzalez claims he lost weight even when he was not on hunger strike and was eating all his meals. The medical staff in 2015 accused Gonzalez of manipulating his weight by not eating on purpose. Gonzalez suspected he had hyperthyroidism, like other members of his family. About a week before Gonzalez was transferred from the Jail to the prison, he asked the medical staff to test him for hyperthyroidism. Ex. H (Gonzalez Dep.) pp. 140-141, 136, 152-153, 155:19-157; Ex. 11 attached to Gonzalez Dep. (extracts from Gonzalez's medical records) at Will 2744-45, 2684, 2921, 3010.

Respectfully submitted,

**BRAD JOSEPHSON and
STUART TAYLOR**

By:    *s/Bhairav Radia*
       Defendants' attorney

Bhairav Radia, #6293600
O'Halloran Kosoff Geitner & Cook, LLC
650 Dundee Road, Suite 475
Northbrook, Illinois 60062
Phone:  (847) 291-0200
Fax: (847) 291-9230
Email: bradia@okgc.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JASON MICHAEL GONZALEZ et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 14 CV 4366 |
| | ) | |
| v. | ) | Honorable Jorge L. Alonso |
| | ) | |
| BRAD JOSEPHSON and STUART TAYLOR, | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2016 I electronically filed Defendants' L.R. 56.1

Statement of Undisputed Material Facts with the Clerk of Court using the CM/ECF system,

which will send notification of such filing to the following registered participant(s):


Patrick R. Gareis
pgareis@ghlaw-llp.com




By:  *s/Bhairav Radia*
One of their attorneys
O'Halloran Kosoff Geitner & Cook, LLC
650 Dundee Road, Suite 475
Northbrook, Illinois 60062
Telephone:  (847) 291-0200
Fax: (847) 291-9230
E-mail:  bradia@okgc.com

55