# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JASON M. GONZALEZ, and<br>CHARLES F.P. BOCOCK, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 14-cv-4366 |
| | ) | |
| v. | ) | Hon. Jorge L. Alonso |
| | ) | |
| BRAD JOSEPHSON and<br>STUART TAYLOR, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Jason M. Gonzalez ("Gonzalez") and Charles F.P. Bocock ("Bocock") seek

relief under § 1983 for alleged violations of their constitutional rights while they were pre-trial

detainees housed at the Will County Adult Detention Center ("Will County Jail" or the "Jail").

Plaintiffs seek relief from two defendants, Brad Josephson ("Josephson") and Stuart Taylor

("Taylor"), each sued in his official capacity.[1] Defendants have moved for summary judgment

on all of plaintiffs' claims.[2] For the reasons set forth below, the Court grants defendants' motion

for summary judgment [49].

---

[1] Claims against Josephson and Taylor in their official capacities are really claims against Will County. *Belbachir v. County of McHenry*, 726 F.3d 975, 982 (7th Cir. 2013) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). Defendants Josephson and Taylor were automatically substituted for previous defendants Michael F. O'Leary and Brian Fink, respectively. Fed.R.Civ.P. 25(d). Michael F. O'Leary and Brian Fink are no longer parties to this case.

[2] Plaintiffs originally filed their claims in case number 13-cv-7240. After they filed this case (in which they alleged only that their bunks were dangerous to enter and exit), this case was consolidated with 13-cv-7240. Plaintiffs filed a first amended complaint [docket 40 in 13-cv-7240] in the first case and dismissed this case. [Docket 39 in 13-cv-7240 & docket 16]. Roughly two months later, plaintiffs voluntarily dismissed 13-cv-7240 and asked to reinstate this case. The Court granted the motion. [Docket 17 & docket 45 in 13-cv-7240]. Plaintiffs never

## I.    BACKGROUND

The following facts are undisputed unless otherwise noted.[3]

Plaintiff Gonzalez was a pre-trial detainee at the Will County Jail from September 22, 2009 to September 15, 2015.  Plaintiff Bocock was a pre-trial detainee at the Will County Jail from June 10, 2013 to at least September 2016.

The Will County Jail is a medium to maximum-security jail in Joliet, Illinois.  The Jail has room for 887 detainees, and its average daily population is between 770 and 850.  The average detainee stays 30 days.  The Will County Jail is run by the Will County Sheriff, who appoints a Warden to direct and administer the Jail on a daily basis and a Deputy Chief of Operations, who is in charge of daily operations.  Defendant Josephson has been Warden since December 2014.  Defendant Taylor has been the Deputy Chief of Operations since December

---

filed an amended complaint in this case, so, technically, only their claim with respect to the high bunk is pending.  Defendants, however, in moving for summary judgment, treat the complaint in 13-cv-7240 as if it had been filed in this case.  Because defendants do not object to considering plaintiffs' claims in this case, the Court will consider those claims.

[3] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment.  The Court enforces Local Rule 56.1 strictly.  At the summary judgment stage, a party cannot rely on allegations; he must put forth evidence.  Fed.R.Civ.P. 56(c)(1)(A); *see also Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.").  Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted.  *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004).  This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence.  *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).  The Court does not consider any facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed.  Statements of fact are not the place for legal argument.

2014 but has worked at the Jail for more than twenty years. The Jail employs 212 correctional officers, 18 sergeants, six correctional lieutenants and 41 civilian staff members.

The Will County Jail opened in 1990 and was expanded in 2008. Thus, the parties refer to the "older" portion of the Jail and the "newer" portion. For example, the Jail contains newer housing units and older housing units. All housing units consist of a common dayroom surrounded by cells, which face the dayroom. Each dayroom contains a station from which correctional officers can observe and interact with detainees at all times.

The older housing units (A-F) include 46 single-occupancy cells. Each cell is 11.3 feet long, seven feet wide and eight feet tall. Each cell in the older units contains a concrete or metal bunk, a desktop, a shelf and a combination sink/toilet with hot and cold water. In the older units, each cell has a window to the outside, but the dayrooms in the older units do not have windows.

The newer housing units (G-L) consist of 28 double-occupancy cells. Each cell is 12.8 feet long, eight feet wide and eight feet tall. Each cell in the newer units contains two metal or concrete bunks, a desktop, a metal stool attached to the floor and a combination sink/toilet with cold and hot water. The toilet is not enclosed for privacy, because that would give detainees a hiding place. The newer cells do not have windows, but the dayrooms connected to the newer cells contain large windows, as do the indoor recreation areas. In the newer cells, the top bunk is about six feet from the ground. Generally, detainees are assigned cells, not bunks, and it is up to the detainees to decide who gets the top bunk. Sometimes, a jail doctor, for medical reasons, will assign a detainee to the bottom bunk, i.e., give the detainee a "bottom-bunk restriction."

No cell has a ladder, so, to reach the top bunk, detainees often step on the stool or the desktop. Before plaintiffs filed this lawsuit, the Will County Jail prohibited detainees from stepping on their desktops, which meant a detainee could be disciplined for using a desktop to

reach the top bunk. The rule was changed when the problem was brought to the attention of the Jail employees in charge of reviewing the rules annually. It is no longer a violation for a detainee to step on furniture while climbing into the top bunk.

During his time at the Will County Jail, Bocock was never formally disciplined for using the desktop to reach the top bunk. Bocock used the top bunk approximately 30-40% of the time when he was assigned to the newer, two-person cells. Bocock slipped dozens of times climbing into/out of the top bunk and fell to the floor three or four times. He experienced bruising and pain but no injury sufficient to warrant calling a nurse. Bocock was given a bottom-bunk restriction in the summer of 2016 due to a hernia.

Gonzalez, on the other hand, slept in a top bunk for only a month or two during his detention. Gonzalez had no problems using the top bunk, other than he occasionally banged his knee or hands on the lip of the bunk, which resulted in temporary discomfort. Once, Gonzalez slammed his finger into the lip of the bunk bed, and his finger was swollen for a week. A nurse gave him an ice pack.

Another difference between the older and newer housing units is the lighting. In the older units (A-F), the ceiling of each cell contains one light fixture with four bulbs. One of those four bulbs is a 9-watt night bulb, so called because it is on 24 hours per day. The other three bulbs are 32-watt fluorescent bulbs. In units A, B and C, the detainees can turn two of the three bulbs on and off, and a correctional officer controls the third. In units D and E, a correctional officer controls all of the lights, except the 9-watt night bulb. The lights controlled by the correctional officers are turned off from 10:30 p.m. to 6:30 a.m. In the newer units, each cell also contains four bulbs, including three 32-watt fluorescent bulbs and a 9-watt night bulb. The

three 32-watt bulbs are controlled by correctional officers and are turned off between 10:30 p.m. and 6:30 a.m. The 9-watt night bulbs remain on at all times.

In both the newer and older units, the lights controlled by the correctional officers remain on during the day (i.e., 6:30 a.m. to 10:30 p.m.) so that the officers can perform their visual checks of the detainees. Officers perform visual security checks every thirty minutes when detainees are in their cells. The visual checks allow correctional officers to observe any violent or self-destructive behavior among detainees. The visual checks also allow the correctional officers to detect contraband, weapons, escape devices and security breaches. The visual checks discourage theft and contraband.

At night, correctional officers perform visual checks every fifteen to thirty minutes. The 9-watt night bulbs allow the correctional officers to take count and to see inside the cells. Using a flashlight does not allow a correctional officer to see every part of the cell, because of the furniture and layout. The Jail has begun replacing 9-watt night bulbs with 7-watt night bulbs, as the 9-watt bulbs burn out.

At night, detainees sleep on mattresses. The mattresses, when new, are 4-5 inches thick and are "fine" to sleep on. After a mattress has been slept on for a while, however, it becomes compressed (to about two inches thick) and is less comfortable to sleep on. If a mattress is worn out, a detainee may request a new one, and a correctional officer is supposed to replace it. Bocock, during his first year at Will County Jail, slept on an old, uncomfortable mattress. Gonzalez experienced pain and soreness in his hips and back from sleeping on thin mattresses. He has not been diagnosed with any medical conditions attributable to a thin mattress. In addition to a mattress, each detainee is issued two bed sheets and a wool blanket. The parties dispute whether detainees are allowed to have a second blanket.

In addition to supplying detainees with bedding, the Will County Jail, twice per week, issues each detainee a towel, wash cloth, socks, underwear, t-shirt, uniform top and uniform bottom. The Jail's policy is to require detainees to wear uniforms. The Jail issues uniforms that are color-coordinated, based on each detainee's classification and housing unit. Jail policy allows detainees to request and obtain a long-sleeved thermal vest, in addition to the standard uniform. Thermal vests are not always available. Gonzalez had a thermal vest during most of his detention. Bocock had a thermal vest at various times during his detention, but it took six months to get the first one. Detainees are not allowed to purchase clothing, shoes or jewelry to wear inside the Jail. One reason for the policy is that outside clothing, shoes and jewelry could be used as currency within the Jail. Another reason is that jewelry can be fashioned into weapons. Detainees are allowed to wear their own clothing for court appearances if that is ordered by a court.

Thus, detainees rely on the Jail for their clothing and bedding. The Will County Jail is sometimes cold, as are the detainees. During the winter of 2014-2015, during a polar vortex, defendant Taylor received multiple complaints about the cold. Taylor had the maintenance staff check the temperatures in the housing units.[4] On February 20, 25, and 26 of 2015, the maintenance staff received work orders about the cold in D-pod, because detainees and

---

[4] Will County Jail has established procedures to ensure that the cells and other areas of the Jail are in good repair. Jail sergeants conduct daily patrols of areas occupied by detainees. Correctional officers are required to inspect their housing units and address any housekeeping or maintenance issues as they occur. Correctional officers refer minor repairs to maintenance staff. Maintenance staff inspect boilers and furnaces once per shift. The Jail's ventilation system provides at least fifteen cubic feet of continuous air flow per minute, with at least five cubic feet of outside air.

correctional officers complained about the cold. Even staff members complained that the temperatures were "unbearable." Each of those work orders was completed the same day.

Gonzalez submitted grievances about the cold condition in D-pod during the winter of 2014-2015. Gonzalez estimates that staff turned the heat up to 60 degrees. Gonzalez did not ask for additional blankets during this time, because he did not know a detainee could request extra blankets. Gonzalez was allowed to wear extra clothing during that time. Other times when Gonzalez was cold, staff gave him an extra blanket and hot Theraflu. Bocock also complained about the cold. During the winter of 2013, he recalls using his wool blanket even in the dayroom (which was not normally allowed). During the winter of 2014-2015, Bocock remembers the severe cold lasting a week or more before jail staff resolved it. He recalls staff entering the housing units to take temperature readings during that time. During that time, Bocock had a wool blanket. At times, Bocock was very warm or very cold, but he did not suffer any long-term harm to his health from either temperature extreme. During November 2015, the American Correctional Association conducted an audit and found the temperature and lighting in the Jail to be normal.

Although detainees are not allowed to buy clothing, they are allowed to buy and keep some property. The Jail contracts with Keefe, Inc. to provide a commissary. The commissary offers snacks, personal hygiene supplies and writing supplies. The commissary also offers craft and hobby supplies, colored pencils, sketch pads, pinochle cards, UNO cards, word search books, stationery, erasers, paper, letter pads, envelopes, greeting cards, stamps and small (golf-sized) pencils. Prices at the commissary are higher than prices outside the Jail, due to the cost of procurement, inventory, administration and distribution.

The Will County Jail issues each detainee a 14-gallon plastic bin in which to store his property. All property that a detainee keeps in his cell must fit in the issued bin (with a few exceptions). In addition to the property each detainee is allowed to keep in his cell in his bin, the Jail also maintains space for storage of additional detainee property. The property department is staffed by clerks and overseen by Sergeant Mary Zaragoza. The Jail limits the amounts and types of property that detainees may store in their cells in the bins, and all additional property must be stored in the property department. In the general population, the Jail limits the property within a detainee's bin in his cell to: three religious books, three reading books, three personally-owned school or educational books, six magazines, ten letters, two greeting cards and twenty photographs. Each detainee may keep unlimited legal papers in his cell, so long as the papers fit inside his bin. The Jail makes an exception to the one-bin limit for detainees involved with *pro se* litigation. For those detainees, the Jail issues a second property bin to store excess legal papers. Bocock, for example, was issued an extra bin for legal papers. According to Bocock, each bin will hold at least 4,000 pages of paper.

The Jail has several reasons for restricting the quantities of property a detainee may keep in his cell. The Jail limits the quantity of paper in a cell to minimize fire hazard and to minimize the material that detainees can use to clog toilets and cause flooding. Limiting property also limits the use of property for trading. The Jail limits detainees to one bin, because additional bins limit correctional officers' view when they are visually inspecting cells. Also, additional bins provide additional space for contraband, which could threaten the safety of other detainees.

The Will County Jail requires detainees to store any additional property (that does not fit in the bin or that is not within the quantity limits noted above) in the property department. Detainees may swap out property from his bin with property at the property department if he

8

wishes. The property department regularly receives requests to swap property in a detainee's bin for property stored in the property department. The property clerks try to fulfill requests during the same shift on the same day they receive a request. Jail policy allows for five days to fulfill requests to swap property, but it does not usually take that long. Bocock and Gonzalez made dozens of property-swap requests during their detentions and were generally pleased with the jobs done by the property clerks, whom they thought were reasonable. In October 2014, the property clerk was especially helpful in assisting Gonzalez in locating a book. In addition, a property clerk helped Bocock index his legal paperwork so that it would be easier to track and locate. Still, Bocock sometimes faced delays in obtaining his property.

Occasionally, property in the property department is lost or stolen. When that happens, it is the Jail's practice to replace the property. Gonzalez has had property lost or stolen, including two bibles and two other books. He also lost three declarations for a civil case. The procedure for obtaining replacement property is for a detainee to file a grievance. The property sergeant initially handles the grievance and then forwards it to Deputy Chief Taylor. If Taylor approves, the property is replaced. Taylor is not aware of any of Gonzalez's or Bocock's property being lost or stolen from the property department.

Will County Jail also limits the commissary items that may be kept in cells. Detainees may keep unopened food items in their bins, but once a detainee opens a single-serve item, the detainee must consume the item. He cannot keep opened, single-serve food in his cell, because such items could attract vermin or cause food poisoning. Detainees may keep individually-wrapped items, such as hard candy, in their bins in their cells. The unopened food from the commissary in their storage bins is the only food to which detainees have access between dinner (which is finished between 5:00 and 6:30 p.m.) and breakfast (which is served at 6:30 a.m.).

Thus, detainees sometimes go up to 14 hours between jail-provided meals. The reason for the gap is that the kitchen staff members leave at 7:00 p.m. (The parties do not say when the kitchen staff arrives.) Gonzalez, who was indigent, did not purchase food from the commissary. Other detainees, however, gave him food and other commissary items, because he helped them with their legal issues. Gonzalez, who hoarded large amounts of food and snacks, has had food items confiscated from his cell. Gonzalez complained at least once, and the Jail reimbursed him for the cost of some items and replaced other items.

Will County Jail serves three meals per day. A dietician reviews the meals provided to detainees once per year. The Jail provides special meals for therapeutic or religious reasons. In addition, the Jail conducts surveys of detainees each year in order to determine their food preferences. The Jail does not allow detainees to keep items from their jail-provided meals for later. Thus, if a detainee chooses not to eat an item from his meal, he is required to throw it away. The reason for the policy is that the Jail does not want detainees using food items for currency to be used for such things as gambling or to pay for services (which might include such services as harming another detainee). The Jail worries less about commissary items being used as currency, because detainees must pay for those items and because the Jail has a record of the purchases.

Gonzalez was not fond of the food at Will County Jail. When he arrived at the Will County Jail, he was six feet, two inches tall and weighed 199 pounds. By December 2012, he weighed 161.2 pounds. In September 2013, he weighed 166.4 pounds. He weighed 151.8 pounds when he transferred to the Illinois Department of Corrections in September 2015. During his time in jail, Gonzalez went on several hunger strikes. When a detainee goes on hunger strike, the Jail transfers the detainee to the medical pod, where detainees have their own

cells.  Gonzalez did not like sharing a cell, so he went on hunger strikes both because he wanted to be moved to the medical pod where he would not share a cell and because he disliked the food.  (Gonzalez also sometimes committed rules infractions so that he would be sent to the discipline pod, where he could have his own cell.[5])  While Gonzalez was on a hunger strike, medical staff at the Jail monitored him.

The medical staff was aware Gonzalez was losing weight.  They monitored his weight at least monthly and checked his health periodically.  The medical staff gave Gonzalez snacks and nutritional supplements when they thought it was necessary.  Gonzalez testified that when he ate all of his meals and had access to snacks, he gained weight.  In 2015, the medical staff suspected Gonzalez was manipulating his weight by purposely not eating.  Gonzalez also suspected he had hyperthyroidism, like members of his family.

Bocock, too, lost weight while in the custody of the Will County Jail.  Bocock, who is 5 feet, 10.5 inches tall, weighed 260 pounds when he arrived in September 2009.  By December 2012, he weighed 161.2 pounds.  In September 2015, he weighed 151.8 pounds.  Bocock testified that the stress of being in jail and facing criminal charges could have contributed to his weight loss.  He gained weight after being transferred to the Illinois Department of Corrections.

Taylor is not aware of (and has not been informed by any medical staff of) any detainee diagnosed with an illness or injury attributable to the 14-hour gap between dinner and breakfast. The American Correctional Association performed an audit in November 2015, and it concluded

---

[5] Generally, detainees had no say regarding the housing unit or cell to which they were assigned. A classification sergeant is responsible for assigning detainees to the housing units and cells.  In assigning detainees, he considers such factors as gender, behavior, available space, medical or mental health issues and criminal history.  The classification sergeant sometimes transfers detainees.  The various reasons for such transfers include, for example, that the detainee had developed too much influence among nearby detainees or that another detainee had reason to need a particular cell (such as a medical issue that required a single cell).

that the number of documented incidents of illnesses caused by food service to be zero in the prior twelve months.

Generally, during mealtimes (and at other times of the day, as will be described below), detainees are out of their cells. Certain times of the day, however, detainees are confined to their cells with the doors locked, i.e., are in what the Jail calls a lockdown period. Scheduled lockdowns occur throughout the day, after meals and during nighttime. Administrative lockdowns can be unscheduled (such as for unannounced inspections) or spontaneous (such as for unplanned events). The watch commander may place the entire Jail on lockdown if, for example, staffing levels fall below the necessary minimum, the Jail experiences a fire or medical emergency or detainees are fighting. The reason the entire jail is locked down during a fight is to eliminate the risk of another fight breaking out while the emergency response team (a team of correctional officers assigned to duties they leave immediately in an emergency) is distracted by the first fight. In addition to lockdowns affecting the entire Jail, individual detainees can be subject to lockdown for violating rules.

The opposite of a lockdown is a timeout, when detainees are allowed out of their cells. Generally, detainees are locked down from 10:30 p.m. to 6:30 a.m. Generally, aside from administrative lockdowns, detainees in the general population are allowed out of their cells (i.e., given timeout) for 2.5 hours in the morning, 2.5 hours in the afternoon and 2.5 hours in the evening. During timeouts, detainees are allowed to shower, watch television, use the telephone, spend time in the dayrooms, socialize and exercise in the indoor or outdoor recreation areas.

Each housing unit has a recreation area. In the older housing units (with the exception of D), each housing unit has an outdoor recreation area but no indoor recreation area. D pod has both outdoor and indoor recreation areas. The newer housing units have indoor recreation areas

but no outdoor recreation areas.  The indoor recreation areas are about 30 feet by 40 feet and are equipped with a basketball hoop and balls.  Detainees can use the indoor recreation areas for exercise.  The only limit on the use of the indoor recreation areas during timeout is that correctional officers will limit the use if it gets crowded.  Use of the outdoor recreation areas, by contrast, requires the permission of a correctional officer.  During the fall of 2013, when Bocock was housed in the B pod, he was sometimes denied use of the outdoor recreation area due to inclement weather.  Bocock has not been denied the use of the indoor recreation area (other than when something was broken in the area).  Detainees are also allowed to exercise in their cells, so long as they do not use the furniture or fixtures in their workout.

During timeouts, detainees may spend time in the dayrooms, each of which contains two televisions.  Correctional officers determine what programming is available on the televisions.  The dayrooms also contain board games.  Each dayroom is provided a copy of *USA Today* each day it is published.  Detainees are allowed to read the newspaper in the dayroom, but no detainee is allowed to take the newspaper back to his cell.  The Jail has several reasons for this rule.  First, the newspaper must be shared, so it must remain in the dayroom.  Second, newspaper is flammable, and the Jail seeks to limit the amount of flammable material in cells.

Not only are detainees not allowed to take the dayroom's copy of the newspaper back to their cells, they are also not allowed to subscribe to a newspaper.  One reason for the Jail's ban on newspaper subscriptions is to limit the amount of flammable material in the Jail.  Unlike magazines, most newspapers publish daily.  The Jail is also concerned about staff resources and does not want staff dealing with publishers about payment for newspapers.

Although detainees may not subscribe to newspapers, detainees are allowed to subscribe to magazines and to receive paperback books in the mail, so long as those arrive through the

postal service (or other large delivery services, such as UPS or FedEx) from legitimate publishers and book sellers.  Generally, to ensure that a book is arriving from a legitimate publisher or book seller, the Jail requires a packing slip.  Sometimes the Jail relaxes the policy.  If, for example, a package comes from Amazon without a packing slip, Taylor will allow the item to be delivered to the detainee.  This policy (requiring books and magazines to arrive directly from publishers and book sellers) left Gonzalez feeling distant from the outside world, because he did not have the money to purchase books and magazines.

Detainees, to Gonzalez's disappointment, are not allowed to receive books or magazines that arrive from a source other than a publisher or legitimate bookseller.  The main reason for this policy is security.  Books from friends or family members could be used to smuggle in drugs or other items that could endanger detainees.  For the same reason, detainees are not allowed to receive stationery from family or friends.  Drugs can be smuggled into the jail in the stationery, particularly on the gummed areas of envelopes or stamps.  Detainees are allowed to possess stationery only if it is purchased at the commissary.

The Jail currently employs one full-time mail clerk to open and inspect incoming mail for all detainees.  Thus, one reason for the Jail's ban on the receipt of books and other items from family members is that to do so would increase the workload of the mail clerk.  If the Jail receives prohibited items (such as books from family members) addressed to a detainee, those items are stored in the property room until the detainee is released.

The mail clerk also inspects all incoming mail for contraband and for content that might jeopardize the order and security of the jail.  For example, detainees are not allowed to receive books, magazines or photographs that contain:  pornographic images; images of anuses, genitals or nipples; images of sexual acts; or books or literature that contain descriptions of sexual acts.

In addition, detainees may not receive books, magazines or photographs related to gangs, explosives, booby traps, martial arts, roadmaps or the construction of weapons. The Jail's reason for the content restrictions is safety of detainees and staff. With respect to the sexual material, the Jail's goal is to prevent sexual assaults. Defendants put forth evidence that some detainees have poor impulse control. Even though some detainees have good impulse control, it is difficult to control who obtains the material once it is inside the Jail. The content restrictions did not harm any of Gonzalez's legal cases.

To make the mail clerk's job easier, the Jail maintains a list of banned publications. The mail clerk also reviews incoming books, magazines and photographs on a case-by-case basis. With respect to sexual content in books, the clerk looks for context. Defendants put forth evidence, for example, that the mail clerk, when confronted with classic literature with a short reference to sex, would generally allow the detainee to receive the book. The mail clerk's practice was to restrict books and publications only if they were in obvious violation of the rules.

The mail clerk's system for processing mail involves electronically logging all incoming and outgoing mail, scrutinizing mail for content and contraband and then putting it in detainee mailboxes. The mail clerk prioritizes incoming mail, with legal mail being processed first, followed by priority mail and regular mail (which includes books and magazines). Legal mail alone takes two to three hours. Finally, the mail clerk processes outgoing mail. The Jail's goal is to process outgoing letters within 24 hours and incoming books and periodicals within 48 hours. After the mail clerk puts mail in the boxes, correctional officers pick up the mail and deliver it to detainees. Gonzalez always received his legal mail, and his outgoing legal mail was always sent, with the exception of one letter that was addressed to a private individual.

The mail clerk sometimes received complaints from detainees about mail delays or about not receiving items. In that event, the mail clerk would check the log and inform the detainee whether the item had been received. Bocock testified that he received all of the mail listed in his mail log except items listed as "sent to property" or "returned to sender," which is what would happen if the item were not approved. Sometimes Bocock received his mail late, weeks after his family had sent him letters. In one case, it took three weeks from the time he ordered a deposition handbook for it to arrive. It did not affect his case, though, because the deposition was postponed. Gonzalez, too, received all of the items listed in his mail log, except those marked "sent to property" or "returned to sender." Due to a delay in receiving mail, however, he once missed a deadline in a fiction-writing contest. Deputy Chief Taylor is not aware (and has not been notified about) significant delays in the delivery of mail. He is aware of one minor delay. Specifically, the mail clerk once informed Taylor that the Jail had a new mail carrier, which caused a 2 or 3-day delay in mail delivery.

The Jail sets other limits on property a detainee may possess. For example, although detainees may possess paperback books, they are prohibited from possessing or receiving hard-cover books, vinyl-bound books, leather-bound books and spiral-bound books. Hard-cover, vinyl-bound and leather-bound books can be used as a weapon themselves, and the covers can be cut open to hide razors, drugs or other contraband. The spiral binding of a spiral-bound book can be removed and used as a weapon. This policy kept Bocock from receiving a copy of the New World Translation of the bible, a book used by Jehovah's witnesses and that had been published only in vinyl-bound version. Bocock was able to subscribe to the Watchtower and Alive magazines for Jehovah's witnesses. Similarly, in 2012, Gonzalez obtained a leather-bound version of the New World Translation of the Holy Scriptures. Although Sergeant Zaragoza

allowed Gonzalez to keep his leather-bound religious book in his cell, it was occasionally confiscated by correctional officers who were enforcing the rule against leather-bound books. Each time, Gonzalez requested it back from the property department, which returned it to him. Eventually, in 2014, Gonzalez received a paperback version.

Among other limits, detainees may not possess ink pens or full-sized pencils, because those items can be fashioned into a weapon. The commissary sells short, golf-sized pencils and erasers in the commissary. The Jail supplies indigent detainees with paper and pencils. Using small pencils has not harmed Gonzalez's legal cases, although small pencils run out more quickly than would large pencils. Detainees are also disallowed to purchase or possess televisions, tablets, laptop computers, digital audio players, hotpots, hot plates or radios. The hot plates and hot pots are a fire hazard. The reasons for disallowing the other electronic items are: (1) that the Jail does not have outlets in the cells; and (2) that the Jail is for detainees, the average of whom stays 30 days.

The Jail limits and monitors (with two exceptions) communications among detainees and between detainees and the outside world. First, detainees are not allowed to communicate with each other in writing, because the Jail does not want detainees to be able to plot either escapes or attacks on other detainees. The Jail also wants to prevent detainees from organizing themselves against the staff. For basically the same reason, the Jail prohibits use by detainees of the internet, which it deems a security risk. The Jail believes it would be impossible to monitor a detainee's communications through the internet, so it does not allow use of the internet. The Jail monitors all incoming and outgoing telephone calls, except that it does not monitor calls with attorneys or clergy so long as the detainee fills out a form. Signs in the dayrooms near the telephones tell detainees to fill out a form so that those private calls will not be recorded.

The Jail is a detention facility for individuals accused but not convicted of crimes, not a correctional facility for prisoners convicted of crimes. Thus, the goals of the Will County Jail do not include rehabilitation. For that reason, the Will County Jail does not offer higher education, vocational programs or hobby programs. Instead, the Will County Jail contracts with the Center for Correctional Concerns, a Catholic order of Franciscan Sisters, to provide GED preparation and testing, adult reading and math skills, English as a second language and enrichment classes, covering such topics as coping skills, computer skills, job skills and typing. The Jail considers the programs offered through the Center for Correctional Concerns (the "Center") to be a privilege, rather than a right.

The Center also provides library and counseling services to detainees. Detainees may submit requests for particular book titles, although availability depends on donations. In addition, the Jail keeps paperback books in the housing units for use by detainees. The Center for Correctional Concerns offers counseling on such issues as depression, substance abuse, loss, anger management and reentry planning.

Finally, the Center offers religious services, including Christian church services and bible study classes. The Center provides religious texts, such as copies of the bible and Koran. Detainees can purchase prayer rugs from the Center. The Center for Correctional Concerns also provides Catholic priests and other clergy for spiritual counseling. The Center, with approval, can provide video visits with detainee's own church clergy.

Separate from the Center, Will County Jail allows visits, subject to Jail rules, from detainees' own clergy, as well as from attorneys, family or friends. Specifically, the Will County Jail offers two types of visits: contact visits and video visits. Video visits generally need to be scheduled in advance, although attorneys need not schedule visits. At the appointed time (or on

a first-come, first-served basis for attorneys), the visitor sits at a booth in the Jail's video visitation center and connects via closed-circuit television to the detainee, who sits at the video visitation station in his housing unit.

The Jail also offers contact visits. During a full contact visit, the visitor and the detainee are in a room together without glass or other partition. The Jail has one room for full contact visits. The Jail also has three rooms with glass partitions that contain slots through which attorneys can pass documents to a detainee to obtain, for example, his signature. Unlike video visits, contact visits are allowed only by a court order. The Jail's reasons for requiring a court order are security and the conservation of Jail resources. During a contact visit, a correctional officer must escort the detainee and remain nearby. The correctional officer must ensure the detainee is not carrying contraband.

The Jail prohibits detainees from carrying paperwork or other material into visits, whether those visits are contact visits or video visits. This is true even when the visit is with an attorney or a member of the clergy. (Note, though, that detainees are allowed to send uncensored letters to their attorneys through U.S. Mail. Detainees can make unrecorded phone calls to their attorneys and members of the clergy so long as they fill out the proper form.) The Jail's reasons for not allowing detainees to bring documents and books to visits are, again, security and conservation of resources. The Jail does not want to have to inspect all books and documents for contraband and coded messages every time a detainee is moved into a contact room or a video visitation room. By contrast, attorneys and members of the clergy are allowed to bring books and documents with them to visits.

Both Gonzalez and Bocock had visits with their attorneys while detained at the Will County Jail. Gonzalez has not suffered any harm to his legal interests from the policy that

prohibits him from bringing documents to visits with his attorneys. The policies, however, made it difficult for him to communicate with the attorneys. Bocock's criminal defense attorney has never told him that the rule prohibiting him from bringing paperwork to meetings harmed his legal interests. Plaintiffs also had visits with members of the clergy. Bocock had regular visits with clergy from the Jehovah's witnesses. Gonzalez had two or three visits per month with clergy from the Jehovah's witnesses.

The Will County Jail also maintains a law library for use by detainees during timeout. The law library, itself, is stocked with books. In addition, the Jail provides a computer in each housing unit. That computer is equipped with LexisNexis, which detainees can use to research legal issues, federal caselaw, Illinois caselaw and federal and state rules. Bocock testified that it was an adequate research tool. From the computer in each housing unit (which detainees can access during timeout), detainees can print legal research or legal correspondence without cost to themselves. (The costs of printing are paid by the Jail from commissary profits.) Detainees can also use the computers to draft legal papers, although they cannot save their work on the computers.

Although detainees are allowed to use the computers and law library for their own cases, they are not allowed to assist other detainees with legal research, because detainees are not attorneys. Likewise, detainees are not allowed to possess legal paperwork for other detainees. The Jail does not want such paperwork used as a means of written communication or code between detainees. Bocock testified that the rule prevents him from using other detainees' draft motions in his own cases. Bocock, though, in 2015, procured a copy of the *Prisoner Litigation Self-Help Manual*, a thousand-page book written by civil rights attorneys. In the event a detainee

needs assistance due to illiteracy, the detainee is supposed to inform a correctional officer that he needs assistance, and the Jail says it helps on a case-by-case basis.

As is clear from the foregoing, detainees at Will County Jail have little freedom. The Jail requires detainees to comply with rules that are set out in a detainee handbook. The handbook sets out detainee rights, privileges and rules. A committee which includes defendants Josephson and Taylor (as warden and deputy chief of operations, respectively) reviews and revises the handbook annually. Detainees who violate rules are subject to progressive discipline. Discipline can include: issuing a verbal warning, locking down the detainee (as in confining a detainee to his cell), requiring the detainee to pay for damages, transferring the detainee to administrative segregation in the restrictive housing unit (D-pod), reducing the detainee's good-time credit and pursuing criminal charges.

A transfer to administrative segregation in the restrictive housing unit is usually the punishment if a detainee violates a major rule or multiple minor rules. When such a transfer happens, the Jail conducts a disciplinary hearing within five days after the detainee is charged with a rule violation. At a disciplinary hearing, a detainee is allowed to call witnesses, including staff members, but Gonzalez was once not allowed to call witnesses. If the hearing board finds the detainee not guilty of violating the rule, the detainee is returned to his previous housing assignment. If the hearing board finds the detainee guilty of violating the rule, the hearing board sets a period of time for which the detainee will remain on administrative segregation in the restrictive housing unit. After a detainee completes his time at the restrictive housing unit, he is reassigned to a general housing unit but not to his previous unit.

If a detainee is dissatisfied with any disciplinary action taken against him, he may file a grievance. The grievance procedure can also be used by detainees to grieve conditions of

confinement, violations of the Illinois County Jail Standards, alleged misconduct or mistreatment by staff, alleged denial of a right, alleged denial of programs or services and alleged sexual harassment or abuse. The grievance policy is set out in the detainee handbook and includes at least one level of appeal. Among the issues a detainee may not grieve are: the Jail schedule, Jail security measures (including administrative lockdowns), housing/cell assignments, issues that do not affect him (except sexual abuse or harassment) and the final decision of an appeal from a decision by the disciplinary hearing board. Deputy Chief Taylor decides appeals from decisions of the disciplinary hearing board and appeals from denials of grievances.

While housed in the Will County Jail, Gonzalez claims he suffered psychological harm, depression, panic attacks, anxiety, sleep deprivation and lethargy. He did not seek medical treatment for any of these conditions. Before entering the Will County Jail, Gonzalez had been diagnosed with bipolar disorder. While in detention, the medical department arranged for counselors and psychologists to talk to Gonzalez, who did not like talking to them. Gonzalez refused medication. Gonzalez testified that a lot of the stress, anxiety and depression he experienced was because his mother and other family members testified against him in his criminal case, in which he plead guilty to murder.

Bocock, while detained in the Will County Jail, has felt malaise, lack of energy and lack of concentration. He has not sought medical treatment for these issues.

Deputy Chief Taylor has never spoken to or met in person either Gonzalez or Bocock.

## II.     STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment is appropriate when the non-moving party "fails to make a showing

sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). In this case, that inference applies only to disputed facts. *Beard v. Banks*, 548 U.S. 521, 529-30 (2006) ("[W]e must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities."); *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) ("[I]nferences as to disputed matters of professional judgment are governed by *Overton*, which mandates deference to the views of prison authorities.") (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

## III.    DISCUSSION

Plaintiffs challenge the conditions of confinement at Will County Jail and argue that they violate plaintiffs' constitutional rights. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). "But the Constitution does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

The constitutional rights of pretrial detainees derive from the Due Process Clause of the Fourteenth Amendment, rather than from the Eighth Amendment's prohibition on cruel and unusual punishments. *Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015); *see also Bell v. Wolfish*,

441 U.S. 520, 535-37 (1979) ("A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. . . . Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."). Nonetheless:

> there is little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions of confinement claims, and . . . such claims brought under the Fourteenth Amendment are appropriately analyzed under the Eighth Amendment.

*Smith v. Dart*, 803 F.3d at 310.

The Supreme Court has held, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89; *see also Riker v. Lemmon*, 798 F.3d 546, 551 (7th Cir. 2015). In considering whether a regulation is reasonably related to legitimate penological interests, courts are to consider four factors:

> First, there must be a 'valid, rational connection' between the prison regulation and the legitimate government interest put forward to justify it. . . . A second factor . . . is whether there are alternative means of exercising the right that remain open to prison inmates. . . . A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. . . . Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation."

*Turner*, 482 U.S. at 89-91; *see also Riker*, 785 F.3d at 552. The Supreme Court went to explain:

> This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. . . . But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship test.

*Turner*, 482 U.S. at 90-91.  "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'"  *Bell*, 441 U.S. at 539.

In considering the constitutional rights of detainees, courts must be mindful that they owe deference to prison authorities.  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.");  *Turner*, 482 U.S. at 84-86 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.  Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.  . . .  [J]udgments regarding prison security 'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'") (internal citations omitted);  *Bell*, 441 U.S. at 554 ("We think the District Court and Court of Appeals have trenched too cavalierly into areas that are properly the concern of MCC officials.  It is plain from their opinions that the lower courts simply disagreed with the judgment of MCC officials about the extent of the security issues affected and the means required to further those interests.  But our decisions have time and again emphasized that this sort of unguided substitution of judicial judgment for that of the expert

prison administrators on matters such as this is inappropriate."); *Duran v. Elrod*, 760 F.2d 756,

759 (7th Cir. 1985) ("Federal judges must always be circumspect in imposing their ideas about

civilized and effective prison administration on state officials.  The Constitution does not speak

with precision to the issue of prison conditions (that is an understatement); federal judges know

little about the management of prisons; managerial judgments generally are the province of other

branches of government than the judicial; and it is unseemly for federal courts to tell a state or

city or, as here, a county how to run its prison system. . . .  Federal courts must be wary of

entanglements in the intramural struggles of state or local government.") (internal citations

omitted).

    To prevail on a claim that the conditions of confinement amounted to punishment in

violation of the Due Process Clause, plaintiffs must establish both: (1) an objectively serious

constitutional deprivation; and (2) a defendant's culpable state of mind.  *Isby v. Brown*, 856 F.3d

508, 521 (7th Cir. 2017); *Smith v. Dart*, 803 F.3d at 309.  As to the objective component,

conditions cannot "deprive [detainees] of the minimal civilized measures of life's necessities,"

such as "food, medical care, or sanitation."  *Rhodes*, 452 U.S. at 347-48.  The reason for the

requirement of a culpable state of mind is that punishment requires intent.  *Wilson v. Seiter*, 501

U.S. 294, 300 (1991) ("[F]or instance, . . . if a prison boiler malfunctions accidentally during a

cold winter, an inmate would have no basis for an Eighth Amendment claim, even if he suffers

objectively significant harm.").  In *Wilson*, the Supreme Court explained:

>    If the pain inflicted is not formally meted out as *punishment* by the statute or the
> sentencing judge, some mental element must be attributed to the inflicting officer
> before it can qualify.  As Judge Posner has observed:  'The infliction of
> punishment is a deliberate act intended to chastise or deter.  This is what the word
> means today; it is what it meant in the eighteenth century . . . [I]f [a] guard
> accidentally stepped on [a] prisoner's toe and broke it, this would not be
> punishment in anything remotely like the accepted meaning of the word, whether
> we consult the usage of 1791, or 1868, or 1985.'

*Wilson*, 501 U.S. at 300 (quoting *Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir. 1985)).  A

defendant is liable for the conditions only if he acted with deliberate indifference to those

conditions.  *Wilson*, 501 U.S. at 302-03.  Furthermore, a defendant "must actually have

participated in the constitutional wrongdoing;" the doctrine of *respondeat superior* will not do.

*See Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996) (citations omitted).  Thus, "[i]n

order to show deliberate indifference, the cognizant official must have known of a substantial

risk of serious injury and consciously must have disregarded the risk."  *Guzman v. Sheahan*, 495

F.3d 852, 859 (7th Cir. 2007).

### A.      Conditions of confinement

Plaintiffs argue that the conditions of their confinement must be considered in

combination, such that, even if each condition individually does not amount to a constitutional

violation, the combination of all of the conditions amounts to a violation.  That is not the law.

As the Supreme Court has explained:

> *Some* conditions of confinement may establish an Eighth Amendment violation
> 'in combination' when each would not do so alone, but only when they have a
> mutually enforcing effect that produces the deprivation of a single, identifiable
> human need such as food, warmth or exercise—for example, a low cell
> temperature at night combined with a failure to issue blankets.  To say that some
> prison conditions may interact in this fashion is a far cry from saying that all
> prison conditions are a seamless web for Eighth Amendment purposes.  Nothing
> so amorphous as 'overall conditions' can rise to the level of cruel and unusual
> punishment when no specific deprivation of a single human need exists.

*Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) (emphasis in the original) (internal citations

omitted).

### *Double celling/lack of exercise*

A number of the conditions about which plaintiffs complain are simply not punishments

actionable as violations of the Constitution.  For example, housing two inmates in one cell is not

punishment.  *Rhodes*, 452 U.S. at 348 ("The double celling made necessary by the unanticipated increase in prison population did not lead to deprivations of essential food, medical care, or sanitation.  Nor did it increase violence among inmates or create other conditions intolerable for prison confinement.").  Likewise, here, plaintiffs have not argued, let alone put forth evidence, that sharing a cell deprived them of the minimum necessities of life.

Plaintiffs seem to be arguing that double-celling is worse when "coupled with denial of the use of available and underutilized-outdoor recreation areas."  (Plaintiffs' Brief/Docket 65 at 20).  It is true that "[d]epriving a prisoner of all opportunity for out-of-cell exercise can violate the prohibition against cruel and unusual punishment."  *Smith v. Erickson*, 684 Fed. Appx. 576, 578 (7th Cir. 2017); *see also Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) ("[W]e stated that lack of exercise could rise to a constitutional violation '[w]here movement is denied and muscles are allowed to atrophy, [and] the health of the individual is threatened.' . . . If exercise is what [plaintiff] desperately wanted he could have improvised temporarily with jogging in place, aerobics or pushups.  He retained the ability to move about in the unit.  This was a short-term situation, lasting only four weeks.").  In *Delaney v. DeTella*, the Seventh Circuit concluded that a prisoner's Eighth Amendment rights were violated when he was denied out-of-cell exercise for six months while being confined in a cell 122 inches by between 43 and 56 inches.  *Delaney v. DeTella*, 256 F.3d 679 (7th Cir. 2001).

The Court appreciates plaintiffs' point, which is probably that it is more difficult to exercise in a cell when the cell is shared, even though the cells at issue in this case are bigger than those in *Delaney* and even though detainees could take turns exercising.  The bigger issue, though, is neither plaintiff has put forth any evidence that he was subjected to any long-term deprivation of out-of-cell exercise.  The undisputed evidence is that, absent unexpected

lockdowns, plaintiffs were generally given timeout (from their cells) for up to 7.5 hours per day, during which time they were allowed, if they so chose, to exercise in either an outdoor recreation area or an indoor recreation area, depending on the housing unit to which they were assigned. Gonzalez has put forth no evidence that he was ever denied use of a recreation area during timeout. The record contains evidence that Bocock, during the fall of 2013, was sometimes denied use of the outdoor recreation area due to inclement weather. The Jail cannot control the weather, so this cannot be thought of as punishment. At most, it was an inconvenience. Plaintiffs have put forth no evidence that they were denied all out-of-cell exercise for months at a time, so defendants are entitled to summary judgment as to this issue.

### Constant illumination

Plaintiffs also complain that nighttime illumination of each cell by a 9-watt bulb deprives plaintiffs of "minimal levels of humane treatment." (Plaintiffs' Brief/Docket 65 at 19). Plaintiffs argue that a flashlight could be used instead. Defendants have put forth undisputed evidence that they perform visual checks of cells every 30 minutes in order to count detainees and to observe any violent or self-destructive behavior among detainees. The visual checks also allow correctional officers to detect contraband and security breaches. Defendants put forth undisputed evidence that, because of the layout and furniture within a cell, the use of a flashlight does not allow a correctional officer to see all parts of the cell. Plaintiffs argue that they could be punished for covering the light, but they do not argue that they were not allowed to put, say, a towel over their eyes while they slept. Nor do plaintiffs put forth evidence of the extent to which they were deprived of sleep or how any such deprivation harmed them. Neither plaintiff sought medical treatment for sleep deprivation.

The Court agrees with defendants that keeping the 9-watt bulbs on during the night is reasonably related to legitimate penological goals and defers to the Jail's opinion that flashlights are not a sufficient substitute. The 9-watt bulbs did not objectively deny plaintiffs the minimum civilized necessities of life. Accordingly, defendants are entitled to judgment as a matter of law on this issue. *See Isby*, 856 F.3d at 513-14 & 522 (affirming summary judgment for defendant on claim that up-to-9-watt night bulbs were an extreme deprivation); *Vasquez v. Frank*, 290 Fed. Appx. 927, 929 (7th Cir. 2008) ("24-hour lighting involving a single, 9-watt fluorescent bulb does not objectively constitute an 'extreme deprivation.'"); *Salem v. Kaupas*, Case No. 2014 WL 2699737 at *3 (N.D. Ill. June 13, 2014) ("[T]he cell lighting is reasonably related to the Jail's legitimate goals, including institutional security. . . . [T]he decision to light cells during the night is a matter of professional judgment which is due deference even at the summary judgment stage.").

### *Adequate warmth*

Plaintiffs argue that they were "expos[ed] to freezing temperatures for long periods of time" and "denied adequate clothing." (Plaintiffs' Brief/Docket 65 at 17). These are examples of conditions that should be considered in combination, because they have a mutually-reinforcing effect. *See, Isby*, 856 F.3d at 522. Detainees must be protected from "extreme cold." *Dixon v. Godinez*, 114 F.3d 640, 642-44 (7th Cir. 1997) (plaintiffs put forth undisputed evidence that temperatures winter after winter were 40 degrees and that ice formed on cell walls); *see also Jordan v. Milwaukee Cty.*, 680 Fed. Appx. 479, 481 & 483 (7th Cir. 2017) (inmate entitled to trial where he put forth evidence that temperature in cell was so cold for two consecutive winters that ice formed on the windows, he could see his breath and he was not allowed to use a blanket to stay warm).

In this case, plaintiffs do not explain why the cold amounted to a constitutional violation and do not argue that defendants knew of and were deliberately indifferent to the cold. What the undisputed evidence shows is that Will County Jail offered thermal, long-sleeved "vests" upon request, although those vests were not always available. It took Bocock six months to get one, but he does not say when he first asked for one or whether he was without one during cold weather. Gonzalez had a thermal vest most of the time while he was in the Will County Jail.

The record contains evidence of two cold snaps. Bocock experienced a cold spell during the winter of 2013, during which he was allowed to wear his blanket even in the dayroom, which was not normally allowed. Both plaintiffs experienced a cold snap during a polar vortex in the winter of 2014-2015. During that cold spell, Taylor received several complaints about the cold, including from staff members. Taylor had maintenance check the temperatures in the housing units. Bocock remembers seeing maintenance staff checking temperatures during that time. On February 20, 25 and 26 of 2015, maintenance staff received work orders for cold in D-Pod, and they completed each work order the same day. As Gonzalez recalls, maintenance staff turned the heat up to 60 degrees. During that time, Gonzalez did not ask for extra blankets (because he did not know he could), but he was allowed to wear extra clothing. Bocock had a wool blanket during that time. Another time when it was cold, staff gave Gonzalez an extra blanket and hot Theraflu.

On this record, it cannot be said that the cold plaintiffs were subjected to was beyond the usual discomforts of winter. Bocock says the cold snap in the winter of 2014-2015 lasted about a week. During that time, plaintiff Gonzalez was allowed to wear extra clothes, and Bocock had a wool blanket. It is also clear that the Jail staff was attempting to fix the problem, which means the temporary chill cannot be thought of as punishment. *Wilson*, 501 U.S. at 300 ("[I]f a prison

boiler malfunctions accidentally during a cold winter, an inmate would have no basis for an Eighth Amendment claim, even if he suffers objectively significant harm."). Bocock saw the maintenance staff checking temperatures, and Gonzalez said the temperature was brought up to 60 degrees, which, while not balmy, cannot be thought of as below the constitutional minimum. Both plaintiffs testified that, during other cold spells, staff assisted them. Gonzalez was given an extra blanket and hot Tamiflu, while Bocock was allowed to use his blanket in the dayroom.

In any case, plaintiffs have not established a basis for holding these defendants liable. The only evidence in the record that Taylor knew of the cold was during the polar vortex of 2014-2015. He had maintenance staff check the temperatures, and Gonzalez testified that the staff brought the temperatures up. That is not deliberate indifference. The record contains no evidence that defendant Josephson was aware of the cold conditions, so, on this record, he is not liable. *Williams v. Raemisch*, 545 Fed. Appx. 525, 529 (7th Cir. 2013) ("[Plaintiff] offers no evidence that the three staff members [plaintiff] sued knew about the temperatures in his cell, so these defendants cannot be liable.").

### Bedding

Plaintiffs complain about having slept on thin, uncomfortable mattresses. The undisputed evidence is that, when new, mattresses at Will County Jail are "fine" to sleep on, but older mattresses, which compress down to about two inches thick, are not comfortable to sleep on. Bocock slept on an old, uncomfortable mattress for his first year at Will County Jail. Gonzalez also slept on an old mattress at some point and experienced pain and soreness in his hips and back. It is undisputed that Will County Jail allowed detainees to request new mattresses. Plaintiffs have put forth no evidence that they ever asked for a new mattress and were denied.

As the Supreme Court has said, the Constitution does not mandate comfortable prisons. The Seventh Circuit has rejected a constitutional claim based on a thin mattress. *Isby*, 856 F.3d at 514 & 522 (fact that "inmates sle[pt] on a thin, vinyl-covered foam mattress" was not extreme deprivation). The Court agrees. In any case, plaintiffs have put forth no evidence that either defendant was aware of and deliberately indifferent to plaintiffs' sleeping on uncomfortably thin mattresses.

### *Adequate nutrition*

Plaintiffs say they were subjected to "substantial and ongoing food deprivation." (Plaintiffs' Brief/Docket 65 at 17). Plaintiffs do not describe the facts related to this claim or otherwise develop the claim.

"The Constitution mandates that prison officials provide inmates 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it." *Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015) (quoting *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir 1985)). Plaintiffs have put forth no evidence that the food served at Will County Jail was nutritionally inadequate. The undisputed evidence is that the Will County Jail serves three meals per day and that, once per year, the menus are reviewed by a dietician.

Perhaps, when plaintiffs say they were subjected to "ongoing food deprivation," they are referring to the sometimes 14-hour gap between dinner and breakfast. This Court agrees with other courts which have concluded that such a gap does not constitute nutritional deficiency. *See Brown v. Gulash*, Case No. 07-cv-370, 2009 WL 2144592 at *6 (S.D. Ill. July 16, 2009) ("Plaintiff also states that there is a 14 hour time span between breakfast and 'dinner,' but as anyone who has ever dieted knows, there is a difference between experiencing 'hunger' and

nutritional deficiency."); *see also Baker v. Hertz*, Case No. 15-cv-600, 2015 WL 4052366 at *14 (S.D. Ill. July 2, 2015).

In any case, detainees were allowed to keep food from the commissary in their property bins within their cells and to eat that food between meals. This fact was less helpful to Gonzalez, who could not afford to shop at the commissary. Nonetheless, Gonzalez often had food from the commissary in his cell, because other detainees gave him commissary items to thank him for his help with their legal cases. Gonzalez, who went on several hunger strikes during his time in Will County Jail, was given snacks and nutritional supplements when needed.

Plaintiffs have not argued or put forth any evidence that suggests either defendant was aware of and deliberately indifferent to any nutritional deficiency involving these plaintiffs. It is undisputed that Taylor was not aware of any detainee being diagnosed with any illness attributable to the 14-hour gap between dinner and breakfast. Defendants are entitled to judgment as a matter of law of this issue.

### *Access to courts*

Next, plaintiffs argue that they were denied reasonable access to the courts. Specifically, plaintiffs argue that the law library is inadequate, that the computers do not allow detainees to save documents, that the library has occupancy limits and that the materials in the library do not provide meaningful assistance.

The Supreme Court has "acknowledged . . . the (already well-established right of *access to the courts*." *Lewis v. Casey*, 518 U.S. 343, 350 (1996) (emphasis in original) (citing *Bounds v. Smith*, 430 U.S. 817, 821 & 828 (1977)). Plaintiffs, however, cannot prevail on their claim for two reasons. First, the restrictions are reasonably related to legitimate interests of the Jail. It is reasonable not to allow detainees to save documents on the computer, because the computer

could be used as a means of written communication between detainees. Regulations barring detainee-to-detainee correspondence are not unconstitutional. *Turner*, 482 U.S. at 93 ("The prohibition on correspondence [between inmates] is reasonably related to valid corrections goals . . . [and] does not unconstitutionally abridge the First Amendment rights of prison inmates."). It is reasonable to limit occupancy of the law library for safety and security reasons. Contrary to plaintiffs' argument that the library contained inadequate materials, it is undisputed that the Jail provided each housing unit with a computer loaded with LexisNexis software, which Bocock testified was an adequate research tool. To the extent plaintiffs are arguing that the Jail's policy of not allowing detainees to take books or documents into visits with attorneys violated their right of access to courts, the Court notes that the rule is reasonably related to the legitimate goal of security.

The second and more important reason why plaintiffs' claim for denial of access to the courts cannot survive summary judgment is that neither plaintiff argues, let alone puts forth evidence, that he has been injured and suffered actual prejudice to one of his cases. *Lewis*, 518 U.S. at 349 ("The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches."); *Owens v. Evans*, 878 F.3d 559, 564-65 (7th Cir. 2017) ("[Plaintiff's] claims about his lack of adequate access to prison libraries were properly rejected on summary judgment because they were not accompanied by any showing of actual prejudice in a lawsuit."). In *Lewis v. Casey*, the Supreme Court explained:

> [A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. . . . [T]he inmate . . . must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which,

because of deficiencies in the prison's legal assistance facilities, he could not have known.

*Lewis*, 518 U.S. at 351. In *Owens*, for example, the plaintiff argued "he missed a twice-extended deadline to file a reply brief because he was unable to access caselaw stored in his boxes." The Seventh Circuit held that plaintiff had failed to show prejudice, because plaintiff "[did] not explain why . . . not filing an optional reply brief doomed one of his cases." *Owens*, 878 F.3d at 565.

In this case, plaintiffs neither argue nor put forth evidence of how any of their cases was prejudiced. Defendants put forth undisputed evidence that plaintiffs' legal cases were not harmed by the existence of several jail policies, including limiting detainees to golf-sized pencils and not allowing them to take books or documents to their video or contact visits with attorneys. Defendants also put forth evidence that Gonzalez once lost three declarations for a civil case, but Gonzalez does not argue or put forth evidence that the loss of those declarations doomed one of his cases. Accordingly, plaintiffs have not put forth sufficient evidence from which a reasonable jury could find for them on their claim that they were denied access to courts. Defendants are entitled to summary judgment on that claim.

### *Other conditions*

In their brief, plaintiffs mention a number of other conditions they dislike, without developing how such conditions affected them or how such conditions constituted constitutional violations. *See Burton v. Board of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) ("[I]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If the [nonmoving party] does not do so, and loses the motion, it cannot raise such reasons on appeal.") (citations omitted).

The Court does not find a constitutional violation among the many issues plaintiffs mention. For example, as plaintiffs mention, the Jail lacks higher education and vocational programs, but "there is no constitutional mandate to provide educational, rehabilitative, or vocational programs, in the absence of conditions that rise to a violation of the Eighth Amendment." *Garza v. Miller*, 688 F.2d 480, 486 (7th Cir. 1982); *see also Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000); *Antonelli*, 81 F.3d at 1431 ("participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee"). In any case, the Will County Jail offers alternatives, such as GED preparation and classes on such topics as English as a second language and computer skills.

Likewise, plaintiffs mention that the commissary charges above-market rates, but that is not a violation of the Constitution. *See Tenny v. Blagojevich*, 659 F.3d 578 (7th Cir. 2011); *Brown v. Gulash*, Case No. 07-cv-370, 2009 WL 2144592 at *5 (S.D. Ill. July 16, 2009) ("With regard to commissary prices, Plaintiff has no federal constitutional right to purchase items (food or non-food) from a commissary at all. Because Plaintiff does not have a federal constitutional right to purchase commissary items, he has no right to purchase commissary items at a particular price or to have Defendants restrained from charging exorbitant prices.") (internal citations omitted). In any case, defendants have put forth evidence of a valid reason for higher prices: to cover the cost of procurement, inventory, administration and distribution.

Plaintiffs complain about a lack of sunlight, but they have not established a constitutional right to sunlight. *See Van Patten v. Allen Cty. Jail*, Case No. 11-cv-73, 2011 WL 4829106 at *3 (N.D. Ind. Oct. 11, 2011) ("[Plaintiff] complains that he was not permitted to stand near or look out the windows, which he believes violated his right to adequate sunlight. Although inmates are entitled to adequate shelter, 'the Constitution does not mandate comfortable prisons,' and

inmates should not expect the 'amenities, conveniences, and services of a good hotel.'")
(citations omitted). In this case, it is undisputed that all housing units had natural light. In the older units, each cell has a window, and, in the newer units, each dayroom has large windows, as do the indoor recreation areas. Furthermore, plaintiffs have put forth no evidence that they suffered any medical problems due to a lack of sunlight. Defendants are entitled to judgment as a matter of law on this issue.

Nor is a lack of a ladder in plaintiffs' cells a violation of their constitutional rights. *See Barbosa v. McCann*, Case No. 08 C 5012, 2009 WL 2913488 at *4 (N.D. Ill. Sept. 8, 2009) ("Although it was inconvenient for Plaintiff to use the toilet and sink to climb to his bunk because there was no ladder, routine discomfort is . . . not sufficiently grave to form the basis of an Eighth Amendment violation."); *Brown v. Jerome Combs Detention Center*, Case No. 13-2232, 2013 WL 6730837 at *2 (C.D. Ill. Dec. 20, 2013) ("The failure to provide a ladder by which [plaintiff] could ascend to the top bunk does not implicate his Eighth Amendment rights."). Lack of a ladder is, at best, an inconvenience, not a deprivation of the minimum necessities of life. In any case, it is undisputed Bocock never suffered an injury from not having a ladder that warranted a call to a nurse, and the one time Gonzalez slammed his finger on his bunk, a nurse gave him an ice pack. Thus, plaintiffs cannot establish that defendants were deliberately indifferent to the condition. Defendants are entitled to judgment as a matter of law on this issue.

Plaintiffs also mention "a total denial of privacy," but it is clear that the Constitution does not protect privacy interests inside a detention facility. *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984) ("[W]e hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell[.] . . . The recognition of

privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept

of incarceration and the needs and objectives of penal institutions."); *Johnson v. Phelan*, 69 F.3d

144, 150 (7th Cir. 1995) ("The fourth amendment does not protect privacy interests within

prisons. Moving to other amendments does not change the outcome."). Although plaintiffs do

not clarify which privacy issues they are complaining about, the ones apparent from the record (a

lack of a privacy screen for toilets in shared cells and the monitoring of communications) are

reasonably related to legitimate penological goals. Privacy screens in toilets would prevent

correctional officers from seeing potential hiding spots for contraband and from seeing what

detainees are doing. Monitoring communications both deters and allows correctional officers to

notice any detainees plotting escapes, harm to other detainees or harm to staff.

To the extent plaintiffs are complaining about lockdowns, they have not put forth

evidence from which a reasonable jury could conclude these were unconstitutional. Will County

Jail has scheduled lockdowns after meal periods and at night. These are reasonable. In addition,

Will County Jail has unscheduled administrative lockdowns for unannounced inspections and in

case of emergency (such as during a fight, a fire, a medical emergency or if staffing levels fall

below the necessary minimum). Plaintiffs have put forth no evidence of the frequency with

which they experienced unscheduled lockdowns, but it is clear that such lockdowns are

reasonably related to legitimate penological goals of safety and security. Defendants are entitled

to judgment as a matter of law on this issue. *See Antonelli*, 81 F.3d at 1430 (dismissing claim

regarding lockdowns, because "plaintiff has no general liberty interest in movement outside of

his cell guaranteed by the Due Process Clause"); *Salem v. Kaupas*, Case No. 12 CV 3141, 2014

WL 2699737 at *2 (N.D. Ill. June 13, 2004) (granting summary judgment to defendants and

explaining, "[t]he lockdowns are clearly conducted to improve the safe and orderly operation of the Jail and, thus, are reasonably related to its legitimate goals, including institutional security").

Plaintiffs complain of a "denial of electric appliances." (Plaintiffs' Brief/Docket 65 at 18). This policy is reasonable given that the Jail lacks electrical outlets in the cells and that certain electric appliances, such as hot plates, are a fire hazard. In any case, denying such luxuries is not a constitutional violation. *Pegues v. Kibby*, Case No. 11-cv-3008, 2011 WL 6179207 at *2 (C.D. Ill. Dec. 13, 2011) ("Human treatment means the adequate provision of life's basic necessities, not luxuries such as gaming consoles and other electronic equipment.").

## B.      First Amendment

Plaintiffs challenge a number of policies of the Will County Jail that they believe violate their First Amendment rights. As noted above, detainees do not give up their First Amendment (or other constitutional) rights when they enter the door of a jail. As the Seventh Circuit has said:

> Freedom of speech is not merely freedom to speak; it is also freedom to read. Forbid a person to read and you shut him out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect. Not that there aren't valid penological reasons for limiting prison inmates' access to certain types of book. A prison need not allow prisoners to buy books detailing famous prison escapes, or, even, we suppose, books on how to make yourself as strong as Mike Tyson through exercise.

*King v. Federal Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005) (citations omitted). Because of the deference federal courts must give to the professional judgment of jail administrators, a regulation is valid, even if it infringes on detainees' constitutional rights, so long as "it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

*Newspapers*

To begin with, plaintiffs take issue with the Jail's policy of not allowing detainees to subscribe to newspapers. The Court thinks the policy is reasonably related to legitimate penological interests. The Supreme Court has held that prisoners in restricted housing can be denied newspapers. *Beard v. Banks*, 548 U.S. 521 (2006). In that case, the defendant put forth several reasons for the ban, including the need to motivate difficult prisoners with the potential reward of receiving newspapers, the need to limit property within a cell and the need to limit the amount of flammable material in cells. *Beard*, 548 U.S. at 530. The Supreme Court said the first reason—providing an incentive for behavior—was enough to justify the ban under *Turner*. *Beard*, 548 U.S. at 530.

This case, of course, is different. Here, the ban applies to all inmates, not just those whose behavior the jail is attempting to correct. Still, the Court thinks the ban is reasonably related to a legitimate interest under the *Turner* factors. First, one reason for the ban is to limit the amount of flammable material in cells and in the Jail. That is obviously a legitimate goal and, given that most newspapers publish daily, it is easy to appreciate how the quantity of flammable material in the jail would quickly accumulate. In addition, the Jail does not want detainees reading local news, because it does not want detainees learning about witnesses in their cases or about gang activity. Second, detainees have alternate means of obtaining news. Detainees can watch television and can subscribe to magazines. Neither is a perfect substitute, because most news magazines publish only weekly and, therefore, are not as up-to-date. Daily television news, while more current than weekly news magazines, is less comprehensive than a newspaper. In addition to those options, though, the Jail provides a copy of *USA Today* to every housing unit every day, so detainees have access to a comprehensive and up-to-date news source.

That is what distinguishes this case from *Koger v. Dart*, 114 F. Supp.3d 572 (N.D. Ill. 2015), where the court concluded that an *absolute* ban on newspapers at the Cook County Jail was unconstitutional. There, the court noted that permitting a copy of a newspaper in the library or dayrooms would be a reasonable alternative to an absolute ban. *Koger*, 114 F. Supp.3d at 583 ("The last of these alternatives proposed by [plaintiff]—permitting newspapers in libraries and day rooms, but not individual cells—would accommodate the right while completely addressing the jail's concerns. . . . It would also enable the jail to control information that is likely to cause violence. The jail could decide to purchase only national or international newspapers, which would be far less likely to contain information about the jail's inmates and local gang activity.").

The Court concludes that, under these circumstances, the newspaper ban is reasonably related to legitimate penological interests, and defendants are entitled to summary judgment.

### Publisher-only rule

Next, plaintiffs challenge the Jail's source restrictions on publications. (Plaintiffs' Brief/Docket 65 at 11). The Jail's policy is that all books and magazines must come directly from a publisher or bookseller and, if from a bookseller, must be accompanied by a packing slip. The reason for the policy is that the Jail trusts publishers and booksellers not to use the publications as a means of introducing contraband into the Jail. The Jail has less confidence in friends and family and wants to avoid the time it would take to inspect every book and magazine that arrives at the Jail. Finally, the Jail does not allow detainees to receive stationery from friends and family, due to the risk that drugs (or other items) could be smuggled in with the stationery, particularly on the gummed portion of envelopes. Detainees can purchase stationery from the commissary and, if they are indigent, receive it from the Jail.

Plaintiffs do not develop this argument or explain why the policy might be unconstitutional, so the argument is waived. In any case, the Court agrees with defendants that the policy is reasonably related to the security and safety concerns of the Jail. The Supreme Court has already upheld a publishers-only ban on hardback books. *Bell*, 441 U.S. at 550 ("We conclude that a prohibition against receipt of hardback books unless mailed directly from publishers, book clubs, or bookstores does not violate the First Amendment rights of MCC inmates. That limited restriction is a rational response by prison officials to an obvious security problem."). The Court agrees and sees no reason not to extend the prohibition to paperback books and magazines. *See Jones v. Salt Lake Cty.*, 503 F.3d 1147, 1158 (10th Cir. 2007) ("We conclude the County Jail's paperback book policy, which allows inmates to obtain books from the jail library and, with permission, the publisher, is rationally related to the legitimate government objective of prison security."). Magazines and paperback books, like hardcover books, can be used to smuggle in contraband. Furthermore, prisoners have alternatives. They can purchase books and magazines directly (or their families and friends can purchase books and magazines directly) from publishers. In addition, the Jail offers paperback books, and detainees can request specific titles from the Center for Correctional Concerns. Finally, forcing the Jail to inspect paperback books and magazines from non-publishers would have a significant impact on the Jail's resources.

### Content restrictions

Plaintiffs also object to the Jail's "sweeping content ban," but they do not say what content they think should be allowed or why the restrictions fail the *Turner* test. Jails are allowed to impose content restrictions so long as they pass the *Turner* test. *See Munson v. Gaetz*, 673 F.3d 630 (7th Cir. 2012) (prison could ban books with drug-related content); *Singer v.*

*Raemisch*, 593 F.3d 529, 536 (7th Cir. 2010) (holding prison could ban access to books related to *Dungeons and Dragons* game and noting "[t]he question is not whether D&D has led to gang behavior in the past . . . [it] is whether the prison officials are rational in their belief that, if left unchecked, D&D could lead to gang behavior among inmates and undermine prison security in the future"); *King*, 415 F.3d at 638 (7th Cir. 2005) (prisons have "valid penological reasons for limiting prison inmates' access to certain types of book. A prison need not allow prisoners to buy books detailing famous prison escapes, or, even, we suppose, books on how to make yourself as strong as Mike Tyson through exercise."); *see also Thornburgh v. Abbott*, 490 U.S. 401, 412 (1989) (holding that the *Turner* test applies to content restrictions and noting that "[o]nce in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct"); *Salt Lake Cty*, 503 F.3d at 1156 ("[T]he jail's ban on 'sexually explicit material' and 'technical publications' passes constitutional muster."); *Gray v. Cannon*, 974 F. Supp.2d 1150, 1161 (N.D. Ill. 2013) ("[T]he court concludes that a prison regulation preventing inmates from obtaining nude or sexually explicit photographs is constitutional under *Turner's* reasonableness standard.").

Here, the Jail restricts access to sexually-explicit photographs, as well as books describing sex acts. In practice, the mail clerk (who screens incoming mail, including books and magazines) does not restrict classic literature with only a short reference to sex. Next, the Jail prohibits books, photographs and magazines related to gangs, explosives, booby traps, martial arts, roadmaps or the construction of weapons. The reasons for prohibiting access to information on weapons or maps are obvious and legitimate: the Jail does not want to assist detainees with escape attempts or allow them to craft weapons with which they could harm themselves or others. The Jail's reason for limiting sexual material is to prevent sexual assaults. The Jail

explains that some detainees have poor impulse control, and, once such materials are in the Jail, it is difficult to keep them away from detainees with poor impulse control. The restrictions are reasonably related to legitimate jail interests, and the Court defers to the Jail's expertise on these issues. Plaintiffs have not pointed out any alternatives that would accommodate their rights while imposing little cost to penological interests. Defendants are entitled to judgment as a matter of law on this issue.

### Limits on property within cells

Plaintiffs challenge the Jail's policy of limiting the amount of property kept within a cell. Plaintiffs do not seem to object to the Jail's rule that all of a detainee's property kept within the cell must fit within a Jail-issued 14-gallon bin. (To be clear, detainees engaged in *pro se* litigation are allowed a second bin.) Instead, plaintiffs seem to object to the Jail's restrictions on the quantities of particular types of property that can be kept within a cell. Specifically, plaintiffs object that a detainee may keep within his cell only three religious books, three reading books, three personally-owned school or educational books, six magazines, ten letters, two greeting cards and twenty photographs. Plaintiffs argue that there is no rational basis for these limits.

The Court agrees with defendants that the limits are rationally related to legitimate interests. First, the Jail's reason for the policy is to limit the quantity of flammable material within a cell and to limit paper available to clog toilets. These are legitimate security concerns. In any case, detainees have a near-perfect substitute for keeping more property within their cells. All additional property is stored in the property department, and detainees are allowed to swap out their in-cell property with their out-of-cell property as they wish.[6] Those swap requests are

---

[6] Plaintiffs note that property in the property department can be lost, damaged or stolen. Gonzalez has lost two bibles and two other books. To the extent plaintiffs believe such loss constitutes a constitutional violation, the Court notes that such unintentional loss cannot be

usually fulfilled the same day.  Defendants are entitled to judgment as a matter of law on this issue.

### *Mail delays*

Plaintiffs state that "[a]ccess to mail" is a "recognized constitutional right" and that they have been subjected to "regular, systemic delays in the delivery of mail."  (Plaintiffs' Brief/Docket 65 at 14).

"[P]risoners have protected First Amendment interests in both sending and receiving mail."  *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999).  But relatively short-term, sporadic, disruptions of mail that are not based on content will not support a constitutional claim.  *Rowe*, 196 F.3d at 782 (no claim where "the delays in receiving mail . . . were relatively short-term [26 days] and sporadic.  Moreover, [plaintiff] did not allege that the delays resulted from content-based prison regulation or practice"); *see also Schroeder v. Drankiewicz*, 519 Fed. Appx. 947, 950 (7th Cir. 2013) ("delay of less than two months" was not "an injury of constitutional dimension").

The undisputed evidence is that the mail clerk logs every piece of mail that arrives at or departs from the Jail.  The undisputed evidence is that each plaintiff received all of the mail in his mail log, with the exception of items that were, due to content restrictions, sent to the property department or returned to sender.  (The Court has already addressed content-based restrictions on mail.)  Bocock once ordered a book on depositions that took three weeks to arrive.  The delay did not affect his case, though, because the depositions were postponed.  Bocock

---

thought of as punishment, and the record contains no evidence that either defendant knew of the loss.  In addition, it is undisputed that the Jail provides a post-deprivation remedy for lost, damaged or stolen property.  Detainees can file grievances, and it is the Jail's policy to replace lost, stolen or damaged property.

sometimes received letters from his family weeks after they were sent. Gonzalez once missed a deadline in a fiction-writing contest due to a mail delay. These sporadic and short-term delays do not violate the constitution. Even if they did, plaintiffs have not put forth any evidence that would form a basis for holding these defendants liable for the delays. The record contains evidence that Taylor was aware of only a single 2 or 3-day delay in mail delivery due to a change in mail carrier. The record contains no evidence that Josephson was aware of any mail delays. These defendants were not deliberately indifferent, and they are entitled to judgment as a matter of law.

### *Recording of calls*

Plaintiffs argue that the Jail's policy of recording all telephone calls interfered with their right to speak freely with their attorneys and clergy. Plaintiffs do not take issue with the Jail's policy of recording other phone calls.

This claim fails. The undisputed evidence is that the Jail records all telephone calls, *except* telephone calls with attorneys and clergy when detainees fill out a form. It is not unreasonable to require detainees to fill out a form, as it is unclear how else the Jail would know which calls not to record.

### C. Other claims plaintiffs have not addressed

To the extent plaintiffs object to other Jail policies (such as policies the plaintiffs either did not mention in their brief or to which they devoted merely a word or two in their brief), they have not sufficiently developed arguments to warrant the Court's even discussing them. Those claims are deemed abandoned. *See Little v. Mitsubishi Motors North Amer., Inc.*, 261 Fed. Appx. 901, 903 (7th Cir. 2008) (failure "to present facts or develop any legal arguments" in response to motion for summary judgment constituted abandonment of claims); *see also Burton*

*v. Board of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) ("[I]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If the [nonmoving party] does not do so, and loses the motion, it cannot raise such reasons on appeal.") (citations omitted). Likewise, the Court deems plaintiffs' Equal Protection claim abandoned, because they failed to respond to defendants' motion for summary judgment on that claim.

IV.     **CONCLUSION**

For all of these reasons, the Court grants defendants' motion for summary judgment [49]. Civil case terminated.

SO ORDERED.                                    ENTERED: March 4, 2019

 

_____
JORGE L. ALONSO
United States District Judge